IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| SVETLANA LOKHOVA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-1603 |
| | ) | |
| | ) | **TRIAL BY JURY** |
| STEFAN A. HALPER | ) | **IS DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

# COMPLAINT

Plaintiff, Svetlana Lokhova, by counsel, files the following Complaint against defendant, Stefan A. Halper ("Halper").

Plaintiff seeks (a) compensatory damages and punitive damages in the sum of **$5,000,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury from March 13, 2020 to the date of Judgment at the rate of six percent (6%) per year pursuant to § 8.01-382 of the Virginia Code (1950), as amended (the "Code"), and (c) court costs – arising out of the Defendants' defamation and tortious interference with contract.

## I. INTRODUCTION

1. Plaintiff is a historian and author. On December 23, 2019, she entered into an Author Profit Participation Agreement (the "Book Contract") with Post Hill Press, LLC ("PHP") to write a work of non-fiction titled, "**THE SPIDER: STEFAN A. HALPER AND THE DARK WEB OF A COUP**" (the "Book"). Under the Book Contract, Plaintiff was entitled to receive 50% of all profits received from sales.

2. Plaintiff completed the Book, and delivered it to PHP for editing and promotion. The Book contained no libelous material. Its publication would not have violated any right of any person or entity. PHP associate publisher Gary Terashita ("Terashita") carefully edited the Book, and stood by every word. PHP represented to Plaintiff's agent, Keith Korman ("Korman"), that it was "more than 100%" behind the Book. PHP created marketing materials and heavily promoted the Book on its website:




[https://posthillpress.com/svetlana-lokhova-and-the-spider-featured-in-daily-caller-piece]. PHP solicited preorders from customers and represented that the Book would be released on August 25, 2020. PHP engaged Simon & Schuster ("S&S") to distribute Plaintiff's Book. S&S carefully reviewed the Book, and also heavily promoted the Book without reservation in marketing materials published by S&S on S&S's website:

## About The Book —

**A Cambridge historian's eyewitness account of rogue spy, Stefan A. Halper, and his formative role in America's first presidential coup.**

**As heard on The Dan Bongino Show!**

There was a spy, an evil spider at work within and around the Trump presidential campaign. This spy earned a huge payday from a contract signed by James Baker of the Defense Department. Stefan A. Halper began his work in September of 2015, just as Trump's campaign began to roll. He initially targeted the important Trump advisor, Lt. General Michael T. Flynn.

During the 2016 Trump campaign, Halper—the spy also known as The Spider—schemed, lied, and ensnared members of the Trump team into his web, including the future president. He fabricated and sustained the fantastical narrative of the Russia hoax. In 2017, he collaborated with the intelligence establishment to take the "kill shot on Flynn," leaking classified information to his associates in the press.

An innocent Cambridge historian, Svetlana Lokhova was pulled into this fabricated narrative through dishonest accusations—for instance, that she was General Flynn's paramour and a Russian spy.

This is the rest of the story (and the truth).

3. PHP actively publicized the sale of Plaintiff's book by, *inter alia*, uploading metadata and creating a live link on Amazon.com and Barnesandnoble.com that included the marketing materials. PHP encouraged customers to "Pre-order now":





BARNES&NOBLE






Home > Books

# The Spider: Stefan A. Halper and the Dark Web of a Coup

by Svetlana Lokhova



(0)







HARDCOVER

[https://www.barnesandnoble.com/w/the-spider-svetlana-lokhova/1136270351].

4. The statements in the marketing materials published by PHP and S&S were true.[1] On their face, the statements also constituted pure opinions, rhetorical hyberbole, and fair reporting. [*See, e.g., Halper is a "rogue spy", an "evil spider", Halper earned a "huge payday" from a DoD contract, Halper "targeted the important Trump advisor, Lt. General Michael T. Flynn", Halper "schemed, lied, and ensnared members of the Trump team into his web", Halper "fabricated and sustained the fantastical narrative of the Russia hoax", and Halper "collaborated with the intelligence community to take the 'kill shot on Flynn'"*].[2]

---

[1] For instance, Halper did, in fact, manufacture and publish to third parties "dishonest accusations … that [Plaintiff] was General Flynn's paramour and a Russian spy." Two recently declassified documents corroborate that Halper was the source of the "dishonest accusations" about Plaintiff and General Flynn. First, on April 29, 2020, the Department of Justice ("DOJ") released a "Closing Communication" published by the Federal Bureau of Investigation ("FBI"). The Closing Communication confirms that Halper told the FBI in 2016/2017 that after a February 28, 2014 dinner Lokhova "surprised everyone and got into CR's [General Flynn's] cab and joined CR on the train ride to ████." *United States v. Flynn*, Case 1:17-cr-00232-EGS (Document 189-1). Second, on May 7, 2020, the House Permanent Select Committee on Intelligence released a transcript of the December 2017 testimony of David J. Kramer ("Kramer"). Kramer testified that Christopher Steele ("Steele") told him that "Mr. Flynn had an extramarital affair with a Russian woman in the U.K [who] … may have been a dual citizen." [https://dailycaller.com/2020/05/08/christopher-steele-michael-flynn-lokhova/]. Halper was the source of Steele's misinformation to Kramer.

[2] The source of the statement that Halper "collaborated with the intelligence community to take the 'kill shot on Flynn'" is an October 2019 court filing by General Flynn's legal team. General Flynn's attorney, Sidney Powell ("Powell"), references a conversation between former Director of National Intelligence James Clapper and Washington Post reporter David Ignatius, claiming Clapper directed the reporter "words to the effect of 'take the kill shot on Flynn'" after Ignatius obtained the transcript of Flynn's phone calls with Russian Ambassador Sergey Kislyak. Powell claimed that the official who leaked the transcripts of the calls to Ignatius was a Pentagon official (Baker) who was Halper's "handler." [https://www.foxnews.com/politics/fbi-agents-manipulated-flynn-file-as-clapper-urged-kill-shot-court-filing].

5. Thousands of copies of Plaintiff's book were pre-ordered online. Given the overwhelming enthusiasm for the Book, the timing and sales of comparable works, Plaintiff reasonably expected to sell over 500,000 copies of the Book.

6. Beginning on March 13, 2020, however, Halper took unlawful action that intentionally interfered with and ultimately caused PHP to cancel Plaintiff's Book Contract. Halper's attorney, Terry Reed ("Reed"), contacted S&S and PHP and falsely accused S&S and PHP of defaming Halper in the marketing materials. Halper requested that S&S and PHP issue a public, written retraction of the defamation. Halper did not stop there. He also defamed and disparaged Plaintiff to S&S and PHP. Halper falsely accused Plaintiff of knowingly publishing "false statements", "inciteful false statements", statements that generated "hatred and threats" against Halper "and his family, including death threats and threats of personal injury". Not a word was true. The sole purpose of Halper's actions was to interfere with Plaintiff's Book Contract and induce PHP to terminate the Contract. Halper knew this would cause substantial economic loss and emotional injury for Plaintiff.

7. In this case, Plaintiff seeks presumed damages, actual damages, special damages and punitive damages as a result of Halper's statements and actions.

## II. PARTIES

8. Plaintiff is a citizen of the United Kingdom (UK).

9. Halper is a citizen of Virginia. He is domiciled in Heathsville, Virginia, within the Eastern District. At all times relevant to this action, Halper was represented by Reed. Reed maintains an office in Alexandria, Virginia. Acting at Halper's direction and

with his knowledge and consent, Reed engaged in tortious acts from his office in Alexandria that caused PHP to cancel Plaintiff's Book Contract.

**III. JURIDICTION AND VENUE**

10. The United States District Court for the Eastern District of Virginia has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

11. Halper is subject to personal jurisdiction in Virginia pursuant to Virginia's long-arm statute, § 8.01-328.1(A)(1), (A)(3) and (A)(4) of the Code, as well as the Due Process Clause of the United States Constitution.

12. Venue is proper in the Alexandria Division of the United States District Court for the Eastern District of Virginia pursuant to Title 28 U.S.C. § 1391(b)(1) and (b)(2).

**IV. STATEMENT OF THE FACTS**

13. Halper's father-in-law was Ray Cline ("Cline"), a former deputy director of the Central Intelligence Agency ("CIA") and director of intelligence and research at the State Department. It was Cline who "recommended his son-in-law, Stefan A. Halper, a former Nixon White House aide, be hired as Bush's director of policy development and research." [https://www.washingtonpost.com/archive/politics/1980/03/01/coming-in-from-the-cold-going-out-to-the-bush-campaign/3758ff60-0d13-43a6-9a6f-c692e20d5378/]. Halper is a veteran political operative. He has participated in or been associated with political dirty tricks campaigns and scandal his entire life. [*See, e.g.,* Patricia Goldstone, *Interlock. Art, Conspiracy, and the Shadow Worlds of Mark*

*Lombardi*, p. 120 (Catapult 2015) (Halper is an "accomplished political operative" linked to several dirty trick campaigns); https://www.revolvy.com/page/Palmer-National-Bank-of-Washington%2C-D.C (Halper was a co-founder and chairman of Palmer National Bank ("PNB") from 1983 to 1990. Halper had no banking experience. As part of the Iran-Contra scandal, Oliver North used the bank to funnel money to a Swiss bank account and ultimately to the Contras); https://www.nytimes.com/1983/07/07/us/reagan-aides-describe-operation-to-gather-inside-data-on-carter.html ("An operation to collect inside information on Carter Administration foreign policy was run in Ronald Reagan's campaign headquarters in the 1980 Presidential campaign … The sources identified Stefan A. Halper, a campaign aide involved in providing 24-hour news updates and policy ideas to the traveling Reagan party, as the person in charge"); https://www.nytimes.com/1984/04/07/us/questions-remain-about-activities-of-aides-to-the-1980-reagan-campaign.html?searchResultPosition=25 ("Nine months after the disclosure that some of President Carter's briefing papers ended up in the hands of the Reagan campaign in 1980, it has become clear that Reagan aides took great pains to get information about the opposite camp. But, despite several investigations, questions remain. One is whether any of the wide-ranging efforts by Reagan officials to obtain information were illegal.")].

14. Halper's 40+-year career as a clandestine political operative is well-known and well-documented. He is a public figure whose career as a spy is a matter of public record, *see, e.g.*:

https://www.washingtonexaminer.com/news/stefan-halper-the-cambridge-professor-the-fbi-sent-to-spy-on-trump
("**Stefan Halper: The Cambridge don the FBI sent to spy on Trump**");

https://nypost.com/2018/05/19/cambridge-professor-outed-as-fbi-informant-inside-trump-campaign/
("**Cambridge professor outed as FBI informant inside Trump campaign**");

https://www.realclearpolitics.com/articles/2019/07/18/the_labyrinthine_ways_and_wages_of_stefan_halper_140809.html
("**The Labyrinthine Ways and Wages of Stefan Halper**");

https://saraacarter.com/grassley-pressures-dod-for-more-information-on-fbi-spy-stephan-halper/
("**Grassley Pressures DOD For More Information On FBI Spy Stefan Halper**");

https://thefederalist.com/2019/11/04/scoop-cia-fbi-informant-was-washington-post-source-for-russiagate-smears/
("**SCOOP: CIA, FBI Informant Was Washington Post Source For Russiagate Smears**");

https://saraacarter.com/durham-probe-expands-to-pentagon-office-that-contracted-fbi-spy-stephan-halper/
("**Durham Probe Expands to Pentagon Office That Contracted FBI Spy Stephan Halper**");

https://www.grassley.senate.gov/news/news-releases/halper-docs-raise-new-questions-about-office-net-assessment-s-purpose-compliance
("**Halper Docs Raise New Questions about Office of Net Assessment's Purpose & Compliance**");

https://www.foxnews.com/politics/defense-department-informant-may-have-received-taxpayer-funds-to-spy-on-trump-campaign-grassley-suggests
("**US informant may have received taxpayer funds to spy on Trump campaign, Grassley says**");

https://www.telegraph.co.uk/news/2020/03/05/spies-lies-secret-recordings-cambridge-professor-snooped-trump/
("**Spies, lies and secret recordings – how a Cambridge professor snooped on Trump campaign advisers**");

https://thefederalist.com/2020/03/13/did-spygate-source-stefan-halper-work-for-the-hillary-clinton-campaign/
("**Did Spygate Source Stefan Halper Work For The Hillary Clinton Campaign?**").

15. Plaintiff was born in Moscow on June 4, 1980. She matriculated to Cambridge University in 1998, where she studied history. She holds a Master's in

Philosophy (MPhil) and a B.A (Honors) in History. Her groundbreaking Master's dissertation remains the definitive account of the founder of the Soviet intelligence service, Felix Dzerzhinsky. [https://www.svetlanalokhova.com/biography]. She became a citizen of the UK in 2002.

16. In 2019, Plaintiff decided to write a book about Halper, and his role in the failed coup against President of the United States, Donald Trump. Plaintiff is a respected author and historian. She has written several books. Her research on Halper runs deep. Her sources are impeccable and thoroughly reliable. Plaintiff's Book demonstrates that between 2016 and 2017 Halper engaged in a clandestine effort to advance the false narrative of collusion between members of the Trump campaign (including General Flynn) and Russians. Specifically, Halper misrepresented to the FBI[3] and others, including Steele, that Plaintiff was a Russian spy who had an affair with General Flynn when he was Director of the Defense Intelligence Agency. An FBI Closing

---

[3] At least one member of the FBI who worked on the FBI's investigation of General Flynn (dubbed "Crossfire Razor") believed that Halper's statements were "not accurate". William J. Barnett ("Barnett") was interviewed on September 21, 2020, and testified as follows:

> The RAZOR investigation contained information obtained by Special Agent SA 2 through a source in another investigation targeting Carter Page (PAGE). The PAGE investigation was also part of Crossfire Hurricane. The source reported that during an event [redacted] 2014 FLYNN unexpectedly left the event [redacted] The source alleged FLYNN was not accompanied by anyone other [redacted] BARNETT believed the information concerning [redacted] potentially significant and something that could be investigated. However, Intelligence Analysts did not locate information to corroborate this reporting concerning [redacted] FLYNN, including inquiries with other foreign intelligence agencies. BARNETT found the idea FLYNN could leave an event, either by himself or [redacted] without the matter being noted as not plausible. With nothing to corroborate the story, BARNETT thought the information was not accurate.

*United States v. Flynn*, Case 1:17-cr-00232-EGS (Document 249-1).

Memorandum declassified in April 2020 reveals some of the lies told by Halper about Plaintiff and General Flynn:



[REDACTED] The CH investigative team also addressed this investigation through CHS reporting CROSSFIRE RAZOR for any derogatory or lead information. As such CH contacted an established FBI CHS to query about CR. During the debriefing the CHS relayed an incident s/he witnessed when CROSSFIRE RAZOR (CR) spoke at the [REDACTED] in the [REDACTED]. The CHS was unsure of the date, but noted that CROSSFIRE RAZOR was still in his/her position within the USIC. [Writer's note: per open source, CR spoke at [REDACTED] on [REDACTED]] The CHS advised that after CR spoke and socialized with members of [REDACTED] at dinner and over drinks, members of [REDACTED] [REDACTED] got CR a cab to take CR to the train station to bring him/her to [REDACTED]. The CHS stated that a [REDACTED] surprised everyone and got into CR's cab and joined CR on the train ride to [REDACTED]. The CHS stated that s/he was somewhat suspicious of [REDACTED], as [REDACTED] has been affiliated with several prominent members of [REDACTED] The CHS believes that [REDACTED] father may be a Russian Oligarch living in [REDACTED]. The CHS could not provide further information on CR and [REDACTED] trip.

[REDACTED] The CH investigative team checked [REDACTED] name through available FBI databases for any derogatory information with negative results. A formal [REDACTED] was submitted to [REDACTED] for any derogatory information. [REDACTED] reported no derogatory information in its holdings.

In undertaking his dirty tricks operation, Halper conspired with political operatives at Cambridge University, including Richard Dearlove and Christopher Andrew, and agents employed by the Wall Street Journal, the Guardian, the New York Times and the Washington Post, to leak false statements about Plaintiff as part of a nefarious effort to smear General Flynn and fuel Russia collusion hoax.

17. Plaintiff's book contains no libelous statements. It was fully vetted and accepted by PHP before PHP decided to publicize it on Amazon.com and Barnesandnoble.com.

18. In March 2020, after learning that Plaintiff intended to publish a book revealing his dirty tricks and unlawful actions, Halper chose to take action intended to quash publication and cancel the Book Contract. Although many other journalists had reported the fact that Halper was a "spy", there was only one historian committed to revealing the entire truth about Halper's efforts to overthrow the duly-elected President of the United States. Was Halper paid to spy on the Trump campaign? The serious questions raised by Senator Grassley and others about the huge payout of $1,058,161.00 USD received by Halper from the Department of Defense (DoD), paid out of the Pentagon's Office of Net Assessment (ONA") – matters fairly reported on by Plaintiff in her Book – provide a motive for Halper and Reed to censor, threaten and intimidate Plaintiff.

19. At the time he misrepresented to S&S and PHP that they had defamed him in the marketing materials, Halper had no intention of engaging in any litigation. There was no possibility that Halper would institute any proceeding. Halper and Reed knew that truth was an absolute defense to Halper's claims,[4] and that by filing a defamation claim, Halper would expose himself (and his confederates) to full discovery of the wrongdoing in 2016 and 2017. Rather, Halper's sole goal was to intimidate and coerce PHP to terminate the Book Contract.[5] Halper escalated the threats and intimidation to S&S's parent company, CBS Corporation ("CBS").

---

4 *See, e.g.*, *Ebersole v. Kline-Perry*, 292 F.R.D. 316, 321 (E.D. Va. 2013) (truth is an absolute defense to a claim of defamation).

5 Significantly, Halper and Reed made no demand on Amazon.com or Barnesandnoble.com or on Plaintiff for that matter.

20. PHP is a small, independent publishing company. It has successfully published a wide spectrum of books, with a focus on the categories of pop culture, business, self-help, health, current events, Christian, and conservative political books. PHP's books have appeared on *The New York Times*, *USA Today, The Wall Street Journal*, and *Publishers Weekly* bestseller lists. A number of its authors have appeared on national media such as Fox News. [https://posthillpress.com/about]. A significant number of PHP's books are distributed by S&S.

21. After Halper contacted S&S and CBS, S&S advised PHP that unless PHP canceled Plaintiff's Book Contract, S&S would refuse to distribute ***any*** of PHP's books.

22. PHP canceled the Book Contract.

23. After PHP canceled the Book Contract, Plaintiff self-published the Book. [https://www.spygate-exposed.com/]. She renamed the Book, "**SPYGATE EXPOSED: THE CONSPIRACY TO TOPPLE PRESIDENT TRUMP**", but the substance of the Book remains the same. Plaintiff marketed the Book on her website, on Amazon and on Twitter [https://twitter.com/RealSLokhova], using the same statements previously employed by S&S and PHP in the marketing materials, including:

> "*A Cambridge historian's eyewitness account of America's first presidential coup. An innocent woman, Svetlana Lokhova was pulled into this fabricated narrative through dishonest accusations—for instance, that she was General Flynn's paramour and a Russian spy.*"

[https://www.amazon.com/dp/B08NXFRL1K/ref=cm_sw_em_r_mt_dp_mJW6FbW4X9VNB ("A Cambridge University historian's explosive eyewitness account exposes the origins of America's first presidential coup. A devious spy worked within and around the Trump presidential campaign, fabricating the fantastical narrative of the Russia hoax. For his efforts, the spy earned a huge payday from the Obama administration, paid by the

Defense Department and the FBI. The spy targeted the most important Trump campaign advisor, Lt. General Michael T. Flynn. During the 2016 presidential campaign, the spy schemed, lied, and ensnared members of the Trump team into a web of deceit, including the future president himself. In 2017, the spy collaborated with the intelligence establishment to take the 'kill shot on Gen. Flynn,' leaking classified information to his associates in the press. An innocent Cambridge historian, Svetlana Lokhova was pulled into this fabricated narrative through dishonest accusations—including that she was General Flynn's paramour and a Russian spy. This is the true story. As first heard on the Dennis Prager Show! Recommended by Rep. Devin Nunes, Maria Bartiromo, John Solomon, Sara A Carter, Dan Bongino.")].

24. Halper never even contacted Plaintiff, which further demonstrates that Halper never believed the marketing materials were defamatory, never intended to take legal action against S&S, PHP or Plaintiff, and only intended to interfere with Plaintiff's Book Contract.

25. Halper never prepared a proposed complaint and never instituted any kind of judicial proceeding.

**COUNT I – <u>DEFAMATION</u>**

26. Plaintiff restates paragraphs 1 through 25 of this Complaint, and incorporates them herein by reference.

27. Halper and Reed made, published and republished numerous false factual statements of and concerning Plaintiff. These statements are detailed verbatim above. Halper and Reed published the false statements without privilege of any kind.

28. The false statements constitute defamation *per se*. Halper's false statements exposed Plaintiff to public scorn, ridicule and contempt. He imputed to Plaintiff misinformation, deception, lack of integrity, and ethical improprieties that severely prejudiced Plaintiff in her profession and employment as an author and historian. Halper's false statements impugned and disparaged Plaintiff's reputation as a trustworthy, intelligent, and competent author and historian.

29. Halper and Reed's false statements have harmed Lokhova and her reputation.

30. The Defendants made the false statements with actual or constructive knowledge that they were false or with reckless disregard for whether they were false. The Defendants acted with actual malice and reckless disregard for the truth for the following reasons:

a. Halper and Reed acted with one unlawful purpose: to induce PHP to terminate the Book Contract. Halper and Reed knew their statements about the marketing materials on the S&S and PHP websites were false and that the sole purpose of the statements to S&S and PHP was to cause cancelation of the valuable Book Contract because, given the opportunity, Halper and Reed failed to object to the ***same*** marketing materials used by Plaintiff on her website and on Amazon. The false statements to S&S and PHP were pretextual dirty tricks. The real purpose of the threats was to cause the cancelation of the Book Contract. Halper and Reed no intention of ever pursuing any litigation against S&S, PHP or Plaintiff as a result of the "defamation".

b. Halper and Reed knew the statements in the marketing materials were not false or defamatory. Reed, an experienced defamation lawyer, knew the

statements were pure opinions, rhetorical hyperbole and/or fair reports, yet he demanded that S&S and PHP censor Plaintiff. Further, Halper was not at the dinner in February 2014; yet he represented to the FBI in 2016/2017 that he "witnessed" Plaintiff get in a cab and leave with General Flynn. Halper and Reed were/are in possession of information that demonstrates that their statements about Plaintiff were false, including evidence that Halper manufactured the claim that Plaintiff and General Flynn had an affair. *See, e.g., Watson v. NY Doe 1*, 439 F.Supp.3d 152, 164 (S.D.N.Y. 2020) ("this is a case where the alleged false statements were allegedly based on the direct knowledge of the alleged defamer that the plaintiff alleges is false. A fair inference from the Complaint is that NY Doe 2 knew that the plaintiff did not rape her but falsely made that accusation. Those circumstances are sufficient to infer actual or constitutional malice on the part of NY Doe 2 because she is alleged to have firsthand knowledge of whether the plaintiff did or did not rape her.").

c. Halper had a motive to fabricate the false claims about Plaintiff. Halper acted in bad faith. He could not have had an honest belief in the truth of his statements about Plaintiff.

d. Halper and Reed reiterated, repeated and continued to republish the false and defamatory statements about Plaintiff out of a desire to hurt her and to permanently stigmatize her.

e. Halper initiated the defamation in retaliation and reprisal for prior litigation instituted by Plaintiff, and went out of his way to publish and then republish false statements about Plaintiff that Halper knew were untrue.

f. Plaintiff demanded a retraction of the defamatory statements in April 2020 prior to PHP's termination of the Book Contract. Halper refused to correct, retract or apologize.

31. As a direct result of Halper's defamation, Plaintiff suffered presumed damages and actual damages, including, but not limited to, insult, pain, embarrassment, humiliation, mental suffering, injury to her reputation, loss of income and business from the sale of her Book, costs, and other out-of-pocket expenses, in the sum of $5,000,000 or such greater amount as is determined by the Jury.

**COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT**

32. Plaintiff restates paragraphs 1 through 31 of this Complaint and incorporates them herein by reference.

33. Plaintiff had valid and enforceable Book Contract and, given the state of the pre-orders, a reasonable expectation of substantial sales.

34. Halper searched the Internet and gained knowledge of Plaintiff's contract with PHP and her business expectancies.

35. Halper intentionally interfered with Plaintiff's property rights and business expectations by, *inter alia*, intentionally lying to S&S and PHS and actively participating in the scheme or artifice to cause PHP to cancel the Book Contract. Halper's improper methods of interference were, *inter alia*, independently actionable, defamatory, unethical, oppressive, over-reaching, fraudulent, hostile, and sharp.

36. As a direct result of Halper's tortious interference, Plaintiff suffered damage and incurred loss, including, without limitation, loss of profits under the Book

Contract, damage to her reputation, prestige and standing, court costs, and other damages in the amount of $5,000,000 or such greater amount as is determined by the Jury.

Plaintiff alleges the foregoing based upon personal knowledge, public statements of others, and records in her possession. She believes that substantial additional evidentiary support, which is in the exclusive possession of Halper, the FBI, Dearlove, Andrew, and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Plaintiff reserves her right to amend this Complaint upon discovery of additional instances of Halper's wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Plaintiff, Svetlana Lokhova, respectfully requests the Court to enter Judgment against Halper as follows:

A. Compensatory damages in the amount of $5,000,000.00 or such greater amount as is determined by the Jury;

B. Punitive damages in the amount of $350,000.00 or the maximum amount allowed by law;

C. Prejudgment interest from March 13, 2020 until the date Judgment is entered at the maximum rate allowed by law;

D. Postjudgment interest at the rate of six percent (6%) per annum until paid;

E. Such other relief as is just and proper.

**TRIAL BY JURY IS DEMANDED**

DATED: December 31, 2020

SVETLANA LOKHOVA

By: */s/ Steven S. Biss*

Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone: (804) 501-8272
Facsimile: (202) 318-4098
Email: **stevenbiss@earthlink.net**

*Counsel for the Plaintiff*