**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

SVETLANA LOKHOVA )
 )
     Plaintiff, )
 )
v. )     **No. 1:20−cv−01603−LMB−TCB**
 )
 )     **TRIAL BY JURY**
STEFAN A. HALPER )     **IS DEMANDED**
 )
     Defendant. )
_____)

<u>**AMENDED COMPLAINT**</u>

1.     Plaintiff, a British historian and author with a specialty in the topic of 20th century Russian intelligence, found herself falsely cast in the role of femme fatale in a manufactured 21st century spy scandal at the onset of the U.S. Presidential administration of Donald J. Trump.

2.     In February 2017, a month after the birth of her first child, she was inundated by the media and others over false allegations that had suddenly surfaced that she had supposedly conducted a clandestine romantic affair with General Michael Flynn, an American military and intelligence official whom she had met once at an academic dinner over two years earlier and had never seen or spoken to again.

3.     The media scrutiny, social media scrum, and violent threats against her because of these false allegations, forced her to flee her home, cost her the academic position she held and her PhD, tarnished her reputation, and have prevented her from re-gaining employment in her chosen field.

4.     She spent the next two and a half years piecing together what had happened to her, partly through her own research, partly through the gradual release of information by the United

States government, and partly through reporting by U.S. media outlets.  She learned the false allegations about her and General Flynn were a part of an FBI investigation called Crossfire Hurricane, which later became the subject of an investigation by the Department of Justice ("DOJ") Office of Inspector General, and investigations by two Special Counsels appointed by the DOJ.

5.     By late 2019, Plaintiff had gathered sufficient information and evidence to demonstrate how the false allegations about her and General Flynn had arisen, and who had conveyed them to the FBI and to the media, and she therefore proposed to write a non-fiction book for general publication telling this story.  The book would serve in part to restore her name, reputation, and employability.

6.     Central to this story would be naming the person who had made the false allegations about her and General Flynn, describing why he had done so, and scrutinizing his other activities, particularly as they related to the Crossfire Hurricane investigation, which had become an issue of national interest and concern.

7.     Having secured a book contract and American publishers, Plaintiff's work was set to be released by them in 2020, but it was not, because the subject of her book -- the man who falsely accused her of being a Russian spy who had an illicit relationship with General Flynn -- intervened and intimidated the publishers into dropping the book project through bogus claims that Plaintiff's truthful recounting of events defamed him.

8.     This case is about the unlawful scotching of Plaintiff's book deal and the attendant defamation of Plaintiff by the person who had falsely accused her and General Flynn:  Defendant Stefan A. Halper.

## II.  PARTIES

9.      Plaintiff is a citizen of the United Kingdom (UK).

10.     Halper is a citizen of Virginia.  He is domiciled in Heathsville, Virginia, within the Eastern District.

## III.  JURIDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs, and fees.

12.     Halper is subject to personal jurisdiction in Virginia pursuant to Virginia's long-arm statute, § 8.01-328.1(A)(1), (A)(3) and (A)(4) of the Code, as well as the Due Process Clause of the United States Constitution.

13.     Venue is proper in the Alexandria Division of the United States District Court for the Eastern District of Virginia pursuant to Title 28 U.S.C. § 1391(b)(1) and (b)(2).

## IV.  STATEMENT OF THE FACTS

### Plaintiff's History as an Academic and Author

14.     Plaintiff was born in Moscow in 1980.  She matriculated to Cambridge University in 1998, where she studied history.  Plaintiff became a citizen of the UK in 2002.  She holds a Master's degree from Cambridge University in Philosophy (MPhil) and a B.A. degree (Honors) in History.

15.     Plaintiff's groundbreaking Master's dissertation remains the definitive account of Felix Dzerzhinsky, who was the founder of the Soviet intelligence service.   Being a native Russian

speaker in addition to an historian, Plaintiff has the ability to read and understand the primary source Soviet era documents declassified by the Russians in the 1990s.

16.     Plaintiff wrote a well-received and reviewed historical non-fiction book about a Soviet era spy, The Spy Who Changed History: The Untold Story of How the Soviet Union Stole America's Top Secrets, published on October 1, 2019 by Pegasus Books, an independent New York publisher.

**The False Allegations About Plaintiff**

17.     In February 2014, an academic dinner was held at Pembroke College, Cambridge in honor of the visiting then-Director of the U.S. Defense Intelligence Agency, Lt. General Michael Flynn, organized by the former head of MI6, Sir Richard Dearlove.

18.     Defendant Halper is a founder of the Cambridge Security Initiative, initiated in 2015, and was also a long time member of the Committee of the Cambridge Intelligence Seminar.

19.     Plaintiff was a member of the Cambridge Intelligence Seminar in 2014.  She was, but she was invited to attend the dinner for General Flynn by Sir Richard Dearlove.

20.     At least a dozen people attended the Flynn dinner.  Plaintiff was the only woman in attendance, however.

21.     She was then a graduate student and researcher at Cambridge, and also taught history to undergraduates.

22.     She later became a By-Fellow of Churchill College, University of Cambridge, and a Fellow of the Cambridge Security Initiative.

23.     Plaintiff had minimal contact with Halper at Cambridge, as he was very senior to her.

24.     Plaintiff is not a Russian spy.  She is not and has never been an operative of any kind for the Russian government or any Russian agency.  She had no in-person interaction with General Flynn other than the one-time, February 2014 Cambridge dinner attended by numerous others, all of whom, including Plaintiff, had to pass security checks in order to attend.  Other than academically-oriented follow up emails that were copied or forwarded to colleagues at Cambridge, she had no other interaction with General Flynn at all.

25.     Defendant Halper knew, at all times from 2014 to present, that Plaintiff was not a Russian espionage agent, and was instead a trusted historian in both the UK and US academic and security worlds.

26.     For example, Halper knew that, when drafting her book about the Soviet spy from the 1930s, she had been assisted in Cambridge (where Halper was then also living and working) by FBI personnel from 2013 to at least 2016.

27.     Indeed, in May 2018, Plaintiff was a presenter at a Cambridge Intelligence Seminar about the book, alongside one of those personnel, the official FBI historian, John Fox, who also did some mainstream media events with Plaintiff about her forthcoming book.

28.     Halper also knew that Plaintiff had been invited in 2014 to be a Fellow of the CSI, an organization he founded and of which he was a leading member.

29.     He further knew that from 2014 to 2016, Plaintiff was – rightfully - a trusted member of the CSI community and was encouraged to, among other things, facilitate contact with General Flynn's successor as the DIA Director on matters of historical and academic interest to the joint UK-US security community.

30.     At no time was there any basis in fact from which Halper could conclude that Plaintiff was anything other than a loyal, patriotic, trustworthy, honest, and credible, British academic, researcher, and historian.

31.     Nonetheless, Defendant Halper told the FBI in mid-2016 - as part of a counter-intelligence/espionage investigation concerning Russia and Donald Trump - that Plaintiff "latched onto Flynn" at the 2014 academic dinner, that she "surprised everyone by getting into a cab with him," that she left the dinner with General Flynn alone, by cab and then by train, and that Halper was "suspicious" of her and her relationships.

32.     Halper's statement to the FBI implied that Plaintiff had a romantic relationship with General Flynn that might be intertwined with espionage on behalf of Russia, none of which was true, and which Halper knew at the time was not and could not be true.

33.     These false allegations became part of the Crossfire Hurricane investigation, as the umbrella investigation of the Trump campaign was dubbed by the FBI, and a key reason why the FBI opened a subpart of that investigation that specifically focused on General Flynn.

34.     The subpart of the Crossfire Hurricane investigation that centered on General Flynn was opened one working day after Halper's meeting at the FBI, and was codenamed "Crossfire Razor."

35.     The Confidential Human Source ("CHS") who provided the false allegations to the FBI about Plaintiff and "Crossfire Razor" was Defendant Halper.

36.     An FBI "Electronic Communication" ("EC"), dated August 15, 2016, and declassified in early 2021,[1] reveals some of the lies that Halper told the FBI about Plaintiff and General Flynn in his initial conversation with the FBI on August 11, 2016:



37.     In other portions of the August 15, 2016 EC, the CHS (Halper) describes specific interactions he was having with several other persons who were advisors to the Trump campaign, some of whom he later surreptitiously recorded on behalf of the FBI.

38.     The report of the Department of Justice, Office of Inspector General, released on December 9, 2019, (the "Horowitz Report") discusses these same interactions with the Trump campaign advisors being undertaken and reported to the FBI by an individual the OIG named "Source 2."

39.     The mainstream media, even prior to the publication of the Horowitz Report, had identified the person making these reports to the FBI as the Defendant in this case, Stefan A. Halper.

---

[1] An earlier declassification of the Electronic Communication in April 2020 had not yet revealed Plaintiff's name as the woman concerned.

7

40.     A Washington Post article dated May 21, 2108, entitled, *Who is Stefan A. Halper, the FBI source who assisted the Russia investigation?*,[2] described Defendant Halper as "the FBI source who assisted the Russia investigation," and stated:

"The Post had previously confirmed Halper's identity but did not report his name following warnings from U.S. intelligence officials that exposing him could endanger him or his contacts. Now that he has been identified as the FBI's informant by multiple news organizations, including the Wall Street Journal, New York magazine and Axios, The Post has decided to publish his name."

41.     Referring to the interactions of the person described as the CHS in the August 15, 2016 FBI EC and as Source 2 in the Horowitz Report, the Post article states:

"In the summer and fall of 2016, Halper, then an emeritus professor at Cambridge, contacted three Trump campaign advisers for brief talks and meetings that largely centered on foreign policy, The Washington Post reported last week.

At some point that year, he began working as a secret informant for the FBI as it investigated Russia's interference in the campaign, according to multiple people familiar with his activities."

42.     The Post article also notes that: "In 2014, Halper, along with Richard Dearlove, the former head of Britain's foreign intelligence service, sponsored a session of the seminar that drew Michael Flynn, then director of the Defense Intelligence Agency, who would go on to serve as Trump's first national security adviser," referring to the Cambridge dinner which Plaintiff attended and about which the false report of her actions pertains.

43.     All of the Trump campaign advisors with whom the CHS/Source 2 interacted as described in the August 15, 2016 EC and the Horowitz report have publicly identified the person with whom they interacted as the Defendant, Stefan A. Halper.

---

[2]https://www.washingtonpost.com/politics/who-is-stefan-a-halper-the-fbi-source-who-assisted-the-russia-investigation/2018/05/21/22c46caa-5d42-11e8-9ee3-49d6d4814c4c_story.html

44.     Halper's statements about Plaintiff and Flynn as recorded by the FBI agent in the EC purport to describe his firsthand observations – just as his statements about the three other Trump campaign advisors with whom he was in fact interacting personally – were set forth.

45.     But Halper did not attend the February 2014 CSI dinner for Flynn and therefore did not have first-hand knowledge of the alleged facts he was relaying about Plaintiff and General Flynn, although he apparently did not tell the FBI agent that.

46.     Nevertheless, Halper repeated the false allegations to the FBI the next day, August 12, 2016, this time in even more specific detail about Plaintiff supposedly traveling with General Flynn:



47.     On information and belief, these allegations have been investigated by the United States' government on at least three separate occasions, including through interviews of DoD personnel who accompanied General Flynn on the day of the dinner, and they have never been corroborated – because they are false.

48.     Defendant Halper also repeated his false allegations about Plaintiff and General Flynn to various members of the media who, upon information and belief, include, among others, journalists working for the Wall Street Journal, the Guardian, the New York Times, and the Washington Post.

49.     Some journalists have confirmed to Plaintiff that Defendant Halper was the source of their reporting about her supposed "relationship" with General Flynn.

50.     Although the FBI recorded Halper's allegations about Plaintiff and General Flynn, it could not corroborate the information – because it was false.  The FBI agent assigned to the Crossfire Razor portion of the investigation, William Barnett, wrote a "Closing Communication" when preparing to close out the case, which noted that the FBI had investigated Plaintiff and had found no derogatory information to support the CHS' allegations:



51.     Agent Barnett was also later interviewed by the investigators from the U.S. Attorney's Office for the Eastern District of Missouri about the allegation concerning Plaintiff and General Flynn and he informed them that investigation of the allegation had turned up no derogatory information, he did not consider the allegation plausible, and with no corroboration, he concluded the information was "not accurate."

52.     The FBI memorandum of interview of Agent Barnett describes his assessment of the allegation after investigating it, as follows:

> The RAZOR investigation contained information obtained by Special Agent [redacted] SA 2 through a source in another investigation targeting Carter Page (PAGE).  The PAGE investigation was also part of Crossfire Hurricane.  The source reported that during an event [redacted] 2014 FLYNN unexpectedly left the event [redacted] The source alleged FLYNN was not accompanied by anyone other [redacted] BARNETT believed the information concerning [redacted] potentially significant and something that could be investigated.  However, Intelligence Analysts did not locate information to corroborate this reporting concerning [redacted] FLYNN, including inquiries with other foreign intelligence agencies.  BARNETT found the idea FLYNN could leave an event, either by himself or [redacted] [redacted] without the matter being noted as not plausible.  With nothing to corroborate the story, BARNETT thought the information was not accurate.

53.     Although the allegations about Plaintiff and General Flynn were not  true, the fact that they had been reported to and investigated by the FBI, and then shared with the media, which in turn also reported on the FBI's investigation of them (but not that they had been deemed inaccurate), still made them highly damaging to Plaintiff and her reputation.

54.     Many commentators, from national television hosts to ordinary citizens on social media, credited the false allegations  that Plaintiff was a Russian spy who had ensnared General Flynn in a sexual or romantic imbroglio at the behest of the Kremlin.

55.     As a UK citizen, a Western academic, a professional historian, researcher, and author, a woman involved in a committed romantic relationship (which later turned into marriage), and a mother, these allegations and their implications damaged Plaintiff's reputation, including her until-then sterling reputation for credibility, trustworthiness, and patriotism, as well as her employability as a legitimate academic.  She has remained unemployable in her chosen field ever since.

56.     By 2019, having regained some stability in her life, and having researched how the false allegations about her and General Flynn were propagated, Plaintiff decided to write a book about her experience being a victim of these allegations and about the man who had started them.

## **The Book Contract**

57.     On December 23, 2019, Plaintiff entered into an Author Profit Participation Agreement (the "Book Contract") with Post Hill Press, LLC ("PHP") to write "THE SPIDER: STEFAN A. HALPER AND THE DARK WEB OF A COUP" (the "Book").

58.     Under the Book Contract, Plaintiff was entitled to receive 50% of all profits received from sales.

59.     PHP is a small, independent publishing company.  It has successfully published a wide spectrum of books, with a focus on the categories of pop culture, business, self-help, health, current events, Christian, and conservative political books.

60.     PHP's books have appeared on The New York Times, USA Today, The Wall Street Journal, and Publishers Weekly bestseller lists.  A number of its authors have appeared on national media such as Fox News.

61.     At that time, there was a considerable and lucrative market for books about the Crossfire Hurricane investigation and the people involved in and subject to it.

62.     Plaintiff completed the Book manuscript on April 10, 2020, and delivered it to PHP for editing and promotion.

63.     The Book contained no libelous material.  Its publication would not have violated the rights of any person or entity.

64.     PHP associate publisher Gary Terashita carefully edited the Book.   PHP represented to Plaintiff's agent, Keith Korman, that it was "more than 100%" behind the Book.

65.     PHP solicited preorders from customers and represented that the Book would be released on August 25, 2020.

66. PHP created marketing materials and promoted the Book on its website, originally at https://posthillpress.com/svetlana-lokhova-and-the-spider-featured-in-daily-caller-piece, as follows:



Svetlana, author of Fidelis book The
Spider, offers crucial insight in a
Daily Caller article on Stefan
Halper's relationship with the FBI.

67. In early January 2020, PHP actively publicized the sale of Plaintiff's book by, inter alia, uploading metadata and creating a live link on Amazon.com and Barnesandnoble.com (https://www.barnesandnoble.com/w/the-spider-svetlana-lokhova/1136270351).3

68. PHP also encouraged customers on Amazon to "Pre-order now" using a feature that allows buyers to purchase a book even before it has been released, and purchase portals for the book were created on Amazon and Barnes and Noble:



69.

---

3 As the Book was cancelled, the original, additional marketing materials included in these links is no longer available online.

70.     To distribute Plaintiff's Book, PHP engaged Simon & Schuster ("S&S"), a New York publishing company founded in 1924, and at present the third largest publisher in the United States.

71.     A significant number of PHP's books are distributed by S&S.

72.     S&S carefully reviewed the Book, and also promoted it without reservation in marketing materials on its website, including the following description:

> ## About The Book                    —
>
> **A Cambridge historian's eyewitness account of rogue spy, Stefan A. Halper, and his formative role in America's first presidential coup.**
>
> **As heard on The Dan Bongino Show!**
>
> There was a spy, an evil spider at work within and around the Trump presidential campaign. This spy earned a huge payday from a contract signed by James Baker of the Defense Department. Stefan A. Halper began his work in September of 2015, just as Trump's campaign began to roll. He initially targeted the important Trump advisor, Lt. General Michael T. Flynn.
>
> During the 2016 Trump campaign, Halper—the spy also known as The Spider—schemed, lied, and ensnared members of the Trump team into his web, including the future president. He fabricated and sustained the fantastical narrative of the Russia hoax. In 2017, he collaborated with the intelligence establishment to take the "kill shot on Flynn," leaking classified information to his associates in the press.
>
> An innocent Cambridge historian, Svetlana Lokhova was pulled into this fabricated narrative through dishonest accusations—for instance, that she was General Flynn's paramour and a Russian spy.
>
> This is the rest of the story (and the truth).

14

73.     The statements in the marketing materials published by PHP and S&S were not defamatory. Some were true statements of fact and therefore not defamatory. Some were opinions, rhetorical hyperbole, or fair reporting, and therefore, likewise, not defamatory.

74.     Halper's 40+-year career as a clandestine political operative is well-known in political circles and has been documented in books and media articles.

75.     Halper is also a public figure whose career as a "spy" has become well documented in numerous media articles since 2017, of which the following references are but a few examples:

https://www.washingtonexaminer.com/news/stefan-halper-the-cambridge-professor-the-fbi-sent-to-spy-on-trump
("**Stefan Halper: The Cambridge don the FBI sent to spy on Trump**");

https://nypost.com/2018/05/19/cambridge-professor-outed-as-fbi-informant-inside-trump-campaign/
("**Cambridge professor outed as FBI informant inside Trump campaign**");

76.     Halper's contracts with the Department of Defense's Office of Net Assessments, which have allegedly paid him approximately $1 million, is one of the topics covered in Plaintiff's Book and referenced in S&S's marketing materials. Those contracts had already drawn scrutiny by the media and the United States Senate, as the following contemporary press release and article demonstrate:

https://www.grassley.senate.gov/news/news-releases/halper-docs-raise-new-questions-about-office-of-net-assessment-s-purpose-compliance
("**Halper Docs Raise New Questions about Office of Net Assessment's Purpose & Compliance**");

https://www.foxnews.com/politics/defense-department-informant-may-have-received-taxpayer-funds-to-spy-on-trump-campaign-grassley-suggests
("**US informant may have received taxpayer funds to spy on Trump campaign, Grassley says**").

77.     Thousands of copies of Plaintiff's book were pre-ordered online.  Given the enthusiasm for the Book, its timing, and the sales of comparable works, Plaintiff reasonably expected to sell over 500,000 copies of the Book and earn a commensurate profit.

### Defendant Defames Plaintiff and Interferes with the Book Contract

78.     In the spring of 2020, Halper took certain actions  to intentionally interfere with, and ultimately cause PHP to cancel, Plaintiff's Book Contract, by using his attorney to write demand letters on his behalf to S&S and PHP.  Although these letters were couched to appear as lawful, in reality they were tortious.

79.     The defamatory statements at issue in this action are contained in these two letters, dated March 13, 2020 and April 3, 2020, which are incorporated by reference and attached hereto.

80.     On March 13, 2020, Halper's attorney, Terry Reed ("Reed"), wrote a letter to S&S that falsely accused it of defaming Halper in the marketing materials for the Book.

81.     On behalf of Halper, Reed requested that S&S cease and desist publishing the marketing materials and issue a public, written retraction.

82.     Further, as Halper's agent, Reed defamed and disparaged Plaintiff to S&S by falsely accusing Plaintiff of knowingly publishing "false statements" about Halper.

83.     Among other things, the letter asserted that Plaintiff "knows full well [that] neither General Flynn nor President Trump was the subject of any scheme, lie, target, or 'web' by Professor Halper."

84.     Among other defamatory statements, the letter conveyed the false allegation that Plaintiff was a liar.

85.     In reality, the letter itself is replete with falsehoods and half-truths about both Defendant Halper and Plaintiff in an effort to portray Halper as a truthful reporter and Plaintiff as a liar.

86.     Toward that end, the letter claims various statements in the marketing blurb are defamatory, when in reality, they are lawful opinions about the conclusions to be drawn from certain facts.

87.     Halper, however, brands any opinions or conclusions with which he disagrees as "defamatory," regardless of whether they are grounded in established facts, or are fair reporting of other people's observations, opinions, or conclusions about him.

88.     For example, he takes issue with the characterization of his role in the Crossfire Hurricane investigation, but that is certainly a matter of opinion.

89.     Similarly, Halper challenges the truthfulness of the blurb's description of his contracts with the DoD Office of Net Assessment ("ONA") "signed by James Baker," but that contract then was, and remains, a matter of public scrutiny and comment.

90.     Only two months prior to Reed's two letters, Senator Charles Grassley had announced a probe into Halper's contracts with the ONA and had requested explanations of them from the Office's Director – James Baker.

91.     The DoD Office of Inspector General also investigated Halper's contracts with the ONA beginning in 2019.  Its review was ongoing until it released its audit report on January 25, 2022.  With respect to Halper's contracts, the OIG "identified incomplete contracting files, limited procedures to ensure the contractor performed work in accordance with the contract, and incomplete records for contractor travel."

92.     The OIG's review of Halper's ONA contracts was ongoing at the time that Plaintiff's Book -- which raised questions about whether Halper had performed the work contracted for, and whether he in fact did travel to the locations for which he sought travel costs from the government -- was being marketed by PHP and S&S.

93.     In sum, the demand letter repeatedly raises the cry of "defamation" about matters that do not involve defamatory falsehoods but rather are characterizations of the facts that cast Halper in an unfavorable light.

94.     The false and improper assertions in the letter are cloaked in language that lawyers legitimately use to try to resolve defamation claims out of court while preparing for litigation if necessary.  Thus, the letter demands that S&S place a "litigation hold" on documents related to the book and to certain persons who had expressed an interest in the false accusations about Plaintiff, including Member of Congress Devin Nunes and certain writers.

95.     On April 2, 2020, Mr. Reed wrote a comparable letter to PHP, with a copy to S&S, making the same allegations and demanding that PHP put in place the same "litigation hold."

96.     Plaintiff has been informed that Halper also escalated the threats and intimidation to S&S's parent company, CBS Corporation ("CBS").

97.     Halper's purpose in having Reed write the two letters was to interfere with Plaintiff's Book Contract and induce PHP to terminate the Contract, thereby halting publication of the book and its widespread marketing because it was going to cast him and his conduct in an unfavorable light, not because it was defamatory.

98.     Although journalists had previously reported the fact that Halper was a "spy," Plaintiff was a credible academic and historian who sought to publish an entire book discussing Halper's efforts to smear a Presidential candidate and his National Security Advisor by falsely

tying them and Plaintiff, an innocent third-party, to Russia, his clandestine operations in spying on the Presidential campaign, and his questionable contracts with the Pentagon.

99.     At the time Halper (through Reed) misrepresented to S&S and PHP that they had defamed him in the marketing materials, he had no intention of engaging in any litigation.

100.    Halper knew that truth was a defense to his defamation allegations and that, by filing suit, he would expose himself to full discovery into his conduct.

101.    Rather than actually pursuing a genuine legal claim, Halper's goal was to intimidate and coerce S&S not to distribute the book and PHP to terminate the Book Contract in order to prevent unfavorable information from being published about him by reputable, significant publishing houses.

102.    As of early 2020, there was already intense scrutiny of, and public debate about, the conduct of the FBI's Crossfire Hurricane investigation and of the individuals associated with it.  In December of 2019, for example, the Horowitz Report was released identifying significant problems with the investigation and numerous of the FBI personnel involved.  Also in 2019, the DOJ began a separate review of the Crossfire Hurricane investigation and its origins, which was later designated a Special Counsel investigation under John Durham, the then U.S. Attorney for the District of Connecticut.

103.    Halper's role in reporting to the FBI and in investigating Trump advisors on behalf of the FBI began garnering significant public interest and also - for the first time - media reporting in 2018-2019, as the articles referenced above, and others, illustrate.

104.    With that reporting came increased scrutiny and criticism of Halper's activities, along with ongoing governmental investigations that directly and indirectly involved him.

105.    Indeed, Halper was subpoenaed in October 2020 by the Senate Committee on Homeland and Governmental Affairs to testify and to produce documents in, but according to public reporting he did not respond.

106.    In 2020, therefore, Halper had motive to dampen and prevent what he perceived as unfavorable stories, books, or articles about him, regardless of whether they were true or not.

107.    With respect to the two Reed letters in Spring 2020, Halper knew that:

a.      the assertion in the letters that Plaintiff was lying was false;

b.      the letters contained falsehoods about himself and about Plaintiff; and

c.      the PHP and S&S marketing statements about which he was complaining were not defamatory, for a multitude of reasons: - they were not false, they did not bring him into disrepute, they were opinions, fair reporting, or hyperbole, his reputation was already such that they would not have been further damaging to him, and/or he was actually complaining about statements that had not even been published yet, among other reasons.

108.    Significantly, Halper caused no comparable letters to be sent to Amazon.com or Barnesandnoble.com, who were advertising the Book for sale, or even indeed to Plaintiff herself or her agent.

109.    After Halper contacted S&S and CBS, S&S advised PHP that unless PHP canceled Plaintiff's Book Contract, S&S would refuse to distribute any of PHP's books.

110.    PHP then canceled the Book Contract as a result of Halper's wrongful and defamatory conduct.

111.    Plaintiff also was dropped by her agent as a result of Halper's wrongful and defamatory conduct.

112.    Being terminated by her publishers and her agent as a result of false claims of defamation wrongfully ruined Plaintiff's reputation in the publishing and creative property communities and industries.

113.    It not only caused her to wrongfully lose the Book contract, but any future options in that contract, any possibility of any other book contracts, whether for academic or general publication works.

114.    For example, after the wrongful termination of her Book contract, she no longer received inquiries about the television or film rights of either the Book or her earlier book about the Soviet spy, which she had previously been receiving.

115.    Plaintiff also lost all previously planned or expected endorsements of the Book, from prominent, national figures, which would have increased the sales of the Book far beyond what she could expect without those endorsements.

116.    Falsely labelling Plaintiff as dishonest and a false reporter of information was also a particularly damaging charge to make in terms of Plaintiff's reputations in both the academic (history) community and the intelligence (security) communities in which Halper and Plaintiff work, which both particularly prize accuracy and trustworthiness, a situation which was well known to Halper.

**Plaintiff Self Publishes Her Book**

117.    After PHP canceled the Book Contract, Plaintiff self-published the Book.

118.    She renamed it, "SPYGATE EXPOSED: THE CONSPIRACY TO TOPPLE PRESIDENT TRUMP," but the substance of the Book remained the same.

119.    Plaintiff marketed the Book on her website, on Amazon4 and on Twitter using the same statements previously employed by S&S and PHP in their marketing materials.

120.    Plaintiff earned significantly less money from the Book as a self-published work than she would have earned from her contract with PHP.

## **Defendant's Use of Improper Means**

121.    Halper never contacted Plaintiff about the advertising or self-publication of the Book, further demonstrating that he never believed the marketing materials were defamatory, and never intended to take legal action against S&S or PHP.

122.    Halper never took any action against Plaintiff for publication of the Book, despite claiming to S&S and PHP that the Book defamed him and would cause him damage to the tune of multiple millions of dollars.

123.    He never initiated any case for defamation against Plaintiff even though she used the same marketing language and sold copies of the Book as advertised on Amazon.

124.    The statute of limitations for filing such a suit has now passed.

125.    Halper's actions regarding Plaintiff and the Book are consistent with his pattern and practice of alleging defamation and making unfounded threats of legal action to deter people from writing about him, regardless of the truth.  As part of this pattern and practice, in one instance Halper initiated retaliatory criminal charges against a writer who attempted to interview him, after Halper caused him to be warned that writing about Halper would result in a defamation action, but who published a story anyway.

---

4https://www.amazon.com/dp/B08NXFRL1K/ref=cm_sw_em_r_mt_dp_mJW6FbW4X9VNB

126.     Halper uses these improper means to achieve his objective that stories, articles, and books not be published about him or his actions at all, regardless of whether they are truthful accounts or not.

127.     Halper utilizes agents and surrogates, including his lawyers and his family members, to carry out his campaign of intimidation through the use or threatened use of legal process.

128.     Plaintiff is aware of at least two other instances in which Halper has used these methods to try to intimidate smaller media outlets into not publishing stories about him, regardless of their accuracy, and to retaliate against them in order to discourage them from doing so again.

129.     On information and belief, Halper has used these methods against other media outlets and writers as well.

130.     In the instances known to Plaintiff, including her own, when the writer has published material concerning Halper despite his threats of legal action, Halper has not carried through with his threat by actually bringing legal actions.

131.     The statutes of limitations for those cases have now passed.

132.     Nor has Halper ever initiated any case for defamation for any of the many articles written about him since 2018 in the media, many, many of which state the very same claims, observations, opinions, and facts as does Plaintiff's Book.


**<u>Actual Malice</u>**

133.     The Defendant acted at all times relevant to this action with actual malice and reckless disregard for the truth.  He caused the successive letters to be sent to S&S and PHP knowing that they contained false statements and defamatory statements about Plaintiff.

Defendant knew that he did not intend to follow through on his threat of litigation against either S&S or PHP.  Defendant acted with the intent of blocking the publication of the Book by reputable publishers and causing the termination of the Contract.  He knew that this would deprive Plaintiff of marketing and sales channels for the Book, prevent or reduce any sales of the Book, and cause her further and extensive economic loss.  Plaintiff's actions were deliberate, calculated, and premeditated.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DEFAMATION

134.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1-133 above, as if fully set forth herein.

135.    Defendant Halper, directly, indirectly and through agents and surrogates, made and published false factual statements of and concerning Plaintiff.

136.    Halper's defamatory statements are not privileged.

137.    Halper abused any privilege which he could claim and therefore is barred from claiming any privilege.

138.    Halper's false statements constitute defamation per se.

139.    Halper's false statements exposed Plaintiff to public scorn, ridicule, and contempt.

140.    Halper imputed to Plaintiff misinformation, deception, lack of integrity, and ethical improprieties that severely prejudiced Plaintiff in her profession and employment as an academic, author and historian.

141.    Halper's false statements impugned and disparaged Plaintiff's reputation as a trustworthy, honest, intelligent, and competent author and historian.

142.    Halper false statements have harmed Plaintiff and her reputation and prevented her from resuscitating her reputation through the publication of the Book.

143.    Halper made the false statements with actual or constructive knowledge that they were false or with reckless disregard for whether they were false.

144.    Halper made the false statements with actual malice.

145.    Plaintiff demanded a retraction of the defamatory statements in April 2020 prior to PHP's termination of the Book Contract. Halper refused to correct, retract, or apologize.

146.    As a direct result of Halper's defamation, Plaintiff suffered presumed damages and actual damages, including, but not limited to, insult, pain, embarrassment, humiliation, mental suffering, injury to her reputation, loss of income and business from the sale of her Book, costs, and other out-of-pocket expenses, in an amount not less than $5,000,000.

## SECOND CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH CONTRACT

147.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 146 above, as if fully set forth herein.

148.    Plaintiff had valid and enforceable contract to publish and market her Book.

149.    Given the state of the pre-orders, and the market for books about the players involved in the so called "Spygate" or "Russia hoax" affaire, Plaintiff had a reasonable expectation of substantial sales for her Book.

150.    Halper gained knowledge of Plaintiff's contract with PHP and indirectly with S&S.

151.    Halper intentionally interfered with Plaintiff's contract rights by, inter alia, defaming Plaintiff, intentionally lying to S&S and PHS irrespective of whether those lies were defamatory, threatening unfounded litigation, and employing a practiced scheme of improper means to cause PHP to cancel the Book Contract.

152.    Halper acted to interfere with Plaintiff's contract with PHP with the intent of depriving Plaintiff of sales in the marketplace.

153.    Halper knew it would harm Plaintiff financially if he could prevent the professional publication of her book.

154.    As a direct result of Halper's tortious interference, Plaintiff suffered damage and incurred loss, including, without limitation, loss of profits under the Book Contract, damage to her reputation, prestige and standing, court costs, and other damages in an amount no less than $5,000,000.

## **DAMAGES**

155.    As a result of Defendant's actions, Plaintiff has suffered the following kinds of harm and damages, among others:

a.    Being prevented from effectively telling and sharing her own story,

b.    Being prevented from resuscitating her reputation through telling her own story,

c.    Additional irreparable damage to her reputation - over and above the harm caused by being accused of being a Russian spy and seductress - from being labeled a liar and untrustworthy in 2020;

26

d.      Economic losses, (past, present and future) from the destruction of her ability to continue conducting any kind of professional work and being rendered effectively unemployable in her chosen field;

e.      Economic losses due to the otherwise unnecessary expenses of responding to government investigations and being involved in litigation, including document preparation, costs, expenses, expert fees, and attorneys' fees for this case,

f.      Pain and suffering damages – anxiety, stress, etc.

g.      Economic loss from lost sales of her Book, sales of her earlier book, lost value of contract options, new book contracts, and the value of television and movie rights for both books and all foreseeable books.

156.    These damages were all foreseeable by the Defendant.

157.    Therefore, Plaintiff seeks presumed damages, actual damages, special damages, and punitive damages as a result of Defendant's actions.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Svetlana Lokhova, respectfully requests the Court to enter Judgment against Defendant Halper as follows:

A.      Compensatory damages in the amount of $5,000,000.00 or such greater amount as is determined by the Jury;

B.      Punitive damages in the amount of $350,000.00 or the maximum amount allowed by law;

C.      Prejudgment interest from March 13, 2020, until the date Judgment is entered at the maximum rate allowed by law;

      D.      Post judgment interest at the rate of six percent (6%) per annum, pursuant

to § 8.01-382 of the Virginia Code (1950), as amended, until the judgment is paid;

      E.      An award of all costs and fees associated with this action; and

      F.      Such other relief, legal and equitable, as the Court deems just and proper,

or necessary to carry out any judgment in this matter.


Date:  June 23, 2022               **MCADOO GORDON & ASSOCIATES, P.C.**


                           By:  ____/s/ Leslie McAdoo Gordon
                           VA Bar# 41692
                           1629 K Street, N.W.
                           Suite 300
                           Washington, DC  20006
                           (202) 704-7388
                           leslie.mcadoo@mcadoolaw.com


                           *Counsel for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 23, 2022, I electronically filed the foregoing Amended

Complaint, using the CM/ECF system, which will send a notification of such filing (NEF) to all

properly designated parties and counsel.

_____/s/_____
Leslie McAdoo Gordon