**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | | |
|---|---|---|
| Svetlana Lokhova, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-1603 (LMB)(WF) |
| | ) | *TRIAL BY JURY IS REQUESTED* |
| Stefan A. Halper, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT HALPER'S ANSWER AND COUNTERCLAIMS**

Pursuant to Fed. R. Civ. P. 7 and 8, Defendant Halper ("Halper") respectfully submits the following as his Answer, Affirmative Defenses, Defenses, and Counterclaims to Plaintiff's Amended Complaint filed on June 23, 2022. To the extent that any allegation in the Complaint is not specifically admitted, Halper denies the allegation. The use of the headings from the Amended Complaint is for convenience only, and is not intended to admit any such heading, which are hereby denied.

Halper answers the corresponding numbered paragraphs of the Complaint as follows:

**ANSWER**

**I. INTRODUCTION**

1. Halper denies the allegations of this paragraph.
2. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
3. Halper denies the allegations of this paragraph.

4. Halper denies the allegations of this paragraph.
5. Halper denies the allegations of this paragraph.
6. Halper denies the allegations of this paragraph.
7. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
8. Halper denies the allegations of this paragraph.

## II. PARTIES

9. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
10. Halper admits that he is a citizen of Virginia, and is domiciled in Eastern District of Virginia, but otherwise denies the allegations of this paragraph.

## III. JURISDICTION AND VENUE

11. Halper denies the allegations of this paragraph as pled under 28 U.S.C § 1332(a)1). Plaintiff is not a citizen of a State. Halper admits that subject matter jurisdiction is available under 28 U.S.C. § 1332(a)(2) as Plaintiff alleges in paragraph 9 that she is a citizen of the United Kingdom (UK).
12. Halper admits the allegations of this paragraph.
13. Halper admits the allegations of this paragraph.

## IV. STATEMENT OF THE FACTS

14. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

15. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them. Halper denies that Plaintiff's MPhil dissertation was on Felix Dzerzhinsky and believes that this was the subject of Plaintiff's undergraduate dissertation.
16. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them. Halper admits that Plaintiff claims authorship of the named book, but otherwise lacks knowledge of its authorship.
17. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
18. Halper admits the allegations of this paragraph.
19. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
20. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
21. Halper denies the allegations of this paragraph.
22. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
23. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them. Halper denies having had minimal contact with Plaintiff at Cambridge based upon any alleged seniority. Plaintiff was not a graduate student at Cambridge; Halper was never her professor. Halper admits that Lokhova never had a conversation with him.

24. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
25. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
26. Halper denies the allegations of this paragraph.
27. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
28. Halper denies the allegations of this paragraph.
29. Halper denies the allegations of this paragraph.
30. Halper denies the allegations of this paragraph.
31. Halper denies the allegations of this paragraph.
32. Halper denies the allegations of this paragraph.
33. Halper denies the allegations of this paragraph.
34. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
35. Halper denies the allegations of this paragraph.
36. Halper denies the allegations of this paragraph.
37. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
38. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
39. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

40. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them. The language of the published article speaks for itself, and is not denied as such.

41. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them. The language of the published article speaks for itself, and is not denied as such.

42. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them. The language of the published article speaks for itself, and is not denied as such.

43. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

44. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

45. Halper admits that he did not attend a February 2014 CSI dinner attended by General Flynn, but otherwise denies the allegations of this paragraph.

46. Halper denies the allegations of this paragraph.

47. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

48. Halper denies the allegations of this paragraph.

49. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

50. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

51. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
52. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
53. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
54. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
55. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
56. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

**The Book Contract**

57. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
58. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
59. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
60. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
61. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

62. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

63. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them. The "Book" manuscript has never been published, according to Plaintiff. Halper has no knowledge of its contents.

64. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

65. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

66. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them. Halper admits that PHP published marketing material about the unpublished book, some of which is re-published in this paragraph.

67. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

68. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

69. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

70. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

71. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

72. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
73. Halper denies the allegations of this paragraph.
74. Halper denies the allegations of this paragraph.
75. Halper denies the allegations of this paragraph.
76. Halper admits that Plaintiff's false characterization of Halper's Defense Department contracts is included in Plaintiff's Book and in S&S marketing materials. Halper otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.
77. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

**Denied Allegations**

78. Halper denies the allegations of this paragraph.
79. Halper denies the allegations of this paragraph.
80. Halper denies the allegations of this paragraph, except that Halper admits that his attorney wrote a demand letter of that date to the General Counsel of Simon & Schuster raising the defamation in its marketing material.
81. Halper denies the allegations in this paragraph except that Halper admits that the demand letter requests the Simon & Schuster cease and desist the defamation in its marketing material.
82. Halper denies the allegations in this paragraph.
83. Halper denies the allegations in this paragraph other than admitting that the letter speaks for itself.

84. Halper denies the allegations in this paragraph.
85. Halper denies the allegations in this paragraph.
86. Halper denies the allegations in this paragraph.
87. Halper denies the allegations in this paragraph.
88. Halper denies the allegations in this paragraph.
89. Halper admits to challenging the marketing material's description of his contracts with the Defense Department, but otherwise denies the allegations of this paragraph.
90. Halper denies the allegations in this paragraph.
91. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them. Halper admits that an audit was conducted in 2019 without any adverse finding as to Halper or his contracts. The language cited in this paragraph relates to the practices of the DOD. The audit speaks for itself; Halper otherwise is without sufficient information to form a belief on the allegations in this paragraph.
92. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them. Halper lacks knowledge of what constitutes the "time of Plaintiff's Book" which was never published, or its contents other than those in the self-published book, or when the OIG review was ongoing.
93. Halper denies the allegations in this paragraph.
94. Halper admits that letter asked Simon & Schuster's General Counsel to place a litigation hold on documents, but otherwise denies this paragraph.
95. Halper admits that Mr. Reed sent a comparable letter dated April 2, 2020 to PHP also seeking a litigation hold, but otherwise denies the allegations in this paragraph.

96. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

97. Halper denies the allegations in this paragraph.

98. Halper denies the allegations in this paragraph.

99. Halper denies the allegations in this paragraph.

100. Halper denies the allegations in this paragraph.

101. Halper denies the allegations in this paragraph.

102. Halper admits that in December 2019, a Report was issued by the DOJ Inspector General, and that an alleged Special Counsel was appointed by Attorney General Barr of the sitting U.S. Attorney of the District of Connecticut, but Halper lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of in this paragraph, and therefore denies them.

103. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

104. Halper admits that an audit was successfully of his DOD contracts starting in 2019 without any adverse finding. The referenced language relates to DOD practices.

105. Halper admits that he was subpoenaed by the Senate Committee on Homeland and Governmental Affairs , but otherwise denies the allegations in this paragraph.

106. Halper denies the allegations of this paragraph.

107. Halper denies the allegations of this paragraph.

108. Halper admits that he did not cause letters to be sent to Amazon.com or BarnesandNoble.com, but otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

109. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

110. Halper denies the allegations in this paragraph.

111. Halper denies the allegations in this paragraph.

112. Halper denies the allegations in this paragraph.

113. Halper denies the allegations in this paragraph.

114. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

115. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

116. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

**Plaintiff Self Publishes Her Book**

117. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

118. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

119. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

120. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

121. Halper denies the allegations in this paragraph.

122. Halper denies the allegations in this paragraph.

123. Halper denies the allegations in this paragraph.

124. Halper denies the allegations of this paragraph.

125. Halper denies the allegations in this paragraph.

126. Halper denies the allegations in this paragraph.

127. Halper denies the allegations in this paragraph.

128. Halper denies the allegations in this paragraph.

129. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

130. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

131. Halper denies the allegations in this paragraph.

132. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

**Actual Malice**

133. Halper denies the allegations in this paragraph.

**Causes of Action**
**First Cause of Action**
**Defamation**

134. Halper incorporates by reference his answers to paragraphs 1 to 133 as though set forth herein.

135. Halper denies the allegations in this paragraph.

136. Halper denies the allegations in this paragraph.

137. Halper denies the allegations in this paragraph.

138. Halper denies the allegations in this paragraph.

139. Halper denies the allegations in this paragraph.

140. Halper denies the allegations in this paragraph.

141. Halper denies the allegations in this paragraph.

142. Halper denies the allegations in this paragraph.

143. Halper denies the allegations in this paragraph.

144. Halper denies the allegations in this paragraph.

145. Halper lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

146. Halper denies the allegations in this paragraph.

**Second Cause of Action**

**Tortious Interference with Contract**

147. Halper incorporates by reference his answers to paragraphs 1 to 146 as though set forth herein.

148. Halper denies the allegations in this paragraph.

149. Halper denies the allegations in this paragraph.

150. Halper denies the allegations in this paragraph.

151. Halper denies the allegations in this paragraph.

152. Halper denies the allegations in this paragraph.

153. Halper denies the allegations in this paragraph.

154. Halper denies the allegations in this paragraph.

**Damages**

155. Halper denies the allegations in this paragraph.

156. Halper denies the allegations in this paragraph.

157. Halper denies the allegations of this paragraph.

## Prayer for Relief

Defendant Halper requests that Plaintiff take nothing and that Defendant recover under Va. Code § 8.01-223.2B.

## Affirmative Defenses and Defenses

Pursuant to Fed. R. Civ. P. 13 and 15, and without assuming any burden it would not otherwise bear, while reserving the right to assert other defenses in this action preceding and up to and including the time of trial, Defendant asserts the following separate and additional defenses:

### First Defense

This Court lacks subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) as Plaintiff is not citizen of a State, as alleged in paragraph 11. In paragraph 9, Plaintiff alleges that she is a citizen of the U.K., which, if true, could provide subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) if its conditions are satisfied.

### Second Defense

Amended Complaint fails to state a claim. This failure includes the failure to allege the necessary elements of a defamation or tortious interference claim as further described in Halper's motion to dismiss the Amended Complaint and which are incorporated herein as factual defenses.

### Third Defense

Defendant Halper is immune from liability under the Supremacy Clause of the U.S. Constitution.

### Fourth Defense

Defendant Halper is immune from liability under federal contractor immunity.

**Fifth Defense**

Defendant Halper is immune from liability under the Petition Clause of the First Amendment.

**Sixth Defense**

Defendant Halper is immune from liability under Virginia Code § 8.01-223.2.

**Seventh Defense**

Defendant Halper is privileged from liability under Virginia common law, including under the privilege of self-defense, common interest, and of communications with law enforcement

**Eighth Defense**

Defendant Halper is privileged from liability under the doctrine of litigation privilege, including as adopted in *Mansfield v. Bernabei*, 284 Va. 116 (2012).

**Ninth Defense**

Plaintiff's claims against Halper are barred by res judicata, including issue and claim preclusion, arising from *Lokhova v. Halper*, Civil Action No. 1:19-cv-632 (LMB) (JFA).

**Tenth Defense**

Plaintiff is the proximate and direct cause of her own damages.

## COUNTERCLAIMS

Pursuant to Fed. R. Civ. P. 13 and 15, Halper alleges the following counterclaims against Plaintiff Svetlana Lokhova. This Court has ancillary and supplementary jurisdiction over these counterclaims.

### Common Allegations of Fact

#### A. The Russian Interference with the 2016 U.S. Presidential Election

1. In 2014, the Russian government, under the leadership of Vladmir Putin, invaded its neighboring country Ukraine. In response, the United States, along with other countries, imposed sanctions upon the Russian government its invasion and annexation of portions of the Ukraine. In 2016, under orders from Vladmir Putin, the Russian government and its proxies engaged in multiple efforts to interfere with the 2016 Presidential election to favor the election of President Trump.
2. In December 2016, the President declared a national emergency based upon this Russian election interference in Executive Order 13757 under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701, et seq. 82 Fed. Reg. 1 (2016).
3. The Russian 2016 U.S. election interference campaign, and Putin's orders to conduct it, were confirmed in an Intelligence Assessment of American

intelligence agencies issued in a January 2017 Report and this was reaffirmed in a second Intelligence Assessment issued in March 2021.[1]

4. In 2017, Congress enacted the of *Countering America's Adversaries Through Sanctions Act* ("CAATSA") ,. See H.R. 3364, Pub. L. 115-44, §§ 211(5 & (6), 222(a), 131 Stat. 886 (1st Sess. 2017) (22 U.S.C. §§ 9501, 9522 note). CAATSA was enacted by overwhelming votes (98 to 2 in the Senate; 419 to 3 in the House). Among other things, CAATSA mandated that sanctions against Russia be considered in response to the Russian election interference of 2016. In particular, CAATSA had enacted findings, and contained express legislative codifications of E.O. 13757. Specifically,

   a. the Act's enacted findings justify the Act by reference to the January 2017 Intelligence Assessment, and to the December 2016 Presidential national emergency declaration (Executive Order 13757) as grounds for its enactment; [2]

---

[1] *See* Report, *Assessing Russian Activities and Intentions in Recent U.S. Elections,* at *i* (January 2017) (declassified assessment of the FBI, CIA, NSA, and Office of the Director of National Intelligence); Report, *Foreign Threats to the 2020 US Federal Elections*, at *i.* (March 10, 2021).

[2] Section 211 Findings:

> (5) On December 29, 2016, President Obama issued an annex to Executive Order No. 13694, which authorized sanctions on the following entities and individuals: (A) The Main Intelligence Directorate (also known as Glavnoe Razvedyvatel'noe Upravlenie or the GRU) in Moscow, Russian Federation. (B) The Federal Security Service (also known as Federalnaya Sluzhba Bezopasnosti or the FSB) in Moscow, Russian Federation. . . .
>
> (6) On January 6, 2017, an assessment of the United States intelligence community entitled, ''Assessing Russian Activities and Intentions in Recent U.S. Elections'' stated, ''Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the United States presidential election.'' The assessment warns that ''Moscow will apply lessons learned from its Putin-ordered campaign aimed at the U.S. Presidential election to future influence efforts worldwide, including against U.S. allies and their election processes'.

b. the Act includes the "codification" of EO 13757, and requires it remain in effect unless waived by Presidential findings. § 222,[3] which has not happened.

5. Starting in 2018, the U.S. Senate Select Committee on Intelligence issued five volumes detailing its extensive investigation into "*Russian Active Measures Campaigns and Interference in the 2016 Election,*" which also confirmed that the 2016 Russian interference "campaign was approved by President Putin."[4]

---

[3] Section 222:

SEC. 222. CODIFICATION OF SANCTIONS RELATING TO THE RUSSIAN FEDERATION. (a) CODIFICATION. —United States sanctions provided for in . . . Executive Order No. 13757 (82 Fed. Reg. 1; relating to taking additional steps to address the national emergency with respect to significant malicious cyber-enabled activities), as in effect on the day before the date of the enactment of this Act, including with respect to all persons sanctioned under such Executive orders, shall remain in effect except as provided in subsection (b).

(b) TERMINATION OF CERTAIN SANCTIONS.—Subject to section 216, the President may terminate the application of sanctions described in subsection (a) that are imposed on a person in connection with activity conducted by the person if the President submits to the appropriate congressional committees a notice that— (1) the person is not engaging in the activity that was the basis for the sanctions or has taken significant verifiable steps toward stopping the activity; and (2) the President has received reliable assurances that the person will not knowingly engage in activity subject to sanctions described in subsection (a) in the future.

(c) APPLICATION OF NEW CYBER SANCTIONS.—The President may waive the initial application under subsection (a) of sanctions with respect to a person under Executive Order No. 13694 or 13757 only if the President submits to the appropriate congressional committees— (1) a written determination that the waiver— (A) is in the vital national security interests of the United States; or (B) will further the enforcement of this title; and (2) a certification that the Government of the Russian Federation has made significant efforts to reduce the number and intensity of cyber intrusions conducted by that Government.

[4] *See* Senate Select Committee on Intelligence Report, Report 116-XX, *Russian Active Measures Campaigns and Interference in the 2016 U.S. Election*, Volume 1: Review of the Intelligence Community Assessment, 3-7 (July 3, 2018) (agreeing with ICA assessment including Putin approval of the election interference campaign); Report, "Counterintelligence Threats and Vulnerabilities," reaffirmed the prior counterintelligence findings. *Id.* at *iv*, 1 (August 18, 2020).

6. Beginning in December 2016, three Presidents (Obama, Trump, and Biden) made successive findings that a national emergency exists under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 et seq., as result of Russian interference in the 2016 Presidential election. *See* E.O. 13757 (2016); E.O. 13849 (2018), E.O. 14024 (2021), and E.O. 14068 (2022).

6. In turn, these Executive Orders have resulted in numerous implementing Treasury sanction regulations, designations, and enforcement directed at the Russian government, its intelligence services, and its proxies.[5] For example, the December 2016 national emergency designated five Russian entities and four Russian individuals for sanctions for "tampering with, altering, or causing the misappropriation of information with the purpose or effect of interfering with or undermining election processes or institutions."

7. In 2017, Special Counsel Robert Mueller was appointed to investigate Russian interference with the 2016 campaign. In 2019, Mueller issued a Report concluding that: "The Russian government interfered in the 2016 presidential election in sweeping and systematic fashion." Report, at 1.

[5] *See, e.g.*, 31 C.F.R. Part 587 ("*Russian Harmful Foreign Activities Sanctions Regulations*"); *Treasury Sanctions Russian Cyber Actors for Interference with the 2016 U.S. Elections and Malicious Cyber-Attacks*, 2018 WL 1325320 (Dept. Treas., March 15, 2018); 84 Fed. Reg. 17950-1, 2019 WL 1880291 (April 29, 2019) (adopting the *Foreign Interference in U.S. Elections Sanctions Regulations*, 31 CFR Part 579 (the "Regulations" implementing E.O. 13848); *Treasury Sanctions Russian-Linked Election Interference Actors*, (Dept. Treas. Press Release Sept. 10, 2020), https://home.treasury.gov/news/press-releases/sm1118; 87 Fed. Reg, 11133 (Feb. 28, 2022) (designations under E.O. 14024).

Among other responses, Mueller initiated prosecutions of Russian persons and entities for this interference.

8. In 2019, the DOJ Inspector General issued a Report which concluded that the FBI investigation into Russian interference in the 2016 election known as Operation Crossfire Hurricane was properly predicated and free of political bias or motivation.
9. The Russian government interfered in the 2016 U.S. Presidential election.
10. Russian government interference in the 2016 U.S. Presidential election is not a "hoax."
11. The FBI, CIA, and Defense Department did not conspire to create a "hoax" that the Russian government interfered with the 2016 U.S. Presidential election.
12. Stefan Halper did not conspire to create a "hoax" that the Russian government interfered with the 2016 U.S. Presidential election.
13. Stefan Halper did not fabricate a hoax that the Russian government interfered with the 2016 U.S. Presidential election.
14. Stefan Halper was not a source for media accounts that the Russian government interfered with the 2016 U.S. Presidential election.

**B. General Flynn's Involvement With Russia During and After the 2016 Election**

15. In December 2015, while a member of candidate Trump's campaign, General Michael Flynn traveled to Moscow to attend a dinner celebrating

the anniversary of the Russian Times, a media source of Russian disinformation. General Flynn sat at the table of Vladmir Putin. General Flynn was recently penalized by the Defense Department for failing to obtain approval for his receipt of Russian payments for this travel.

16. In December 2016, General Flynn, the prospective National Security Advisor, communicated with Russian Ambassador Sergei Kislyak about the sanctions just imposed by President Obama for Russian election interference.

17. In February 2017, less than a month after starting his job as National Security Advisor, President Trump terminated Flynn from his post for falsely denying to the FBI his conversations with Kislyak about these sanctions in a January 2017 interview.

18. Flynn would later twice plead guilty under oath to lying to the FBI (in violation of 18 U.S.C. § 1001) about his December 2016 Kislyak sanctions communications.

19. After his termination as NSA in February 2017, several media articles appeared about Flynn and his connections with Russia.

20. In 2019, Plaintiff filed a lawsuit in this Court against Stefan Halper falsely alleging that Halper was a member of a conspiracy to defame Svetlana Lokhova.

21. Stefan Halper was not a source of the media articles about General Flynn alleged in the Complaint and Amended Complaint in Lokhova v. Halper, Civil Action No. 1;19-cv-632 (“Lokhova I”)

22. Stefan Halper was not a source of the media articles about General Flynn and Svetlana Lokhova alleged in the Complaint and Amended Complaint in Lokhova v. Halper, Civil Action No. 1;19-cv-632.

23. Stefan Halper did not conspire with the media companies identified in the Complaint and Amended Complaint in Lokhova v. Halper, Civil Action No. 1;19-cv-632 to defame Michael Flynn,

24. Stefan Halper did not conspire with the media companies identified in the Complaint and Amended Complaint in Lokhova v. Halper, Civil Action No. 1;19-cv-632 to defame Svetlana Lokhova.

**C. Plaintiff Misstates Her Academic Credentials**

25. Plaintiff claims she was born in Moscow and moved from there at age 18 to study as an undergraduate at Cambridge University.[6] She obtained a Bachelor of Arts degree in 2001. She then obtained a Master in Philospohy (M.Phil) in European Studies from Cambridge in 2002. Her M.Phil thesis was on "The Evolution of the Cheka 1917-1926." She has both claimed and denied that she later entered a PhD program at Cambridge.

26. In 1994, Plaintiff's father, Sergey Lokhov, founded the Black Sea Shipping Company (Blasco) (U.K.), Ltd. in London, England, to operate bulk container ships from the Black Sea near the Ukraine, a year before the privatization of the shipping company Black Sea Fleet Company

[6] Sexism and the City: Svetlana Lokhova, Times of London, May 2, 2015.

(owned by the Russian government).[7] The following year the company's name was anglicized to Ocean Agencies, Ltd. This was during the period known as the first wave, after the December 1991 collapse of the Soviet Union, in which Russia reorganized its economy and began investment in Europe. In 2019, Ocean Agencies, Ltd. bought its twelfth supramax bulk carrier, the Arosa.[8]

27. Plaintiff has falsely claimed that she was a PhD student at Cambridge University since 2004. In fact, Lokhova has never been a PhD student in a PhD program at Cambridge. In 2020, Lokhova claimed that her 2018 book "was meant to be her PhD, as agreed with Cambridge University," but this is not true either.

28. In 2017, Plaintiff gave an interview to the New York Times about her participation in a February 2014 Cambridge dinner attended by General Flynn, stating: "I was not a graduate student at the time; there is not even a course in Soviet intelligence history at Cambridge University." LI, Compl. ¶ 132. In this action, Lokhova falsely alleges that, at this February 2014 Cambridge dinner, "She was then a graduate student and researcher at Cambridge." Amended Complaint, ¶ 21.

29. The purpose of Plaintiff's fabrications about being a PhD student at Cambridge is to create an alleged expertise, reputation. and credibility to address Russian intelligence activities.

---

[7] *See* Journal of Commerce, Privatization of Black Sea Shipping Embroiled in Political Imbroglio (February 13, 1994).

[8] Ocean Agencies, Ltd.'s ships are named: Anita, Arcadia, Anarita, Aviona, Astoria, Alicia, Arizona, Almeria, Aragona, Arosa, Arinaga, and Arcola.

30. To further her false claim of being a Cambridge PhD student studying Russian intelligence, Plaintiff affiliated with the Cambridge Security Initiative ("CSI"), a private educational group in Cambridge. Plaintiff would later claim that, as a result of her CSI association, she "was introduced to many former and serving security chiefs." Lokhova I Compl. ¶53.

31. In her CSI presentations after the invasion of the Ukaine, Plaintiff's remarks indicated that she was a Russian nationalist, a Putin supporter, and a strong Krymnashistka, i.e., an advocate for the Russian annexation of Ukraine.

32. Rather than becoming a PhD student, in 2004 Plaintiff became employed in London working successively for two large U.S. banks on their private wealth clients from Russia.[9] In 2008, she changed employers and began work at the London offices of Troika Dialog ("Troika"), the largest Russian private investment bank. She became the head of its fixed income desk in 2010 earning upwards of 750,000 pounds a year, and she would later claim that she was responsible for almost 1/3 of Troika U.K's profits (5.7 million pounds out of an 18.8 million pound profit).[10]

33. The founder of Troika, Ruben Vardanyan, was a friend of Vladmir Putin. While at Troika, Plaintiff faced opposition in the London office because she had close links to Troika's upper management in Moscow. After

[9] Sexism and the City: Svetlana Lokhova, Times of London, May 2, 2015.
[10] Banker who was dubbed "cokehead" seeks 14 million pounds, October 14, 2014

briefly leaving Troika in 2010, Plaintiff was hired back by the Moscow management in 2011 to work on equity sales when Troika was to be merged into Sberbank. Sberbank was the largest commercial bank in Russia, with a majority interest being held by the Central Bank of Russia.

34. During the period from 2008 to 2012, Troika facilitated transfers of large amounts of money out of Russia to, among other places, Britain. Troika would become known as the Troika Laundromat, and has been alleged to have laundered billions of dollars out of Russia to individuals and entities associated with Vladmir Putin and Russian oligarchs. *See The Troika Laundromat*, Organized Crime and Corruption Reporting Project (March 2019) (https://www.occrp.org/en/troikalaundromat). Among other transactions, Troika is alleged to have laundered more than 100 million dollars from the Magnitsky Russian tax fraud scheme, and transferred $69 million dollars to a musician friend of Putin (Sergei Roldugin). *Id.*[11]

35. After commencing work at the London offices of Sberbank, Plaintiff brought a 14-million-pound claim for employment discrimination in 2013 against Sberbank based upon the conduct of her co-workers. She would later also directly sue some of her co-workers for defamation. In a judgment dismissing her defamation claim, the British court stated "it is apparent from emails that Ms. Lokhova's appointment was perceived in equity sales to involve office politics as Ms. Lokhova has strong support

---

[11] https://www.transparency.org/en/news/troika-laundromat-a-different-kind-of-financial-crisis https://www.transparency.org/en/news/troika-laundromat-a-different-kind-of-financial-crisis.

from certain persons in the Moscow office." *Lokhova v. Tymula*, 2016 EWHC 225 (QB) ¶26 (Dec. 2, 2016).

36. Plaintiff's employment claim sought 14 million pounds, but Plaintiff was successful in only 19 of 22 allegations before the employment tribunal. Nonetheless, Sberbank entered into a settlement of her remaining claims for 3.2 million pounds in 2015.

37. Plaintiff claimed to the press at the time that she owed $2 million in legal fees that she had borrowed from her father and from her boyfriend. In 2018, Plaintiff filed for personal bankruptcy in London.

38. In 2018, Plaintiff published a book entitled *The Spy Who Changed History: The Untold Story of How the Soviet Union Won the Race for America's top Secrets*. Plaintiff claims to have done the research for this book at the Moscow archives of the Russian Communist Party, RGASPI. Lokhova I, Compl. ¶¶27, 56. The book claims that Stalin's intelligence services successfully misappropriated American technology by placing student spies at American universities.

39. In May 2019, only a week after her discharge from British personal bankruptcy in May 2019, Plaintiff filed her first lawsuit against Halper (*Lokhova I*) in this Court. The Complaint was 66 pages and sought $15 million in damages. The lawsuit made fantastical claims about Halper being the mastermind of an international conspiracy against the Trump Presidential campaign and Presidency. But her suit was also predicated upon a series of falsehoods about herself, including that:

a. "Lokhova began a PhD in Soviet Intelligence Studies in 2004." LI, Compl.¶27. In that suit, Plaintiff sought damages against Halper and the other defendants by claiming that she lost "the opportunity to gain a PhD, despite working for seven (7) years toward her goal." Id., ¶ 5. Again, Plaintiff was never a Cambridge PhD student.

b. Lokhova "has never worked for an entity associated with the Russian State." LI, Compl. ¶ 29. Plaintiff worked for Troika, which was purchased by Russian government-owned Sberbank and she then sued Sberbank for employment discrimination. Sberbank is owned by and associated with the Russian State, and it settled Plaintiff's employment claims for 3.2 million pounds. On February 28, 2022, Treasury blocked the assets of the Russian Central Bank and National Wealth Fund (the controlling owner of Sberbank) under Executive Order 14024.[12] On April 6, 2022, OFAC imposed blocking sanctions upon Sberbank under Executive Order 14024, including upon its London offices (Sberbank CIB, formerly Troika).[13] Plaintiff's former employer is the subject of U.S. and U.K. sanctions imposed upon the Russian government.

**D. Lokhova's First Suit Against Halper**

---

[12] https://home.treasury.gov/news/press-releases/jy0612.

[13] https://home.treasury.gov/news/press-releases/jy0705. The same day (April 6, 2022), OFAC issued General License 21 under the Russian Harmful Foreign Activities Sanctions Regulations, 31 C.F.R. part 587, for transactions appropriate to the winding up of Sberbank CIB U.S.A., Inc. The Treasury Department issued a press release the same day explaining that Sberbank was central to the Russian banking system, and that the sanctions were being imposed pursuant to Executive Order 14024. https://home.treasury.gov/news/press-releases/jy0705

40. Plaintiff's first suit against Halper, *Lokhova I*, was based upon a series of false and defamatory allegations against Halper in the Complaint and repeated in the Amended Complaint, including the following:

a. That Halper was a "spy and ratfucker." Complaint, ¶1; Amended Complaint ¶1.

b. The profane accusation of Halper being a "ratfucker" was intended to attract public attention to the lawsuit and to Plaintiff to promote herself, her fundraising off of the lawsuit, and her later book about Halper. The fundraising included a PayPal account for donations, and a GOFUNDME site to which she attached a copy of her complaint and its first sentence accusing Halper of being a "ratfucker."

c. That Halper was the mastermind of an international conspiracy of the FBI, CIA, Defense Department, Cambridge University "operatives," and eight media companies in Britain and the U.S. to "topple" the Trump Administration by smearing his former NSA, General Michael Flynn.

d. Halper was a co-conspirator with the FBI in "the true goal of the FBI counterintelligence operation: to overthrow President Trump in a soft coup." ¶ 140.

e. Halper promoted the "wholly fabricated and fictitious 'Russian collusion" narrative," the "massive fraudulent hoax about 'Russian collusion'" with the 2016 Presidential campaign that was a "counterintelligence hoax." LI Compl. ¶ 5, 76,144.

f. That Halper was the "source" for multiple media articles claiming that Plaintiff was a Russian spy paramour of General Flynn, when he was not a media source of any such allegation.

g. Halper funded the FBI's conspiracy to topple the Trump Administration by diverting monies he obtained under Defense Department research grants to finance Operation Crossfire Hurricane in 2016 to fabricate the false claim that Russian intelligence was interfering in the 2016 U.S. Presidential campaign to benefit Trump.

h. That Halper smeared a Presidential candidate and his National Security Advisor by falsely tying them and Plaintiff, an innocent third party, to Russia

i. That Halper engaged in clandestine operations to spy on the Presidential campaign and had questionable contracts with the Pentagon.

41. On February 27, 2020, the United States District Court for the Eastern District of Virginia dismissed Lokhova's lawsuit ruling, among other things, that it failed to allege that Halper was a media source of articles about Lokhova, that she had failed to allege a plausible conspiracy, and had failed to allege a plausible claim that Halper interfered with any book or other opportunity of Plaintiff. *Lokhova v. Halper*, 441 F.Supp.3d 238 (E.D. Va. 2020), *aff'd.*, 995 F.3d 134 (4th Cir. 2021).

42. Plaintiff had a full and fair opportunity in this Court to make her *Lokhova I* claims against Halper of defamation, conspiracy, and tortious interference with contract in *Lokhova I*.

43. Plaintiff failed to prove her Lokhova I claims against Halper.

44. Lokhova appealed the dismissal of her first lawsuit against Halper to the Fourth Circuit Court of Appeals. At the oral argument on March 10, 2021, a member of the appellate panel, Judge Thacker, described Lokhova's complaint as defamatory to Defendant Halper.

**E. After Losing Her Suit, Lokhova Markets Her False Allegations to Promote a Book**

45. Thereafter, Plaintiff authored and authorized publication on the internet of marketing materials for a book about Halper that she had not yet completed writing entitled: The Spider: Stefan Halper and the Dark Web of a Coup (the "Coup Book").

46. The book title promised more of the same allegations just rejected in the Lokhova I suit, alleging that Halper participated in an FBI coup conspiracy to topple the Trump Administration. Orchestrating a Presidential coup is unlawful.

47. In those Coup Book marketing materials, Plaintiff alleged:

a. That Halper "fabricated and sustained the fantastical narrative of the Russia hoax" about Russian interference in the 2016 Presidential election;

b. That Halper committed government contract fraud by obtaining DOD research grants to finance the FBI's Operation Crossfire Hurricane;

c. That Halper leaked classified information to the press to promote the conspiracy to topple the Trump Administration; and

d. That Halper participated in a coup conspiracy.

48. Each of the foregoing book marketing material factual allegations are false and defamatory as to Halper, as they accuse him of crimes and unlawful actions.

**F. Lokhova Sues Halper Again**

49. On December 31, 2020, Lokhova filed a second suit against Halper in this Court for $5 million making the same allegations of defamation. In her Complaint, Plaintiff alleges that "In March 2020, after learning that Plaintiff intended to publish a book revealing his dirty tricks and *unlawful actions,* Halper chose to take action. . . .LII, ¶ 18 (emphasis added). As of March 2020, there was no book; there was only the Simon & Schuster internet marketing material described above.

50. Accordingly, Plaintiff admits that her book marketing material was sufficient, in itself, to communicate that Plaintiff intended to publish a book about Halper's "unlawful actions." Because Plaintiff's Coup Book was unpublished in March 2020, only Plaintiff knew its prospective contents.

51. Thus, when on March 13, 2020 and April 2, 2020, Halper notified the publishers of the Coup Book marketing material that it was defamatory, conflicted with the Court's judgment adverse to Plaintiff, and falsely accused Halper of unlawful conduct, only Plaintiff knew what would be contained in her future book. The notice letters demanded that the marketing material cease and desist from publishing allegations of

unlawful conduct by Halper, including within any subsequent book. Among other things, the letter notices pointed out that Halper had been the subject of threats, including death threats, since Lokhova had begun her false accusations that Halper had fabricated the Russian hoax with the FBI, CIA, and DOD. In her subsequently self-published book, Lokhova admits knowing of warnings that exposing Halper "'would jeopardize his life and those of others, and also put American national security at grave risk.'" Spygate Book, at 29 (quoting Glenn Greenwald, The Intercept (May 19, 2018). Indeed, Lokhova was also placed on notice of these death threats as a result of the Halper demand letters to her publishers Simon & Schuster and PHP in March and April of 2020, but she persisted in her defamation of Halper.

52. Plaintiff claims that the publishers subsequently made a decision not to publish the Coup Book. Plaintiff also alleges that she was also terminated by her agent.

53. Plaintiff thereafter allegedly self-published the same book under a new title: "Spygate Exposed: The Conspiracy to Topple President Trump." ("Spygate Book"). According to Plaintiff, however, other than renaming it "the substance of the Book remained the same." Amended Complaint, ¶ 118. The Spygate Book is little more than the *Lokhova I* Complaints with additional *ad hominem* for emphasis.

54. Lokhova's Second Suit against Halper repeats the same false claims about Halper fabricating the Russian hoax, of being a media source of false information about Lokhova, and committing government contract fraud.

**G. Despite Ample Prior Notice, The Spygate Book Defames Halper.**

55. Before Plaintiff self-published the Spygate Book, she had received notices warning that she should refrain from defaming Halper from:

a. the March and April 2020 letter notices to the marketing material publishers;

b. her two publishers' alleged cancellations of the Coup Book, as alleged in ¶ 112 of the Amended Complaint; and

c. her agent Keith Korman's termination of his dealings with Plaintiff (as claimed in ¶¶ 111-12 of the Amended Complaint).

d. Her publisher who Lokhova admitted "wanted me to change facts and alter metadata."

56. Instead of blaming Halper, Plaintiff alleged from her Twitter account that: "My publisher cancelled my book contract under pressure from the Deep State." Notwithstanding these overlapping warnings about defaming Halper, the self-published Spygate Book is devoted almost exclusively to defaming Halper.

**H. Stefan Halper**

57. Dr Stefan Halper taught at the Department of Politics and International Studies at the University of Cambridge from 2001 to 2016. He lectured on latter 20th Century US foreign policy, China, and contemporary

international security issues. Professor Halper holds doctorates from Oxford and Cambridge and is a Life Fellow of Magdalene College, Cambridge. He has previously worked at the White House and State Departments under Presidents Nixon, Ford, and Reagan. He has written extensively on political and international issues and has produced four major analytical studies at the request of the Pentagon's Office of Net Assessment. He is also the author/ co-author of 4 books on political and security affairs

58. Since 2005, Professor Halper has won a string of research awards from the Defense Department on national security issues. This research has led to books, and multiple other consulting agreements on national security issues.

59. By 2016, Halper had accumulated multiple national security consulting contracts.

60. As a direct and proximate result of Lokhova's defamation of Halper, he has suffered damage to his reputation and lost his DOD contract research revenue.

**I. Plaintiff's Conduct Warrants Punitive Damages**

61. Plaintiff's conduct in defaming and tortiously interfering with his business expectancies was willful and wanton, and done so recklessly as to evince a conscious disregard of Halper's rights.

**COUNTERCLAIM ONE**

**Defamation**

62. Counterplaintiff Halper incorporates by reference the allegations of paragraphs 1 through 35 as though set forth in full herein.

63. Plaintiff made, published, and republished numerous false factual assertions of and concerning Halper. These statements are detailed verbatim above. Lokhova published the false statements without privilege of any kind.

64. The false statements constitute defamation *per se*. Plaintiff's false statements about Halper: (1) impute the commission of a crime of moral turpitude by Halper for which a party may be convicted; (2) impute his unfitness to perform the duties of a job or lack of integrity in the performance of duties; and (3) prejudice Halper the party in his profession as a professor, author, and national security analyst and consultant.

65. Plaintiff's false statements exposed Halper to public scorn, ridicule and contempt. She imputed to Halper misinformation, deception, lack of integrity, and ethical improprieties that severely prejudiced Halper in his profession and employment as a professor, author, and national security analyst and consultant. Lokhova's false statements impugned and disparaged Halper's reputation as a trustworthy, intelligent, and competent professor, author, and national security analyst and author.

66. Lokhova's false statements have harmed Halper and his reputation.

67. Lokhova knew that the statement about Halper in the book marketing material and the Spygate book were false and defamatory as to Halper, including but not limited to:

    a. The marketing material falsely alleged that Halper fabricated the "Russian hoax" of Russian interference with the 2016 Presidential election;

    b. The marketing material falsely alleged that Halper had committed government contract fraud by falsely procuring Defense Department research contracts for the purposes of financing the FBI investigation into Russian election interference known as Operation Crossfire Hurricane;

    c. The marketing material falsely alleged that Halper had leaked classified government information to the media to advance the "Russian hoax;" and,

    d. The marketing material falsely alleged that Halper participated in a coup to topple the Trump Administration.

68. Lokhova acted with actual malice in making those defamatory marketing material statements about Halper because:

    a. She had previously lost her first lawsuit where she made similar allegations about Halper but lost that suit;

    b. She learned of the notices provided to her publishers Simon & Schuster and PHP that the marketing material contained false and defamatory statements about Halper, but then self-published them

rather than eliminate them from her Coup Book. She rejected the warnings provided by Halper.

c. She was placed on notice by her two publishers (Simon & Schuster, PHP) and her own agent that they refused to participate in the publishing of her defamatory material about Halper.

d. To self-publish the Spygate Book, Lokhova rejected the professional advice of her own publishers and agent.

e. To self-publish the Spygate Book, Lokhova rejected that warning provided by Halper counsel, which Lokhova has admitted is "an experienced defamation lawyer." Complaint, ¶ 30b.

f. In May 2020, Plaintiff admitted that her publisher "wanted me to change facts and alter metadata" relating to the book manuscript, but she refused to do so. This admission that her publisher raised issues with the content and source (metadata) of her draft manuscript, which she then refused to address, demonstrates willfulness and malice on her part.

69. Despite these notifications, Lokhova thereafter repeated the false statements of the marketing material in her self-published book, and made further, false statements about Halper in her self-published book (the Spygate Book). The Spygate Book mentions Halper by name 1,151 times, indulging in a torrent of defamatory and abusive *ad hominem*, including but not limited to:

A. "Halper reveals himself to the world as a delusional man or a liar." Page 275.

B. "The start of Spygate can be traced to the lies that Stefan Halper made up years later about the events that never happened that evening." Page 22
C. "No one will dispute, based on the FBI evidence alone, that Stefan Halper is a deceiver." Page 33
D. "The importance of my story is that by uncovering the true start and extent of Halper's work, which included a false report to the FBI about General Flynn)." Page 39.
E. CIA Director John Brennan "might have needed the services of an amoral, unscrupulous intelligence operative or a fantasist. Brennan had just the one right on hand," indicating that "Halper also worked for, and was paid by, the FBI, Obama's Department of Defense, and had links to the Hillary campaign's dirty tricks operation." Page 123.
F. "The excellent academics at Cambridge easily smell out fraud so is that the reason Halper avoided contact with anyone except his minions?" Page 176.
G. "Like many a pseudo-academic, [Halper] regurgitated a thesaurus to hide his pedestrian reasoning." Page 176.
H. "It was the only time in four years of being around Halper that he spoke to me. Despite the fact I had absolutely zero interactions with Halper, he later told the press and the FBI he knew me, and I was a Russian spy acting on the personal orders of Vladimir Putin to become the lover of Gen. Flynn." Page 177.
I. Halper swanned around the world at the taxpayer's expense gathering 'gossip' and manufacturing lies for the CIA and FBI." Page 179.
J. "Halper circled around his chosen targets, weaving his web of deceit. He tricked his way into meetings, sometimes offering money, women or access to important people." Page 201
K. "The email demonstrates Halper was happily pimping the University of Cambridge and faking political support to open the door to get inside the Donald Trump for President campaign." Page 218
L. "Halper revealed on international radio the true goal of the FBI counterintelligence operation: to overthrow President Trump in a soft coup." Page 348.
M. "Halper seeded the media, who already harbored an extreme bias against and ill-will toward President Trump with extraordinary stories and disinformation." Page 272.
N. "Halper's tales were false and defamatory statements about me and General Flynn—statements eagerly republished with no evidentiary support . . . for the sole purpose of advancing the sensational and false narrative of Spygate." Page 272.

70. In addition, Lokhova has contacted various people at Cambridge and published to them the same defamatory allegations regarding Halper, including but not limited to the Master of Magdalene College (where Halper is a Life Member), the former head of the Church of England, the

Archbishop of Canterbury Lord Rowan William, and Halper's colleagues at Cambridge.

71. Lokhova made these false statements with actual or constructive knowledge that they were false or with reckless disregard for whether they were false.

72. Lokhova had a financial and personal motive to fabricate her false claims against Halper in bad faith, including: (i) to promote her fundraising for the *Lokhova I* lawsuit, and now this suit; (ii) to advance her alleged reputation as a Russian intelligence scholar despite the lack of a PhD; (iii) to promote and misstate her failed academic career; (iv) to populate her Twitter account for fame and economic gain; and (v) to sell books; (iv) and to generate a conservative media following, including multiple interviews with Fox TV, Prager University, Real Clear Politics, Real Clear Investigations, the Washington Examiner, Sara Carter, Catherine Herridge, Marie Bartiromo, John Solomon, John Batchelor, the Federalist, Dan Bongino, Mollie and Mark Hemmingway, Tracy Beanz, and others.

73. As a direct result of Lokhova's defamation, Plaintiff suffered presumed damages and actual damages, including, but not limited to, insult, pain, embarrassment, humiliation, mental suffering, injury to her reputation, loss of income and business from the sale of her Book, costs, and other out-of-pocket expenses, in the sum of $5,000,000 or such greater amount as is determined by the Jury.

**Counterclaim Two**

**Tortious Interference with Contract and Business Expectancies**

74. Counterplaintiff Halper incorporates by reference the allegations of paragraphs 1 through 73 as though set forth in full herein.

75. Halper had a valid and enforceable research contract with the Defense Department.

76. Lokhova knew of Halper's Defense Department contracts and intentionally interfered with Halper's contractual and business expectancy rights by defaming Halper.

77. The improper means employed by Lokhova to interfere with Halper's contractual and business expectancy rights include: defamation, profanity, and promoting others to complaint to legislative and executive officials using Lokhova's lies.

78. As a direct and proximate result of Lokhova's tortious interference, Halper suffers damage and incurred loss, including loss of consulting contract revenue, reputational damage, court costs, and other damages.

**Counterclaim Three**

**Statutory Recovery Under Virginia Code § 8.01-223.2B**

79. Counterplaintiff Halper incorporates by reference the allegations of paragraphs 1 through 73 as though set forth in full herein.

80. Statutory immunity applies to statements "regarding matters of public concern that would be protected under the First Amendment to the United

States Constitution made by that person that are communicated to a third party."

81. Plaintiff has admitted that the subject of her book is "a matter of immense public concern."

82. The alleged statements of Halper that are the subject of the Amended Complaint are matters of public concern, and hence are immune from liability under Va. Code § 8.01-223.2B

83. A national emergency declared by three successive Presidents constitutes "speech concerning the legitimacy of the political process." *Philadelphia Newspapers,* 475 U.S. at 778. Likewise, Russian interference with U.S. elections is a matter of public concern.

84. Under Va. Code § 8.01-223.2B, if a "person who has a suit against him dismissed. . . pursuant to the immunity provided by this section may be awarded reasonable attorney fees and costs."

85. If this Court, or the jury dismisses the Amended Complaint under statutory immunity, Halper seeks an award of reasonable attorney fees and costs.

**Prayer for Relief**

WHEREFORE, Counterclaiming Halper respectfully requests the Court to enter Judgment against Plaintiff Halper as follows:

**A.** Compensatory damages in the amount of $5,000,000.00 or such greater amount as is determined by the Jury;

**B.** Reasonable attorney's fees and costs pursuant to Virginia Code § 8.01-223.2;

**C.** Financial and other appropriate sanctions pursuant to Fed. R. Civ. P. 11;

**D**. Punitive damages in the amount of $5,000,000.00 or the maximum amount allowed by law;

**E**. Prejudgment interest from January 2017 until the date Judgment is entered at the maximum rate allowed by law;

**F**. Injunctive and other equitable relief, as appropriate.

For this We Ask,

By: ____/s/________________________

Robert Luskin
Paul Hastings LLP
875 15th ST NW
Washington, DC 20005
202-551-1966
202-551-0466
robertluskin@paulhastings.com

By: ____/s/________________________

Terrance G. Reed (VA Bar No.46076)
Lankford & Reed PLLC
120 N. St. Asaph St.
Alexandria, VA 22314
Phone: (703) 299-5000
Facsimile: (703) 299-8876
Email: tgreed@lrfirm.net

*Attorneys for Stefan A. Halper*