```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3     --------------------------x
       SVETLANA LOKHOVA,          :     Civil Action No.:
 4                                :     1:20-cv-1603
                Plaintiff,        :
 5         versus                 :     Wednesday, August 31, 2022
                                  :
 6     STEFAN A. HALPER,          :
                                  :
 7                Defendant.      :
       --------------------------x
 8

 9          The above-entitled hearing was heard before the
       Honorable William E. Fitzpatrick, United States Magistrate
10     Judge.  This proceeding commenced at 2:08 p.m.

11                     A P P E A R A N C E S:

12     FOR THE PLAINTIFF:    LESLIE MCADOO GORDON, ESQUIRE
                             MCADOO GORDON & ASSOCIATES, PC
13                           1140 19th Street, NW
                             Suite 602
14                           Washington, D.C.  20036
                             (202) 293-0534
15
       FOR THE DEFENDANT:    TERRANCE REED, ESQUIRE
16                           LANKFORD & REED PLLC
                             120 N Saint Asaph Street
17                           Alexandria, Virginia  22314
                             (703) 299-5000
18
       COURT REPORTER:       STEPHANIE M. AUSTIN, RPR, CRR
19                           Official Court Reporter
                             United States District Court
20                           401 Courthouse Square
                             Alexandria, Virginia  22314
21                           (571) 298-1649
                             S.AustinReporting@gmail.com
22
            COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
23

24

25
                                                              1
```

```
 1                    P R O C E E D I N G S

 2          THE DEPUTY CLERK:  Lokhova versus Halper,

 3  Case 1:20-cv-1603.

 4          THE COURT:  Good afternoon, everybody.

 5          MS. GORDON:  Good afternoon -- I beg your pardon.

 6          THE COURT:  I'm sorry.  Go ahead, Ms. Gordon.

 7          MS. GORDON:  Good afternoon, Your Honor.  I have a

 8  little bit of a cough, so I apologize this afternoon.

 9          THE COURT:  And, I'm sorry, just for the record,

10  enter your appearance for me.

11          MS. GORDON:  My name is Leslie McAdoo Gordon on

12  behalf of Ms. Lokhova, the plaintiff.

13          THE COURT:  Ms. Gordon, good afternoon.

14          MS. GORDON:  Thank you.  You as well, Judge.

15          MR. REED:  Mr. Terrance Reed on behalf of the

16  defendant and counter plaintiff, Stefan Halper.

17          THE COURT:  Mr. Reed, good afternoon.  How are

18  you?

19          MR. REED:  Fine.  How are you, Your Honor?

20          THE COURT:  All right.  So we've got a lot to

21  wrestle with this afternoon.  There are a number of case

22  management issues that we're going to try to resolve today,

23  and obviously we're going to try to resolve all -- we will

24  resolve all of the discovery objections.  Right.  It is

25  certainly the goal of the Court to give the parties as much
```

2

1    clarity as possible moving forward so we can -- this case

2    can be -- can be advanced in an efficient manner and also in

3    a way that protects the rights and the interests of both

4    parties.

5            What that is going to entail, at least initially,

6    is we're going to have to draw some boundaries.  We're going

7    to have to figure out exactly where the lines are for the

8    amended complaint and the counterclaims in terms of what is

9    properly discoverable and what is the reasonable schedule

10   for providing that discovery in light of outstanding

11   motions, upcoming depositions and everything that you all

12   have before you.  In order to begin to draw those lines, we

13   are going to stay very closely moored to the allegations in

14   the amended complaint and the allegations in the

15   counterclaims.

16           I realize, perhaps, this could be a little bit of

17   a moving target given the fact that, at some point -- I

18   believe on the 9th you have your argument before

19   Judge Brinkema on the motion to dismiss the counterclaims,

20   but we also have a discovery deadline I believe of

21   December 9th, if I recall correctly.

22           MS. GORDON:  Yes.

23           MR. REED:  That's right.

24           MS. GORDON:  Yes, Your Honor, that's right.

25           THE COURT:  And it's not, it seems to me, entirely

1  unusual to have to reevaluate and recalibrate the discovery

2  process giving -- or given the rulings of a District Court

3  judge involving some dispositive motions.

4        So it's certainly possible that we do something

5  today, that we'll have to readjust in light of

6  Judge Brinkema's ruling on the 9th or thereafter when she

7  makes her decision.

8        But it's my responsibility to make sure that this

9  case proceeds efficiently and properly, and I just don't

10 think we can wait, given the discovery deadline.  And I

11 know, Ms. Gordon, you have some other commitments in

12 September that you need to attend to, so we are going to try

13 to make as much progress today and give you all as much

14 certainty today as we possibly can so that this case can

15 move forward and move forward efficiently.

16       In order to draw those boundaries and make the --

17 and to properly rule on the objections of plaintiff and to

18 properly consider the positions of Mr. Halper, I do want to

19 make sure that we are all on the same page in terms of

20 exactly what the claims are and exactly what the

21 counterclaims are.

22       And I will say -- and this is not -- this is

23 not -- this is not intended to be a derogatory statement at

24 all, right.  I think you know my sense is that both parties

25 are really working hard to represent the interests of their

4

1   clients, both parties are really doing the best they can in

2   a very unusual case or a unique case that presents a lot of

3   different challenges.

4           My sense is, Mr. Reed, the defense's position,

5   generally speaking, is that you can't litigate this matter

6   without really litigating all the underlying claims; is that

7   fair to say?

8           MR. REED:  That is fair, Your Honor.

9           THE COURT:  And I understand where you're coming

10  from, because it seems to me in almost all defamation cases,

11  in order to prove the truth or falsity of the alleged

12  defamatory statement, in this case it doesn't matter whether

13  it's plaintiff's claim or Mr. Halper's counterclaim, you

14  have to peel back the layers of the onion and determine

15  whether or not the underlying statements were true.

16          MR. REED:  Correct, Your Honor.

17          THE COURT:  I completely understand that position.

18          And I also, from the plaintiff's perspective, see

19  your desire and your objections to limit as much as possible

20  to the narrow claims in your complaint, while, at the same

21  time, not addressing the counterclaims until Judge Brinkema

22  has ruled.

23          I do, however, think that there is -- and I think

24  Mr. Reed has pointed out a little bit of an inconsistency

25  between the first several pages of the complaint, which do

                                                            5

```
1    seem to allege this rather broad conspiracy, and plaintiff's
2    current position, which is we need to really limit discovery
3    and the issues to just the very narrow allegations in the --
4    in the specific claims.
5              And I think that does raise a little bit of a
6    challenge for the plaintiff because I'm sure -- obviously
7    you've thought of, Ms. Gordon, as you know, Ms. Gordon, that
8    if your position is we really need to narrow some of these
9    issues, then that is going to be a position that I am sure
10   is going to follow you all the way through trial, assuming
11   this case goes to trial.
12             You're not going to be in a position today to say,
13   well, you know, we are going to -- you know, we shouldn't
14   have to provide discovery on these five issues because it
15   clearly is outside the four corners of what we're claiming,
16   and then when we get to trial, you know, there's not going
17   to be the presentation of a lot of the underlying facts that
18   you're seeking to prevent discovery on now; right?
19             MS. GORDON:  Right.
20             THE COURT:  It does seem -- but that's the
21   challenge.  Right.
22             From Mr. Reed's perspective is, how do you
23   properly litigate this case without litigating all the
24   underlying claims.  But we're going to have to find a way to
25   do that.  I think going into this, I'm a little bit closer
```

6

1    to where Ms. Gordon is, in that we are going to have to find

2    a way to properly cabin both the claims and the

3    counterclaims without opening up discovery for everything

4    that was said by everyone throughout the history of this

5    case.

6           And I'm going to do my level best for both parties

7    to try to draw those lines in a consistent and principled

8    way.  Understanding that, again, given what Judge Brinkema

9    may rule on any outstanding motions, that may move the goal

10   post for us a little bit.

11          But in order to do that, in order to make sure

12   that we're drawing the lines properly, setting the

13   boundaries reasonably, I just want to make sure I understand

14   exactly what the core of both the claims are and the

15   counterclaims.

16          So with respect to the plaintiff's claims -- and,

17   quite frankly, Ms. Gordon, I am setting aside the first

18   several pages of the complaint because I think that's --

19   that's background or context, and it may exceed the scope of

20   where this case is ultimately tried.

21          But the alleged defamation comes from two letters,

22   a letter dated March 13th, 2020, and the second letter dated

23   April 2nd, 2020, to the two prospective publishers of

24   Ms. Lokhova's book.  Those letters are informing the

25   publishers that it was Mr. Halper's position that the

7

1   information in there was false and defamatory.  It is

2   essentially Ms. Lokhova's position that, in doing so,

3   claimed that she had lied and didn't tell the truth.  And

4   that constitutes the core of Ms. Lokhova's defamation claim

5   against Mr. Halper in the amended complaint.

6           Is that a fair characterization?

7           MS. GORDON:  Of the defamation claim, it is.

8           THE COURT:  Yes, of the defamation claim.

9           MS. GORDON:  It is.  So I am not going to put in

10  front of the hypothetical jury here any statement by

11  Mr. Halper that was made to the media, to the Bureau and

12  claim that those are defamatory statements.  I am sticking

13  with what's in these two letters.

14          I think I'm required to do that because *Lokhova I*

15  is over and done with.  It was dismissed, the Circuit

16  affirmed that.  I think as far as res judicata goes, I can't

17  argue that Mr. Halper defamed her in any way other than

18  what's in these two letters.  I think I'm limited to that.

19  That is what I intend to do.  The Court is correct, that all

20  the stuff that comes before is context for understanding the

21  book and the letters.

22          So it's never been my position that we can't talk

23  about anything that happened before Mr. Reed wrote those

24  letters.  We obviously are going to have to, to a certain

25  extent, to understand what's going on so the jury can

8

1    understand what's going on, but I am not going to claim --

2    we are not claiming in the amended complaint that the

3    defamation is based on anything other than what's in those

4    letters.

5              THE COURT:  Okay.  And let me just jump on that

6    one comment that you made just a minute ago.  But also, with

7    respect to the second claim, the tortious interference with

8    the contract, that also is grounded in the two letters; is

9    that correct?

10             MS. GORDON:  It is.  It's tied to those two

11   letters only.

12             Now, I think there are statements in those letters

13   that may not be defamatory, but may be misstatements or lies

14   that can be the basis for the improper conduct for purposes

15   of tortious interference, but that's simply a different way

16   of looking at what's in the letters.

17             But I am not doing anything in either claim that's

18   outside the four corners of those letters in terms of what's

19   actionable for defamation and constitutes the false

20   statements that may be made for purposes of the tortious

21   interference.

22             Now, on the tortious interference, I do have the

23   theory laid out in the complaint that what Mr. Halper is

24   using as the improper means required under the case law is

25   that he threatens to sue people for defamation, but he

                                                              9

```
 1    doesn't.  When they back down, he doesn't sue them; when
 2    they do publish, he still doesn't sue them.  Right.  He does
 3    other things, he gins up a bogus kind of criminal case
 4    against them.  But those are facts that are outside the
 5    letters that are part of my proof on the improper means that
 6    he's using to tortiously interfere.  But none of that --
 7             THE COURT:  That sounds like that's an
 8    admissibility issue whether or not you can get into that
 9    that --
10             MS. GORDON:  Right.  Those -- that conduct by him.
11             But none of that conduct has to do with Crossfire
12    Hurricane, it doesn't have to do with statements to the
13    Bureau, it doesn't have to do with statements to any of the
14    media companies.  That's all over and done with.  *Lokhova I*
15    is dead.
16             So here, I'm talking about these two letters.  And
17    the -- I'm saying, for purposes of the tortious interference
18    claim, that the letter is an example of the kind of conduct
19    that I think is improper means, as required under the case
20    law for tortious interference, that Mr. Halper is engaging
21    in in order to interfere.
22             So, under the case law *Duggin v. Adams,* I think it
23    is, you know, for purposes of tortious interference, there
24    has to be some kind of improper conduct, otherwise it's not
25    tortious.  So my theory here is that the sending of this
```

                                                              10

```
1    letter is a -- an example of the kind of improper conduct
2    that Mr. Halper engages in.
3           Now, I agree with the Court that there may be
4    admissibility issues as to whether or not I can get in the
5    other examples, right, of the -- what he's doing that I
6    think is improper conduct -- improper means, but we're still
7    talking about things that happened with these letters or
8    things that have happened that have nothing to do with
9    Crossfire Hurricane.
10           THE COURT:  So let me just take up on one quick
11    comment that you made, and let me anticipate Mr. Reed's --
12    at least, perhaps, part of Mr. Reed's response.
13           You said that, inevitably, you're going to have to
14    go back to some period of time prior to the letters to put
15    the letters in context, right, I understand that, and I
16    think that makes perfect sense.
17           The question is, how far and to what degree and
18    what doors does that open up?  I think Mr. Reed's position
19    is, you know, you can't -- you can't splice things up that
20    thinly; right?
21           MS. GORDON:  To the point where he can't defend
22    himself.  And I'm not trying to do that.
23           So, what we have here is that Mr. Halper, up until
24    a month ago, had not sued Ms. Lokhova for defamation.  Had
25    he done that and said she defamed him in her book, she could
```

                                                              11

have defended on the grounds that what's in her book is the truth.  Right.  Okay, but he didn't sue her for defamation then, and my position is he's waited way too long.  Her book was published in 2020; he can't file a defamation claim against her in 2022.  So he cannot raise that claim; it's time-barred.

So -- but even -- let's assume he had filed it timely, then I think he would be able to say, well, you defamed me, and I can prove truth as a defense to defamation.  Then we might be looking at some -- a situation where things that are in the book could be actionable, according to his theory of the case, for purposes of defamation.  But we're never going to do those because he's out of time.  So I don't think we should be taking discovery on his truth defense, because he can't defend my claim of defamation of what's in the letters by proving that things that Ms. Lokhova said in her book are not true.  Those two things -- those are like ships passing in the night; they don't have anything to do with one another.

He can defend, properly, on the grounds that -- that he didn't defame her because the things that he said in his letters are true.  That, he can do, of course.  I'm saying what's in the letters are false, he can prove that what's in the letters are true.  I think he's going to have trouble doing that, but he can try.  What he can't do is

12

```
 1    say, oh, but the things you said in the book about me are
 2    lies.  That has nothing to do with whether what's in the
 3    letters --
 4              THE COURT:  Don't the letters say the things in
 5    the book aren't true?  I mean, you know, I'm not sure how
 6    you --
 7              MS. GORDON:  Well, the book.
 8              THE COURT:  -- delink them.  I'm sorry, I'm not
 9    sure how you delink the statements in the letter with the
10    truth or falsity of the book.
11              MS. GORDON:  For two reasons.  One, the book had
12    not been published at the time he wrote the letter.  So he
13    can't be claiming that anything that's in the book is true
14    or false, because it hadn't been published yet.
15              The second point is that, what he's claiming in
16    the letters as defamatory is the marketing materials for the
17    book.  That, I agree, he can do.  He can say what's in those
18    marketing materials was false, these are lies about me.
19    That we definitely -- he can defend on that ground.  Because
20    I'm saying they're defamatory; he's saying, no, they're not,
21    they're true.  That's why I think the case has to be
22    grounded in what is in the letters.
23              THE COURT:  What's your view in terms of the
24    tortious interference counterclaim?
25              MS. GORDON:  Well, the tortious interference --
```

13

```
 1              THE COURT:  In other words -- I'm sorry.

 2              From the standpoint of -- I understand your

 3     position of why we shouldn't take discovery at this point on

 4     Mr. Halper's defamation counterclaim, but what's your

 5     argument as to why we should stay discovery at this point

 6     about Mr. Halper's tortious interference counterclaim?

 7              MS. GORDON:  I don't think he makes out -- he

 8     doesn't even come close to making out the elements of

 9     tortious interference.

10              Now, for his tortious interference claim, he's

11     claiming that the contracts that were interfered with are

12     contracts that he had with the Department of Defense to do

13     certain work for them and that Ms. Lokhova interfered with

14     those, but he doesn't even begin to make out the elements of

15     that tortious interference.  And I think it's very

16     illustrative that none of his discovery goes to that issue

17     whatsoever.  Nothing is talking about the DOD contracts or

18     her contacts with DOD to scotch those contracts.  He just

19     says by 2016, I had these contracts, and her defaming me,

20     you know, interfered with them.  I mean, it's just woefully

21     insufficient.  I fully expect the District Court to dismiss

22     that or make him replead it, but I don't think he's going to

23     be successful in that either.

24              And then I'll anticipate your next question, which

25     is about the third counterclaim.  That claim he's raising
```

14

```
1    the SLAPP statute defense, but that is not a private cause
2    of action.  There's not -- that's not a claim; that's a
3    defense that doesn't even apply in this case.
4         And, again, there's no -- none of his discovery
5    goes to anything that has to do with that.  I think those
6    are just far afield from what the case is actually about,
7    and I think the reason that that is is because his
8    defamation claim is not viable; it is time-barred.
9         So I think the purpose is to try to expand the
10   discovery.  Because what he really wants to do is what Your
11   Honor identified in the beginning, he wants to sort of
12   defend on all of it.  Which would be right if we were still
13   in Lokhova I or if he had properly counterclaimed timely in
14   either Lokhova I or Lokhova II for defamation, but he
15   didn't.
16        So now we're both stuck with what happened with
17   Lokhova I, which is all of those claims are barred.  He's
18   stuck with he's out of time to counterclaim for defamation.
19   What we've got left is these two letters and the tortious
20   interference.  And if he wants to properly plead a tortious
21   interference claim with the DOD contracts, he can do that,
22   but I don't think he's done that so far.
23             THE COURT:  Okay.
24             MS. GORDON:  And then the third claim is that's
25   not a claim at all.  It's a defense, it's a statutory
```

15

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

1    defense.  I don't think it applies to this case, but it's

2    definitely not a private cause of action.

3              THE COURT:  Okay.  All right.

4              Mr. Reed.

5              MR. REED:  Thank you, Your Honor.

6              First off, let me say, I appreciate the Court

7    trying to place some four corners on the litigation.  This

8    is the second iteration of the -- to our way of thinking

9    essentially the same claims.

10             Opposing counsel purported to identify a number of

11   things that she wasn't claiming in this case, but the

12   problem is they're all in the complaint.  The complaint is

13   the governing document, and we're entitled to prepare to

14   answer the complaint.

15             This is the fourth iteration of this story, the

16   second in this case, and in it, Ms. Lokhova accuses

17   Mr. Halper of engaging in defamation that has harmed her

18   academic career.  And if you look solely to paragraphs 1 to

19   6, and most especially to paragraph 98, she basically says

20   that this is the same case.

21             Now, whether it's the same case or not is a

22   question that ultimately will probably have to be resolved,

23   and it will have to be resolved as a matter of the res

24   judicata defense.  And I -- I recognize that opposing

25   counsel has, for the first time, acknowledged that there is

                                                           16

1    a res judicata effect, but I suspect that that issue, like

2    all others, is going to be subject to dispute and ultimately

3    a ruling from the Court about -- and/or the jury about the

4    scope of res judicata here.  And we respectfully submit that

5    we're entitled to take discovery based on just the

6    acknowledgment that we're going to have to refine the scope

7    of res judicata here.

8          And how do you refine?  Like all other ways you

9    refine either claims or defenses is, you take discovery on

10   them and let the -- let the parties winnow through the facts

11   to determine whether, in this case, what is the scope of the

12   res judicata defense.  But, for our purposes, we need to

13   take discovery on the -- on her core allegations, which are

14   that Mr. Halper defamed her, and that when he denies that,

15   that is, itself, defamatory.

16         If you just take a look at her claims that she

17   just said, she said that the -- even in the pared-down,

18   winnowed-down case that she is carving here for the first

19   time in this court, the issue still becomes what was -- what

20   was the substantial truth or falsity of statements made in a

21   demand letter.

22         Her position is that everything there is false.

23   And not just false, it is defamatory.  And what was -- what

24   was the demand letter about?  It was on the heels of this

25   court's ruling in *Lokhova I*, and it was about *Lokhova I*,

                                                           17

1   this Court's ruling.  And so the argument that *Lokhova I* has

2   no place in -- in terms of the relevance in discovery or in

3   terms of the scope of discovery, is just doesn't match even

4   the pared-down, winnowed-down case that she carved for the

5   first time in this court this afternoon.

6          So we are governed by what is in this complaint.

7   "We," meaning the defense, is governed by what is in their

8   complaint that they're the masters of, okay.  We didn't

9   draft their complaint.  We certainly didn't draft the first

10  lawsuit's complaint either; however, what -- what was said

11  in that complaint, that -- the *Lokhova I* complaint, is

12  relevant.  Why?  If only because the fact it failed.  It was

13  dismissed.  And the same allegations reappear here in this

14  dispute.  And, therefore, that's relevant to the credibility

15  of the plaintiff to be able to establish that she made these

16  allegations before, they were rejected by this Court and the

17  Fourth Circuit, and that should shed some light on her

18  credibility or lack thereof.

19         So, I just don't know how it's even possible to

20  carve out of this case the prelude, if you will, of the

21  *Lokhova I* litigation.  I am sympathetic to the -- to an

22  effort to try to do that, but I can't -- I can't file an

23  answer to a complaint that's written here in court now.

24         THE COURT:  I understand.

25         MR. REED:  And I can't file a motion to dismiss to

                                                           18

```
 1    a complaint that's being written in this courtroom as we
 2    speak.
 3              I'm -- because of the Judge's ruling, I'm in
 4    discovery, and I need to take discovery to make sure that I
 5    am prepared to depose the plaintiff and potentially other
 6    witnesses that may have relevant facts about her expanded
 7    lengthy story.
 8              THE COURT:  I understand.  And I appreciate that.
 9    I'm sorry, I don't mean to cut you off.
10              MR. REED:  No, that's all right.
11              There is one other point --
12              THE COURT:  Sure.  Please.
13              MR. REED:  -- that I just wanted to emphasize that
14    the Court said.
15              THE COURT:  Please.
16              MR. REED:  And I -- normally is this the second
17    lawsuit brought by plaintiff in this form against my client,
18    it is the second defamation suit.  And, as the Court pointed
19    out, one of the -- one of the perils of bringing a
20    defamation suit is that you expose to discovery everything
21    that's relevant to the truth of the matters that you're
22    placing in dispute.
23              Opposing counsel said that there is no truth
24    defense in this case.  She has it backwards.  It's her
25    burden to prove the lack of substantial truth; it's not our
```
                                                              19

```
 1   burden to prove truth.  So we're entitled to take discovery
 2   on literally anything she says in the complaint that is
 3   relevant to a determination by the Judge, Your Honor, by
 4   Judge Brinkema, or a jury as to where the truth lies.  And
 5   that is daunting.
 6           I can't tell you how many clients I've dissuaded
 7   from bringing defamation suits simply because they put their
 8   whole reputation and everything they've said regarding a
 9   matter at issue.
10           THE COURT:  It does open a lot of doors.
11           MR. REED:  And this is the second door opening.
12           THE COURT:  I understand.
13           In a few minutes we're going to go through each of
14   the interrogatories, request for productions, each of the
15   objections.  Both parties will have an opportunity to be
16   heard on every objection as we go through it, and I'll rule
17   on those objections as we go.  So, by the end of the day,
18   you'll at least have from me exactly where I think these
19   fall.
20           I would say, Mr. Reed -- I would just make two
21   points before we do that.  Number 1 is, I don't necessarily
22   agree that the amended complaint in the earlier pleadings
23   open up all the issues.
24           I do agree with Ms. Gordon from the standpoint
25   that when she came into the case, she certainly narrowed the
```

20

```
 1   original complaint in Lokhova II.  Right.  It is clearly

 2   more narrow.  But I also certainly agree with you that the

 3   first several pages are certainly more broad than what

 4   Ms. Gordon is arguing now in terms of how this case is going

 5   to be tried and the factual issues that the jury must

 6   decide.

 7          And I think what we're going to do -- or what I'm

 8   going to do is, I'm going to treat Ms. Gordon's submissions,

 9   the position that plaintiff has taken in her pleadings, the

10   oral arguments that plaintiff is making now as, in some

11   ways, an amendment or a narrowing of the first several pages

12   of the complaint.

13          MR. REED:  Does that --

14          THE COURT:  I think that -- what I mean by that

15   is, I think some of what's in the complaint is essentially

16   going to be surplusage.  Right.  If this case is going to be

17   tried, if plaintiff's claims are going to be tried on

18   whether or not the two letters were, in fact, defamatory,

19   and whether or not there was a tortious interference with a

20   contract, right, the question for me is not necessarily --

21   and I am -- and this is ultimately -- I don't mean to

22   overstep my bounds; this is ultimately an issue for

23   Judge Brinkema.  But in terms of managing the discovery, at

24   least initially, it's going to be what is properly

25   discoverable on those claims.  Right.  And only those
```

                                                              21

1    claims.

2              Now, the problem that I have, the challenge that I

3    have is -- and what I would ask the parties to do when we go

4    through the -- each discovery objection is, I would ask the

5    arguments to focus on the specific claims or counterclaims.

6    Right.

7              So, in other words, if the essence of the

8    plaintiff's defamation claim are the two letters at issue,

9    right, what parts of those letters is the discovery intended

10   to deal with.  What assertions in those letters is a

11   discovery intended to determine whether or not that

12   statement is true or that statement is false.

13             What statement in that letter, what part of that

14   letter -- if the defamation is cabined into those two

15   letters, what part of those letters is the discovery

16   designed to identify other relevant evidence, other

17   admissible evidence.  Right.

18             I just don't think -- I think to do otherwise is

19   essentially to open up the entire issue, and we're just not

20   going to do that.  Maybe this is the wrong place to draw the

21   line, but this is where we're going to draw the line.  And

22   I'm going to try to draw it in a way that -- and what I'm

23   going to need in order to -- from the parties, in order to

24   rule on these objections, I'm going to need for you to

25   explain to me, given how counsel has orally informed the

                                                              22

```
 1    Court and you about the theory upon which plaintiff is going
 2    to try this case, the scope with which plaintiff is going to
 3    try this case.  Because we're just not going to open up
 4    discovery to everything about -- about the allegation
 5    that -- let's back up.  Right.  Because, at the end of the
 6    day, plaintiff is arguing that Mr. Halper defamed her by
 7    claiming that she was involved in a romantic relationship
 8    with an American general.
 9              MR. REED:  And a Russian spy.
10              THE COURT:  And a Russian spy.
11              MR. REED:  Yes.
12              THE COURT:  Right.  And she was an agent of a
13    foreign government; right?
14              MR. REED:  That's her mantra.
15              THE COURT:  I get it.  I get it.
16              The heart of Mr. Halper's counterclaim is that he
17    was falsely accused of being a conspirator in this scheme to
18    undermine the U.S. Administration, or President Trump, or
19    something along those lines with the FBI.  All of sort of
20    what we've seen in the media for the past umpteen years.
21              MR. REED:  Right.  Her language does that.
22              THE COURT:  Right.  I understand that.
23              We're not going to litigate those two massive
24    issues.  We're just not going to.  We are going to try to,
25    as specifically and as definitively as we can -- and I
```

23

```
1    believe this is where -- in reading the transcript from
2    Judge Brinkema's -- the hearings that Judge Brinkema's held,
3    I think this is -- this is entirely consistent with
4    Judge Brinkema's efforts to make sure that, to the extent
5    that this case is ultimately tried, that it's tried on a
6    theory that is clear, that is concise, and that is properly
7    pled.
8                MR. REED:  Your Honor --
9                THE COURT:  So you look like you disagree
10   vehemently, Mr. Reed.
11               MR. REED:  Yes.  I apologize.
12               THE COURT:  You don't need to apologize.  You
13   just --
14               MR. REED:  Because the -- the defamation claim,
15   even if it's boiled down, distilled down, is still that
16   contradicting the plaintiff's historical account is
17   defamatory to her.  Okay.
18               THE COURT:  That's -- I hear you.  That's -- and
19   that's what I mean when I say that --
20               MR. REED:  So how can her account be irrelevant to
21   her own defamation claim, much less our counterclaim?
22               THE COURT:  I hear you.  And that's the challenge.
23   That's what makes this a little difficult.  Right.
24               But that's why what I'm -- and maybe it's easier,
25   we just need to sort of get into the process and start
```

1    pushing through some of these.  But that's why what I need

2    from the parties is when we go through each one of these

3    interrogatories, we go through each one of these requests, I

4    need a specific argument as to why this request -- and I

5    will tell you, my initial -- and I haven't made up my mind,

6    I'm happy to hear the -- but my initial theory is that some

7    of these are a little overbroad; some of these are not

8    really proportionate time; some of them are completely

9    reasonable and necessary.  Right.

10           But what I need the parties to tell me is, based

11   on your specific counterclaims and based on the plaintiff's

12   specific claims as articulated by counsel today and in prior

13   hearings, as articulated by counsel in her pleadings, why is

14   the discovery appropriate given that?  And if your argument

15   ultimately, Mr. Reed, is you can't delink these, then you're

16   going to have to really explain why.  Because -- because,

17   you know, it is my -- I do think what's proper, I think

18   what's reasonable, and I think what's best for this case is

19   for me to find a clear linear path to get through the

20   discovery process and to get this case through dispositive

21   motions, and, if necessary, to trial.

22           MR. REED:  Your Honor, I agree.  And I'm -- I'm

23   sympathetic and supportive of your goals.  I just do not

24   want to put myself and my client in a position that these

25   amoeba-like allegations are disavowed down, but when the

                                                          25

```
1    time comes for summary judgment or for trial, we're back to
2    where we were -- we have been since 2019.
3              THE COURT:  That's how we started the day.  Right.
4    I mean, there's a wonderful court reporter in front.  And we
5    started the conversation with me and Ms. Gordon, you know,
6    going through this notion that if I -- if I make these
7    rulings based on her representations about the theory upon
8    which she's going to try this case, that she is essentially
9    locked into that.  And it is going to be -- I can't imagine
10   that she's going to be able to use these arguments as both a
11   sword and a shield to shield herself from -- from -- or I
12   can't imagine the Court would permit it if it happened.
13   That she would use her arguments to shield herself from
14   certain discovery obligations and then turn around and try
15   to argue that point to the Court or to the jury.  I just
16   don't think that's where we're going.  So, if I'm wrong,
17   I -- Judge Brinkema will certainly let me -- let me know I'm
18   wrong.  But I think that makes sense where we are today.
19             So let's try to push through this as best we can.
20   And, again, I think that the -- I think it makes sense to --
21   let's go through the -- first, why don't we go through the
22   interrogatories, and then we'll go through the requests.
23             The only question I have is, do the parties have a
24   position as to whether we bifurcate the discovery process
25   from the standpoint of if there are discovery requests that
```
                                                              26

```
1    are specific to the defamation counterclaim?  I will at
2    least hear argument as to whether or not it's appropriate to
3    hold that in abeyment until Judge Brinkema rules on the
4    motion to dismiss the defamation counterclaim.  I'm not sure
5    it makes much sense on the other one, but I'll certainly
6    hear you on that.
7            MS. GORDON:  I think it's so unwieldy that if we
8    do bifurcate that and the District Court rules in my favor,
9    then we don't have to do it.  If she doesn't rule in my
10   favor, then at least we have a narrower scope of things that
11   we can do a second round of production or interrogatory
12   responses to.
13           Most of his -- most of -- I beg your pardon.  Most
14   of the defendant's discovery requests don't relate to that;
15   a few of them do.  And so I think it would be easy to
16   identify those and then decide do we want to do them now, or
17   do we want to do them later.
18           THE COURT:  One of my concerns is, I don't -- if
19   it's a question of all or nothing, then we're going to move
20   forward with all today.  Because one of the concerns I have
21   is, you have a hard discovery cutoff of December 9th.
22           MS. GORDON:  Maybe I misunderstood Your Honor.
23   You were thinking you would not rule on them today or --
24           THE COURT:  If there were specific -- if the
25   parties -- if there were specific -- part of this was an
```

27

1    effort to make things a little easier on the plaintiff.

2    Right.  Because you are going to have to provide a

3    significant amount of discovery in a very short period of

4    time.

5           The -- if there is a -- if there is a request for

6    documents, if there is an interrogatory that is uniquely

7    associated with the counterclaim, I would hear argument

8    about reserving on that issue until Judge Brinkema has ruled

9    on that -- on the motion to dismiss that counterclaim.

10          MS. GORDON:  So --

11          THE COURT:  If everything is sort of intertwined,

12   then my sense is let's just attack everything now, let's see

13   where we are, and then we'll proceed.  But that's the

14   impression I'm getting from counsel.

15          MS. GORDON:  So I think I misunderstood you.  I

16   wasn't sure if you meant you wanted to rule on them today or

17   just delay the production.

18          I think there are so few in number that relate

19   to -- that specifically relate to the counterclaims.  I

20   think there's only one maybe in the interrogatories that

21   specifically speak to that, and there's a handful in the

22   documents.  It might be wise just to do them.

23          THE COURT:  Okay.

24          MS. GORDON:  Just do them all.

25          THE COURT:  Let's just push through them then.

                                                              28

```
 1              Does that make sense?
 2              MR. REED:  Yes, it makes sense.
 3              THE COURT:  Okay.  Let's roll through the -- why
 4    don't we start with the interrogatories and the objections.
 5    And we're going to go through a lot, so as long as the --
 6              MS. GORDON:  Can we sit?
 7              THE COURT:  I was going to say, as long as the
 8    court reporter can hear you, there's going to be a lot of
 9    back-and-forth.  So whatever you're comfortable doing.
10              MS. GORDON:  I wonder if it might be wise to take
11    up the definitions.  Because for a number of my objections
12    for both discovery requests, there's an issue with the
13    definition of the word "you" and with the definition of "me"
14    accompanies.  So if we can address those, that will
15    definitely narrow --
16              THE COURT:  If you want to take the general
17    objections up first, we can do that first.  Okay.
18              So your objections -- why don't we take up the
19    question of "you."
20              MS. GORDON:  So the definition of "you" under the
21    instructions includes Ms. Lokhova, myself, her former
22    counsel, Mr. Biss, her trustees in her bankruptcy, her
23    publishers.  I mean, these are people that some of whom she
24    no longer has any control over.
25              I'm not saying the defendant can't maybe take
```

                                                              29

1    discovery from them as a third-party person, but to include

2    all of those in the definition of "you" is, I think -- by

3    operation of language makes a lot of the requests overly

4    broad.

5            And then the other issue that arises there is the

6    question of work product.  So, for some of my objections, I

7    am objecting on the basis that, including myself and

8    Mr. Biss in the definition of "you" necessarily means that

9    the request is literally asking for work product.  And so if

10   the defense were to say, well, we disavow that, we're not

11   interested in the work product, and to that extent counsel

12   is excluded from the definition of "you," that would be

13   progress.

14           THE COURT:  Let's just handle that first.  Right.

15           MR. REED:  Sure.

16           THE COURT:  The first issue is, if either side is

17   asserting a privilege, whether it's a work-product

18   privilege, whether it's an attorney/client communication, we

19   have a process for that that's handled in the discovery

20   plan.  So that -- I think that's a separate issue.

21           If there is something that appears to be

22   responsive to discovery and you want to assert a privilege,

23   we'll just handle it the way we typically handle it.  We

24   have a process for that.  We would ask for a privilege log

25   and, you know, we will handle that as efficiently and as

                                                            30

1    quickly as we can.

2            Other than that, with respect to who constitutes

3    "you," do you have any thoughts or anything else you want to

4    add to your submission, Mr. Reed?

5            MR. REED:  Just that the -- one of the reasons for

6    defining "you" to include counsel, is that prior counsel

7    took the position that he didn't have the documents that --

8    of the plaintiff, and therefore he was not producing any

9    documents because they were in her exclusive possession.  So

10   I wanted to make sure that we didn't have a repeat of that

11   here, I would ask actually for assurances that it won't

12   happen, I haven't received such an assurance.

13           THE COURT:  I'm sorry, you have or have not?

14           MR. REED:  Have not.

15           THE COURT:  Okay.

16           MR. REED:  And so the term "you" is defined as it

17   typically is, that's you and your agent.  And the "agent"

18   just means somebody that you have control over so that you

19   can't say that what they possess, you don't.

20           The itemization of particular "agents" is other

21   than the attorneys, to make it very clear that that dodge is

22   not acceptable, is simply to identify potential agents.

23           If she has a problem with a particular agent or

24   saying that somebody is -- she's not answering, or the

25   document's in the hands of her, you know, agent, then she

                                                              31

```
 1   can do that and just say she's withholding documents, and
 2   I'm happy to address that.
 3           THE COURT:  I think that's right.  I think the
 4   definition of "you" is appropriate under these
 5   circumstances.  It's going to include Ms. Lokhova, all of
 6   her agents.
 7           If there is an issue that you have, Ms. Gordon,
 8   either with the privilege assertion, or there are documents
 9   that are responsive but you don't have control over them, I
10   would ask you to meet and confer.  If you can't resolve it,
11   bring the issue to the Court.  But I don't see any reason,
12   at this point, to narrow that term any further.
13           With respect to "media companies," did you want to
14   be heard further on that?
15           MS. GORDON:  Yes.  So this -- these -- the
16   definition of "media companies," as I understand it, comes
17   from a reference to Lokhova I.  Because the -- specifically
18   one of the companies that's identified is all of the media
19   defendants that were sued in Lokhova I, and then there's an
20   entire litany of others that are listed as well.  And it
21   simply makes the discovery so broad as to being completely
22   unwieldy and unmanageable.
23           And I notice that a number of them are Russian
24   media outlets, and I fail to see the relevance there except
25   as, as I've said in my pleadings, that it's designed to
```

                                                              32

 1   embarrass Ms. Lokhova, harass her.  And so there's kind of a

 2   multitude of problems there.  There's too many of them, it's

 3   absurdly broad.  The Russian one, that's not legitimate

 4   discovery; that's abuse.  And the question of the media

 5   defendants from *Lokhova I* is totally outside the scope of

 6   this case.

 7                THE COURT:  Mr. Reed.

 8                MR. REED:  Yes, Your Honor.  There are two

 9   reasons -- or at least two for the definition of "media

10   companies."

11                One, obviously they're relevant to the

12   counterclaim.  All of the references to "media companies"

13   are with respect to discovery related to communications by

14   the plaintiff to a media company or back relating to Halper.

15   So that's obviously relevant to the counterclaims for

16   defamation because that would be the defamation if we

17   suspect that she was telling them what they published.

18                And so the definition of "media companies" is

19   simply the means by which plaintiff conducted her

20   defamation.  The timing of that, and the fact that --

21                THE COURT:  I'm just going to ask Ms. Gordon right

22   there, isn't it important, Ms. Gordon, in a defamation case

23   to know who the alleged defamatory statements were conveyed

24   to?

25                MS. GORDON:  He would have to identify those.

                                                                    33

1    That's the problem.  He doesn't identify any of the media

2    companies as being recipients of defamatory statements.

3              THE COURT:  Well, that's the purpose of discovery,

4    right.  So -- I mean, I don't think it's understood that he

5    needs to know now.  I mean, I think we're talking about

6    records or documents or communications in Ms. Lokhova's

7    possession regarding who she conveyed these allegedly

8    defamatory statements to.

9              MS. GORDON:  But he hasn't identified what the

10   defamatory statements are, nor to whom they were conveyed

11   except -- well, for purposes of his counterclaim, she's

12   saying he defamed him by publishing her book and by making

13   certain comments to people at Cambridge, none of whom are

14   any of these media companies.

15             So, for purposes of the defamation claim, you have

16   to say what the defamatory statement is and how it was

17   published.  And he has, in his counterclaim, identified two

18   of those, the book, and statements to people who were

19   basically professors at Cambridge.  Not any of these media

20   companies.

21             He's not entitled to discovery on claims that he

22   hasn't made.  If he wants to broaden his claims to other --

23   you know, other -- listing other defamatory statements, he

24   can do that by getting documents in discovery, but only

25   documents that are relevant to the claim that he's already

                                                              34

```
 1   making.
 2            You can't just say I want all your statements that
 3   you might have made about me because I'm going to add new
 4   defamation claims after I see what it is.  That's not how it
 5   works.  You have to define the statements first.  He's
 6   accusing me of not doing that in one of his interrogatories,
 7   of not saying what the defamatory statements are.  Now, in
 8   fact, we have done that because the complaint clearly says
 9   what the defamatory statements are.  It's contained in these
10   letters.
11            THE COURT:  Let's stay on this issue, though.
12   Okay.
13            MS. GORDON:  Right.  But I'm saying, it's
14   parallel.  He's correct.  You have to identify what the
15   defamatory statements are.  I have done that.  He has
16   identified what his defamatory statements are for purposes
17   of his counterclaim, and none of them have anything to do
18   with these media companies.  Nothing.
19            MR. REED:  That's not accurate, Your Honor.
20            First off, she complains that we list there the
21   media companies that she claims in *Lokhova I* had Halper as a
22   source for the defamation that she's claiming.
23            So, you know, the idea that there's not going to
24   be any defamatory statements about Halper from Ms. Lokhova
25   to the media, you know, it's just not remotely correct.
```

                                                              35

```
1    There are --
2                THE COURT:  Your argument is --
3                MR. REED:  In the counterclaim --
4                THE COURT:  Isn't her argument in her -- her
5    argument is in your counterclaim.  The defamatory statements
6    at issue are the publication of the book itself and the
7    advertisements about the upcoming book that were allegedly
8    defamatory.  So those are the defamatory statements.
9                MR. REED:  There's certainly that, but there's
10   also other defamatory statements, including the statements
11   that she has made tirelessly in the media.  And that has two
12   pieces of relevance.  One, it's relevant to the counterclaim
13   for defamation; and two, it's relevant to the defense of
14   self-publication.
15               What is the defense of self-publication?  The
16   defense of self-publication is that if a plaintiff, a
17   defamation plaintiff, broadcasts the alleged defamation, and
18   particularly in this instance, repeatedly, that relieves the
19   defendant of responsibility for the publication.  They
20   basically are self-publicating.  And we've cited the case
21   law for this proposition.
22               And that's why, quite frankly, the fact that she
23   has been saying this about herself for years makes all of
24   this relevant to the defense of self-publication, separate
25   and apart from the counterclaim.
```

36

1          So we respectfully submit that her assertions

2    about allegedly being accused of being a Russian spy and

3    paramour of General Flynn, those are relevant, in and of

4    themselves, both for defense purposes and also for

5    counterclaim purposes.

6          She's made them also relevant for another purpose,

7    and that is she's got pending a motion for summary judgment

8    on personal jurisdiction saying that this Court lacks

9    jurisdiction over her.  Why?  She claims that this Court

10   lacks jurisdiction over the counterclaims because some --

11   although she doesn't identify all, some of the defamation

12   that we're complaining about was actually done in England,

13   and she's an English resident, a British resident, and

14   therefore this Court doesn't have jurisdiction over them.

15   Okay.

16         Now, an obvious response to that personal

17   jurisdiction is, no, she brought a suit here in *Lokhova I*

18   where five of the -- or four of the eight -- no, five of the

19   eight media articles that she was bringing a suit over under

20   the Virginia long-arm statute in this court were British.

21   And so we're entitled to get discovery from her in order to

22   respond to her personal jurisdiction challenge about these

23   communications by her to media companies.

24         And, you know, we respectfully submit that there

25   are going to be a fair number of them, and we understand

                                                            37

```
 1    that.  But the number and frequency of her communications to
 2    media companies is directly relevant to the question of
 3    did -- has she purposefully availed herself of the benefits
 4    in this forum.  And if she pummels defamation from Britain
 5    into this forum, we're entitled to evidence of that in order
 6    to establish her minimum contacts with this forum and also
 7    her purpose -- availment of this forum.  And, indeed, part
 8    of our counterclaim is that she -- she's raised money off
 9    this defamation in this forum.
10              THE COURT:  Where in your counterclaim do you
11    allege that the defamatory statements allegedly made by
12    Ms. Lokhova included interviews to the media?
13              MR. REED:  Interviews to the media?  I don't know
14    that we used the term "interviews to the media."
15              THE COURT:  Or anything along those lines.  The
16    way I read the counterclaim -- the way I read it is, you're
17    alleging that the defamatory statements are contained in the
18    book that was published and in the advertisements for the
19    book that was ultimately not published.
20              MR. REED:  Those would be timely acts of
21    defamation.  We don't know all --
22              THE COURT:  I'm not ruling on the timeliness.
23    That's for Judge Brinkema.
24              MR. REED:  Right.
25              THE COURT:  But, I mean, I'm just -- in terms
```

38

```
 1    of -- let's put aside the minimum contacts.  Let's put aside
 2    that issue for a second, because that's a -- I think that's
 3    a very fair point you're making.
 4             But in a defamation suit, if the defamatory
 5    statements that you're alleging in your counterclaim is the
 6    publication of the book, is the advertisements for the
 7    publication of either that or another book, I'm having a
 8    hard time seeing the need for every discussion about the
 9    book or, you know, with the media outlet.  Help me just --
10             MR. REED:  Sure.
11             THE COURT:  -- connect those dots.
12             MR. REED:  Sure.  The book itself is a 360-page
13    summary of her conspiracy theories writ large.  But, more
14    importantly, it is -- it goes chapter and verse, literally
15    verbatim, quoting the eight articles in a cut-and-paste
16    operation from the Lokhova I complaint into her book
17    describing each of those articles in the same language, and
18    that's defamatory.
19             THE COURT:  Was that alleged in your complaint --
20    I mean in your counterclaim?
21             MR. REED:  Well, in part, because it was -- we
22    quoted at length.  We could quote more from her defamatory
23    assertions in the book.  I mean, you know, at 360 pages,
24    there's quite a few of them.  She mentions Mr. Halper like
25    1,100 times in the book.
```

1          THE COURT:  I understand.  But, to me -- and maybe
2    it's just because I have a very provincial way of thinking
3    about this.
4          When it's pled, there has to be an allegation of
5    what the defamatory statement was, how it was -- it was
6    communicated.  And you're asking for discovery, it seems to
7    me, for -- for potentially defamatory statements that were
8    not necessarily pled.  You're asking for essentially
9    other -- you know, other acts.  And, again, we're trying to
10   cabin this to how it's pled.  I understand -- I just need to
11   understand the connection between --
12         MR. REED:  Sure.
13         THE COURT:  -- the book -- if you're asking about,
14   you know, communications about, you know, the specific book
15   or the specific, you know, something along those lines, it
16   seems to me to be a little bit more narrowly tailored.
17         MR. REED:  Well, we're talking about the
18   definition of media companies.
19         THE COURT:  Well, that's it.  I think we've sort
20   of moved the goal post a little bit.
21         MR. REED:  Right.
22         THE COURT:  So --
23         MR. REED:  But the through line for the defamation
24   is not only the discussions in the *Lokhova I* complaint, but,
25   more importantly, the fact that these are published in her

                                                            40

```
 1   book in June of 2020.  All of it, all over again.  Same
 2   thing.
 3             THE COURT:  I understand.  But that's subsumed
 4   within the book.  That's subsumed within the alleged
 5   defamatory statements made in the book.
 6             MR. REED:  Yes.
 7             THE COURT:  Okay.  So -- okay.
 8             MR. REED:  So -- and the media companies -- the --
 9   any specific itemization -- and we'll get to her complaint
10   about Russian media if the Court would like.
11             In paragraph 98 of her complaint, she says:
12   "Although journalists have previously reported that Halper
13   was a spy, plaintiff was a credible academic and historian
14   who sought to publish an entire book discussing Halper's
15   efforts to smear the presidential candidate, his national
16   security adviser, by falsely tying them and" -- I'm sorry --
17   "and plaintiff, an innocent third party, to Russia."
18             The allegation here is that Mr. Halper is falsely
19   tying the plaintiff to Russia.  That, to me, makes relevant
20   any evidence with respect to whether there's substantial
21   truth to that or not.  Specifically, what is the
22   relationship of Ms. Lokhova to Russia.  And you'll see
23   that --
24             THE COURT:  I'm sorry.  What were you reading from
25   just a moment ago?  Was that the --
```

                                                              41

```
 1              MR. REED:  The amended complaint.

 2              THE COURT:  Amended complaint.

 3              MR. REED:  Paragraph 98.  It's in our material

 4     packet.

 5              And so that opens the door to a defense that,

 6     indeed, she's fairly tied to Russia.

 7              THE COURT:  The general objection right now is

 8     just -- before we get to the specific request for

 9     production, the general objection right now is, what does

10     "media companies" mean.

11              Is that correct, Ms. Gordon?

12              MS. GORDON:  Right.  Because it's all over the

13     place, and it covers media that have no relation whatsoever

14     to this case.

15              THE COURT:  Well, that, I'm not so sure -- that,

16     I'm not so concerned about.

17              But the question is, what is the proper definition

18     of a media company?  I mean, clearly the New York Times is a

19     media company.  Is some blogger sitting in his basement

20     writing a blog about some issue, is that, you know -- I

21     think we need to make sure that we're -- we have a little

22     bit more of a narrowly-defined term.  And then we can

23     determine, on a case-by-case basis, whether or not a

24     specific interrogatory is appropriate or a specific request

25     for production -- or for documents is appropriate.
```
                                                              42

1          MR. REED:  Your Honor, I was attempting to make it

2   clearer for her.  If you want to go with a general

3   definition and ask her to identify the entity or somehow

4   make it clear that she's excluding some entity from the

5   inquiry, that's fine with me.

6          THE COURT:  Okay.  And I'm not completely moved by

7   the notion that -- I don't see any attempt for

8   embarrassment, Ms. Gordon.  You know, if it turns out that

9   communications with the media company or media in general is

10  properly discoverable, whether that media company is in

11  London or New York or Moscow, I just don't think that really

12  is going to matter.  I don't think that there's any inherent

13  prejudice to your client, particularly at the discovery

14  phase.

15         But I do want to say this, I am certainly moved by

16  Mr. Reed's argument that Ms. Lokhova is asserting that this

17  Court does not have personal jurisdiction over her.  I can

18  tell you, I -- if there is -- if there is any movement in

19  this area, it certainly is going to include any

20  communications that Ms. Lokhova has that would establish

21  personal jurisdiction.  It seems like it is -- you know,

22  again, that's an issue that will be decided ultimately by

23  Judge Brinkema.  But, for discovery purposes, I think

24  Mr. Reed is absolutely entitled to a factual predicate to

25  make sure that he -- I think he probably already has a very

                                                              43

```
 1    strong hand in that regard.
 2              MS. GORDON:  I'm going to have to disagree, Your
 3    Honor.
 4              The personal jurisdiction issue has to do only
 5    with his counterclaims.  I'm obviously not claiming the
 6    Court doesn't have personal jurisdiction for a lawsuit that
 7    she filed.
 8              The personal jurisdiction issue has to do with the
 9    defamation counterclaim where the defendant is saying that
10    Ms. Lokhova defamed him in England speaking to people who
11    were British citizens about him there.  That has nothing to
12    do with his statements here, it --
13              THE COURT:  It has to do with her book.  It has to
14    do with her book, and whether her book -- if she's talking
15    to somebody, and, you know, if she's on an interview and
16    that interview is carried in the Eastern District of
17    Virginia, if she is --
18              MS. GORDON:  Well, he's not talking about
19    interviews, Your Honor.  This is paragraph 70 of his
20    counterclaim.  He's talking about statements that she made
21    to four specific individuals who reside in England.
22              This Court doesn't have jurisdiction over every
23    claim that a plaintiff -- that could be brought against the
24    plaintiff because the plaintiff sued in this court.
25              THE COURT:  That's not how I understand his
```

                                                                    44

1    counterclaim to read.

2          So I will say, we're going to have to start going

3    through these, otherwise we're going to be here until --

4    until December 9th.  So the -- but what I can tell you is,

5    when it comes up -- you know, I think with respect to his

6    counterclaim, we're not -- I think we're seeing it the same.

7          With respect to his counterclaim, the issues about

8    what she did and who -- and if there's records or documents

9    or materials that's discoverable that's in her possession,

10   that's in an agent's possession that would bear on personal

11   jurisdiction on the counterclaims, I think is --

12          MS. GORDON:  I want to be clear with the Court.

13   The personal jurisdiction argument goes to one paragraph

14   only in his counterclaim, paragraph 70.  It doesn't have to

15   do with the book.  Paragraph 70 has to do with her

16   contacting people at Cambridge and publishing allegedly

17   defamatory statements to them.  That's it.

18          THE COURT:  Whatever your -- I mean, you brief

19   that.  I mean, whatever that issue is framed as, if there is

20   information that they are requesting that is responsive to

21   that issue, then they're going to be entitled to it.  Right.

22          So that's sort of a -- I don't mean to give an

23   advisory opinion, but that's kind of where we are.

24          MR. REED:  And I don't want to interrupt, Your

25   Honor, but just to give the Court notice, we did file today

                                                              45

```
1    with the District Court a Rule 56(d) motion basically taking
2    the position that we're entitled to discovery before the
3    Court addresses the pending summary judgment motion.  And
4    one of the issues that we are briefing is the fact that
5    they're objecting to personal jurisdiction, and we've asked
6    for discovery relevant to personal jurisdiction.
7              THE COURT:  Well, given that, I don't mean to -- I
8    don't mean to jump into Judge Brinkema's --
9              MR. REED:  No, I'm not asking you --
10             THE COURT:  If Judge Brinkema's wrestling with
11   that issue, I don't mean to --
12             MR. REED:  I'm just giving you notice.
13             THE COURT:  Right.  Unless -- if she asks me to
14   wrestle with it, I'm happy to.  If you --
15             MS. GORDON:  Let's hope that.
16             THE COURT:  -- if you frame that issue for her,
17   then that's good.
18             Okay.  All right.  Let's see if we can push
19   through some of these.
20             So let's first go through the -- and let me just
21   say, if the court reporter needs a break, just let me know.
22             Let's first go through the objections to these
23   specific interrogatories.  And we have 18 of them.
24             MR. REED:  That's right.
25             THE COURT:  Number 1:  "Identify all persons
```

46

```
1    involved in responding to defendant's first set of

2    interrogatories, including but not limited to persons from

3    whom you attained information to answer any interrogatory."

4          MS. GORDON:  And my objection to this is purely on

5    work product.  That it, by its terms, would include

6    information that I have attained from witnesses and so

7    forth.  That's my only objection to this one.

8          THE COURT:  Okay.  If to the extent that there is

9    a work-product privilege that you want to assert, assert the

10   privilege, you know, prepare a privilege log, and to the

11   extent that you all can meet and confer on that privilege

12   issue, that's great; if you need me to resolve the privilege

13   issue, let me know.  But I'm not going to --

14         MS. GORDON:  I didn't really expect the Court to.

15   I lodged all of my objections in -- the sort of normal

16   ordinary ones I would always lodge.

17         THE COURT:  I understand.  I understand.  I

18   just -- I want there to be -- you have them now, I want to

19   go through them and make sure the record is clear as to each

20   one.

21         MS. GORDON:  Right.

22         THE COURT:  Objection to specific interrogatory

23   Number 2.  "Identify all persons with knowledge of any

24   defamation of Plaintiff Lokhova by Defendant Halper."

25         Again, so I'll just read it just so they're on the
```

47

1    record.  And I have your objections, but I just want -- if

2    you have any additional argument or any other context you

3    want to provide, please do, and then I'll give Mr. Reed an

4    opportunity to be heard.

5              MS. GORDON:  Well, I mean, I've stated it here.

6    It says:  "All persons with knowledge of any defamation of

7    Plaintiff Lokhova by Defendant Halper."  About any topic?

8    Any time?  About any subject?  Whether it involves

9    *Lokhova I,* which is already over and done with?  It's

10   just -- it's absurdly overbroad.  And I'm not saying he

11   can't ask me to identify people who have knowledge of the

12   defamation that she claims in this particular case, that's

13   an appropriate interrogatory, but this one goes way beyond

14   that.

15             THE COURT:  Mr. Reed, can we narrow this a little

16   bit?

17             MR. REED:  This was drafted in mind of the

18   language of the complaints, including the amended complaint.

19   I'm not sure how to refine it.  The problem here is going to

20   be --

21             THE COURT:  Well, what I'll order then is I think

22   that it needs to be limited or narrowed to include the two

23   letters at issue and any statements contained within those

24   letters.

25             MR. REED:  The problem with that, Your Honor, is

                                                              48

```
1    they have yet to identify the statements in the letter that
2    they consider to be defamatory.
3              I don't know what I'm going to be getting here in
4    terms of an answer, and it's certainly not going to cover
5    the territory of a counterclaim.
6              I mean, just to take a hypothetical, Your Honor.
7    "Identify all persons with knowledge of any defamation."
8              THE COURT:  That's too broad.  I mean, that's
9    any -- I mean, first of all, you're asking -- you know, what
10   is -- I mean, you're asking them to --
11             MR. REED:  I'm asking her to identify people with
12   knowledge of her defamation claims.
13             THE COURT:  Of her defamation claim?
14             MR. REED:  Yeah.
15             THE COURT:  Okay.  Let's say that then.  I didn't
16   necessarily read it that -- so specifically with respect to
17   her claim, plaintiff's claim, that Mr. Halper defamed her,
18   essentially, by claiming that her statements were untrue;
19   right?
20             MS. GORDON:  Right.
21             THE COURT:  That her statements -- right.
22             MS. GORDON:  I'd be happy if it said "as set forth
23   in the amended complaint."  Then I would know that's the
24   scope of what --
25             THE COURT:  Well, here's the problem.  You know,
```

49

```
 1    you all aren't agreeing necessarily with the amended -- if
 2    this was an indictment, if this was a criminal case, it
 3    would be dismissed, right, because the defendant has to know
 4    what the crime is, where the crime was committed, how the
 5    crime was allegedly committed.
 6            The problem is, you know, your argument and your
 7    argument is that the claim and the counterclaim are too
 8    vague, too ambiguous.  Right.  So, to your credit, you tried
 9    to put some -- you know, you tried to cabin it in a little
10    bit.
11            MS. GORDON:  Mr. Reed is actually the author of
12    the letters that we're talking about.  So, I mean, to the
13    extent that we don't know what we're talking about, you
14    know, I'm not sure how that could be.
15            THE COURT:  Well, he authored the letters, but
16    you're the ones making the claim that there are defamatory
17    statements in there.
18            So, you know, the idea that Mr. Reed has to sit
19    and guess which clause in this letter are they fighting
20    about, which clause -- but my sense is, we know.  Right.  My
21    sense is we know what the plaintiff is alleging the
22    defendant said that they don't think is true; we have a good
23    idea of what the defense is claiming the plaintiff said
24    isn't true.  Right.
25            You know, again, if this was a criminal case, the
```

                                                                  50

```
 1    Court would be ordering a bill of particulars.  State with
 2    specificity.  But the reality is, we know.
 3            And maybe -- because we are dealing with discovery
 4    at this point rather than jury instructions.  I think that
 5    we -- you know, I do think that there is enough information
 6    that the parties have to comply with their discovery
 7    obligations in a full-throated, good-faith basis.
 8            So I just -- I do think that -- "identify all
 9    persons with knowledge of any defamation of Plaintiff
10    Lokhova by Halper."
11            MR. REED:  Your Honor, this is -- this probably is
12    within the realm of a mandatory disclosure.
13            THE COURT:  I think it is.  But, you know -- but,
14    you know, we just -- we're not talking about with respect to
15    Lokhova I; right?
16            MR. REED:  Well, I --
17            THE COURT:  I know you want to.
18            MR. REED:  I want to.
19            THE COURT:  But I don't think we're there.  It is
20    as -- I'll order that this be limited to the allegations in
21    the amended complaint.
22            Do you disagree?
23            MR. REED:  Well, I would agree if we worked off of
24    the real complaint as opposed to the one that's being
25    redrawn here.
```

51

```
1              THE COURT:  Well, look, you're going to have to
2     just understand -- you're going to have to get past this
3     issue.  Right.  You're just going to have to do it, because
4     otherwise we're going to keep coming back to it and back to
5     it and back to it.
6              The complaint -- the amended complaint with all of
7     the allegations in it about this massive conspiracy and how
8     Ms. Lokhova was victimized and all of these other things,
9     right, is never going to make it to the jury.  I just don't
10    see that happening.  Right.
11             What is going to happen is there's going to be --
12    you know, what counsel has done is she said, look, all those
13    allegations are in there, but what we're saying they did,
14    what is actionable now -- and we have to deal with the here
15    and now.  What is actionable is the two letters drafted by
16    Mr. Reed that said everything in this book is false; right?
17             MR. REED:  Okay.
18             THE COURT:  And because of that, right, he claimed
19    that Ms. Lokhova was a liar.  Right.  That's where we are.
20             MR. REED:  Right.
21             THE COURT:  So all of the back stuff, all of the
22    back story, all of the context, we're not going there.
23    That's *Lokhova I.*  And as much as -- and I understand
24    that -- your position that we can't delink them, but we are.
25    We are.  This is a new case, it's a new complaint, and we
```

                                                          52

1    are.  We are not taking, you know, a massive amount of

2    discovery about all of those things.

3              I wish the complaint was drafted differently.  I

4    wish -- you know, we wouldn't be having this argument if the

5    complaint was drafted perhaps a little more judiciously.

6    But counsel has come forward and clearly said, here's our

7    theory.  If she tries to back out of it, it's not going to

8    work.  She's locked herself in.  She's on the record.  She's

9    filed pleadings to this effect.

10             So, you know, we are going to take discovery only

11   on the position of these two letters.  We're only going to

12   take discovery on the things that -- as we are now.  Right.

13   That's where we are.

14             I still think there are big problems, because, you

15   know, it's going to be -- and we haven't even started

16   wrestling with what I think are the big problems.  Which is

17   when you get into those letters and those letters are

18   talking about the book, well, how far do you go back?  How

19   far do you peel back the layer of the onion?  That's the

20   problem.

21             MR. REED:  Well, there's a --

22             THE COURT:  But that's not the problem -- you want

23   to address a problem, Mr. Reed, that we're not going to

24   tackle anymore.  We are not litigating *Lokhova I.*

25             So what I'm going to tell you is -- and we've got

                                                          53

```
 1    to start rolling though these.  I'm going to cabin

 2    Question 2 into -- as alleged in the amended complaint.

 3              MR. REED:  Your Honor, and what I'm anticipating

 4    is, you know, I'm going to be deposing Ms. Lokhova next

 5    week, and I'm going to be anticipating that there's going to

 6    be objections.  As long as an answer is given, we can come

 7    back to the Court and deal with that, but that's not what

 8    I'm anticipating.

 9              THE COURT:  What date is the --

10              MR. REED:  Tuesday.

11              THE COURT:  Okay.  I'll be here all day.  Answers

12    will be given.

13              MR. REED:  Okay.

14              THE COURT:  If answers are not given, get me on

15    the phone.  I will make myself available for an emergency

16    conference call.  I don't want to say answers must be given.

17    You know, you advise your client as you deem appropriate.

18    But there's just not going to be any gamesmanship.  There

19    just is not going to be.

20              If there is an issue during the deposition, you

21    are completely free to call my chambers.  We will have a

22    court reporter there, or we will find a court reporter, or

23    I'll come and do it in the courtroom and we'll record it.

24              MR. REED:  We'll have one.

25              THE COURT:  Oh, you'll have one.  Good point.
```

                                                                      54

1    You'll have one.

2            And if there is -- if there is any gamesmanship

3    during the deposition, we will resolve it right there.

4            MR. REED:  All right.  And so, Your Honor, if you

5    had rewritten this to be "as alleged in the amended

6    complaint," can I at least make a record that I have my own

7    interpretation of the language of the amended complaint?

8            THE COURT:  Look, I'm here every Friday.  If you

9    guys kind of -- can't agree to -- I mean, what we can't do

10   today is we can't -- we can't --

11           MR. REED:  I understand.

12           THE COURT:  No.  No.  I'm just saying, I can deal

13   with the -- I can order, at least in my view what I think is

14   appropriate, the proper scope and reach of the

15   interrogatories, the proper scope and reach of the requests

16   for production of documents.

17           I can't sit here and just say, well, you know, our

18   party interprets this as this, interprets this as this.  You

19   sort of know where we're coming.  I think you know, at least

20   generally speaking, where my head is.  If you can't agree on

21   what's responsive, then we do discovery disputes every

22   Friday.

23           MR. REED:  Okay.

24           THE COURT:  Right.  And --

25           MR. REED:  Any particular time, or ...

                                                                55

```
1              THE COURT:  File a motion on Friday, response on

2    Wednesday, reply on Thursday, hearing on Friday.  We have a

3    seven-day turnaround.

4              MR. REED:  Okay.

5              THE COURT:  So that's it.  And I have a sneaking

6    suspicion we are going to know each other very well between

7    now and December 9th.

8              MR. REED:  I think you're right, Your Honor.

9              THE COURT:  So that's fine.  We'll get there.

10             So -- all right.  Anything else on two?

11             Three:  "List each and every false statement made

12   by Defendant Halper of or concerning plaintiff.  And for

13   each statement, describe the time, place and manner of the

14   statement and why it is false."

15             Okay.  Anything else we need, Ms. Gordon?

16             MS. GORDON:  I mean, other than what I've briefed,

17   no.  The "each and every" I think is an old formulation that

18   people use that's actually sort of -- you know, each and

19   every is -- goes too far.

20             But I take this interrogatory to be asking me what

21   the false statements are.  I think that it is sufficient for

22   me to say it's your two letters that you wrote.  But I don't

23   disagree that we could specify more specifically which

24   statements in the letters.  Obviously we're going to have to

25   do that when I promulgate my discovery.  That's the way it's
```

                                                              56

```
 1    going to read.  You said X, Y, Z in this letter, what are
 2    you basing it on.
 3              THE COURT:  Yeah.  I think the time, place and
 4    manner is pretty clear.  I do think that what I'm going to
 5    require in response to Exhibit 3 -- I'm sorry,
 6    Interrogatory 3 is exactly what counsel has been asking for.
 7    I do think it is appropriate with respect to those two
 8    letters in response to three for the plaintiff to state
 9    precisely why they think it is false.  I think it is
10    appropriate to reiterate the fact that your defamation claim
11    is limited to those two letters.  I think that's in response
12    to this interrogatory.  I think the time, place and manner
13    is fairly self-evident, but that's captured within the
14    response as well.
15              Anything else on that, Mr. Reed?
16              MS. GORDON:  The other aspect of it was that it,
17    again, sort of like what you're doing with Number 2, which
18    is -- because literally read it could be, you know, asking
19    us to identify every false statement made by Mr. Halper
20    concerning Ms. Lokhova from Lokhova I or outside of this,
21    and we're not.
22              THE COURT:  It's limited to the amended complaint
23    and how counsel has amended the amended complaint, and it's
24    limited to the two letters and specifically what plaintiff
25    alleges is false in those two letters.
```

57

```
1              Anything else on that, Mr. Reed?
2              MR. REED:  No, Your Honor.  Other than to note
3    that, to date, the only allegation has been that there's
4    something in the two letters.
5              THE COURT:  Well, this will help with that.
6              MR. REED:  Right.
7              THE COURT:  Four:  "Identify each person who you
8    intend to call as a fact or expert witness at the trial of
9    this matter and describe the person's knowledge of the
10   subjects at issue in the case.  In your answer, please state
11   the subject matter on which the person is expected to
12   testify and provide a detailed summary of the substance and
13   facts about which the person is expected to testify."
14             Obviously with respect to expert witnesses, that's
15   covered in paragraph 10 of the joint discovery plan.  So I
16   don't think it's appropriate necessarily to have this
17   interrogatory supersede that.
18             Am I missing that, Mr. Reed?
19             MR. REED:  No.  And, just for the record, these
20   interrogatories were propounded before we had a plan at all.
21             THE COURT:  Okay.  Okay.  So is it fair to say
22   Number 4 is moot then, or ...
23             MR. REED:  I do believe --
24             THE COURT:  I'm sorry.  The fact witness issues.
25             MR. REED:  The fact witness issues, yes.
```

58

```
 1              MS. GORDON:  I think that's covered under the
 2    mandatory disclosures.  My objection here is that this is
 3    asking the plaintiff to provide information pursuant to an
 4    interrogatory that conflicts with the rules, the plan.  You
 5    know, we've set forth deadlines for our 26 -- Rule 26
 6    disclosures.  The plan --
 7              THE COURT:  But this is a little different.
 8    Right.  The Rule 26 disclosures just talk about the witness
 9    list.  Right.  This is a little more broad.
10              MS. GORDON:  It is.
11              THE COURT:  So, you know, a final witness list --
12    this is a little bit more broad.  And I don't know that
13    there's necessarily anything inconsistent between this
14    interrogatory and either the local rules, the Federal Rules
15    of Civil Procedure, or any order of the Court, either the
16    scheduling order or the 26(b) order.
17              MS. GORDON:  The detailed substance summary of the
18    substance and facts does go beyond what the rules require.
19    But subject to what the rules do require, I'm happy to
20    answer this one.  But I -- as Mr. Reed has said, he
21    promulgated all of this discovery knowing that we were going
22    to do a joint discovery plan, because he's promulgated it
23    early because he's trying to get ahead of what the rules --
24              THE COURT:  Well, in this district, Ms. Gordon, we
25    move at a fast pace.  If you don't get ahead of it, it runs
```

                                                                  59

```
 1   you over.
 2              MS. GORDON:  Yes.  But he knew that I was in
 3   trial, and the rules apply to this.
 4              THE COURT:  I understand.  And that's a separate
 5   issue and it's a separate point.
 6              You know, look, you clearly are a very talented
 7   lawyer, you're clearly doing a wonderful job on behalf of
 8   your client.  And I know it's hard being in a small
 9   practice, there's a lot of pushes and pulls and a lot of
10   pressures, but this is EDVA, and we do move quickly.
11              MS. GORDON:  I understand, Your Honor.  I've been
12   practicing here for a long time.  Not often, but a long
13   time.
14              THE COURT:  I know.
15              MS. GORDON:  I would say it is impossible for me
16   to be doing a six-day trial in Greenbelt and answering
17   discovery for Mr. Reed at the same time.
18              THE COURT:  I can pretty much assure you that the
19   response to that is, you know, you did choose to bring this
20   case, and you did choose to bring it here.  And I know it's
21   hard, and I gave you relief when you were on trial, you
22   know, to file these objections, but --
23              MS. GORDON:  But I've had no relief with -- from
24   the Court in terms of actual production.  What I asked for
25   was 15 days of set-off.  That's all I asked for.  Because
```

                                                                60

```
 1    the first 15 days of this month I was in intensive pretrial
 2    preparation and actually trial in the Federal District Court
 3    in Greenbelt.  Mr. Reed decided to take advantage of that.
 4              THE COURT:  We're not going to go there.
 5              MS. GORDON:  But Your Honor is saying I got
 6    relief.  I did not get relief.
 7              THE COURT:  Of course you did.  I wasn't compelled
 8    to -- you know, you -- I will say this, you missed the
 9    15-day deadline to object.  Right.  That's a fact.  You
10    missed the 15-day deadline to object.  This is a big case.
11    This is a complicated case.  You're trying to do it -- or
12    you are doing it, you know, alone.
13              It is not going to be acceptable going forward to
14    just --
15              MS. GORDON:  I'm not going to just --
16              THE COURT:  -- to not meet deadlines.
17              MS. GORDON:  I'm not suggesting --
18              THE COURT:  I did give you -- I did give you
19    relief.  I didn't have to.  A lot of judges wouldn't.  A lot
20    of judges would not have done that.  I did not want your
21    client to be prejudiced because you were in trial.  I
22    allowed you, outside the scope of a deadline, to file these
23    objections so that these objections could be properly heard
24    and properly litigated.
25              Now, I'm not asking for anything else, but what
```

```
 1    I'm -- what I am asking you to do is understand that in this
 2    district, deadlines matter.  In this district, rules matter.
 3    And, you know, you don't have to go into it anymore, and we
 4    don't have to discuss it anymore, but what I am saying is,
 5    going forward, you're not going to be able to go to the well
 6    again and again and say, you know, I missed this deadline, I
 7    need more relief.  This case is going to proceed
 8    efficiently.
 9            I am going to prepare the discovery so you are
10    done by December 9th and Judge Brinkema can hold her final
11    pretrial and Judge Brinkema can set a trial date and we can
12    get this case resolved.  But that's all we need -- that's
13    all we need to go into it now.
14            With respect to four, the expert, we're not going
15    to change the expert dates based on the current standing
16    order.  And I'll let the fact witness interrogatory stand
17    and part of the interrogatory dealing with fact witnesses.
18            Interrogatory 5:  "Set forth a detailed and
19    itemized statement of all damages that you claim to have
20    sustained as a consequence of any action alleged in the
21    amended complaint and expect to provide in this action as
22    damages.  Include the basis for the damages you claim, the
23    calculations used to determine such damage amounts, and
24    every fact that supports each claim of damages."
25            MS. GORDON:  So the objection here is to "every
```

                                                                      62

```
1    fact."  This is too far.  It goes too far.  I don't object
2    to a proper interrogatory asking for the damages, but this
3    is also covered by the disclosures.  It's also going to
4    largely be covered by the expert -- the experts.
5           So the objection here is that it goes too far as
6    for every fact, which is improper.  And within -- but within
7    reason I don't object to providing the defendant with what
8    our information is going to be about damages.
9           THE COURT:  Okay.  I'll let Number 5 stand as
10   written.
11          "List all monies obtained from the publication of
12   any book."
13          . Reed, this seems a little broad.
14          MR. REED:  Well, the principal reason is that the
15   book or books at issue have different titles to them.  But I
16   believe, not having seen them all, that they're the same
17   document.  There is an early book in 2019 by the plaintiff,
18   and we would want the revenues from that just for purposes
19   of comparison to these other books.
20          THE COURT:  Comparison for what purpose?
21          MR. REED:  For damages.
22          THE COURT:  Okay.
23          MR. REED:  And --
24          THE COURT:  So the books were kind of referred to
25   the spy book and coup book; is that right?
```

```
 1                  MR. REED:  Those are two iterations that I know
 2     of.  There may be others, and I just don't want to --
 3                  THE COURT:  So if Number 6 is referred to as list
 4     all monies obtained from what you understand to be the spy
 5     book and the coup book?
 6                  MR. REED:  Right.  The third book is not -- has
 7     nothing to do with this.  It's a historical book she wrote
 8     about the Soviet spies from the 1930s that came from the
 9     U.S.  That's the one he wants the revenues to compare.  It
10     has no relevance to this case whatsoever.  And whether or
11     not one book sells better than another or generates more
12     numbers when they're not about the same topic, I think this
13     comparison argument is absurd.
14                  THE COURT:  Are you entitled to just financial
15     information with respect to damages?
16                  MR. REED:  Absolutely.
17                  THE COURT:  All right.  Isn't this -- aren't you
18     entitled to actually more broad financial information?
19                  MR. REED:  Yes.  And this is --
20                  THE COURT:  So why aren't we just asking for more
21     broad-based financial information with respect to damages?
22                  MR. REED:  Well, I was trying to be narrow, Your
23     Honor, and to limit the -- just discovery to the monies
24     she's made from these books.  I'm happy to propound
25     discovery asking for all the monies she made, you know.
```

```
1              THE COURT:  I mean, my sense is he's entitled to
2    more than this.
3              Am I wrong about that, Ms. Gordon?
4              MS. GORDON:  Yes, I believe so.
5              THE COURT:  Why?
6              MS. GORDON:  He's entitled to damages information
7    about the -- about the book if -- on his counterclaim, I
8    suppose.  The damages that we are alleging have to do with
9    the book deal being scotched.
10             So information that's relevant to that is how much
11   did she make by self-publishing it.  How much would she have
12   made if the deal hadn't been scotched.  But I fail to see
13   what that has to do with money that she might have made
14   about a book that's on a completely different topic that was
15   published a year before.  These things are apples and
16   oranges.
17             THE COURT:  I'll limit it to the two books, the
18   spy book and the coup book.
19             Seven:  "Identify each person or witness who can
20   corroborate the allegations of each paragraph in the amended
21   complaint."
22             We're sort of back to where we were before.  I
23   don't think each paragraph in the amended complaint, as
24   narrowed by counsel, is ultimately going to be admissible.
25             But why isn't it discoverable?
```
                                                              65

1              MS. GORDON:  It's the idea of each, Your Honor.  I

2    always make this kind of formal objection because this is

3    how lawyers, you know -- well, any and all, each and every,

4    right.

5              THE COURT:  Well, it's what you know.  It's each

6    person you know.  I mean, it's -- if you know somebody, then

7    you have to disclose it.

8              MS. GORDON:  Right.  Right.

9              THE COURT:  You can't disclose what you don't

10   know.  You can't provide what you don't have.  I mean, I

11   think it's --

12             MS. GORDON:  Right.  And so -- right.

13             The main objection here is that based on the

14   defendant's description of how he interprets the amended

15   complaint is different from mine.  And so, to the extent

16   that we're talking about, as he's sort of addressed in all

17   of his other requests, the entire factual pattern, that's

18   not -- that goes too far.

19             THE COURT:  Well, I think your concern is --

20   didn't you invite that by drafting the complaint in very

21   broad terms, the initial part of the complaint?

22             MS. GORDON:  The reason for doing that was to --

23   for several reasons.  One, it was to clarify what the

24   previous counsel had drafted.  The other was to demonstrate

25   the narrowness of the actual claims.  So if you read the

                                                            66

1  complaint, when you get to paragraph 77, there's a heading

2  that -- between 77 and 78, defendant defames plaintiff and

3  interferes with the book contract.

4         I'm making clear, both in that heading and in

5  paragraph 8 of the amended complaint, that although this --

6  this claim is set in this context, this background of the

7  back and forth between these two people, that what the

8  claims in this case are basically start from paragraph 78

9  down.

10        THE COURT:  But you've lost me there.  If the

11 claims start at page -- or paragraph 78 down, why do we have

12 paragraphs 1 through 77?

13        MS. GORDON:  In order to understand the background

14 and the context.

15        THE COURT:  All right.  I'm going to allow this

16 interrogatory to stand.  I'm -- I don't think a lot of it is

17 going to be admissible, but I think it is discoverable.

18        When I say I don't think it's going to be

19 admissible, my sense is the issues that are presented to the

20 jury are going to be far narrower than what you have in the

21 amended complaint, the first 77 paragraphs.

22        "State all facts upon which you rely to deny any

23 allegation in defendant's counterclaims."

24        MS. GORDON:  I mean, again, you have the "all

25 facts."  I always object to that.

                                                            67

```
 1               THE COURT:  Okay.

 2               MS. GORDON:  And then you know my position on the

 3     counterclaims.

 4               THE COURT:  I understand.  I'll let that -- I'll

 5     let that stand.

 6               And, understandably, if -- obviously if there's a

 7     ruling from Judge Brinkema on the counterclaims, that will

 8     significantly narrow that response.

 9               "List all donations or financial support provided

10     to the prosecution of either Lokhova I or Lokhova II."

11               Why does this matter?

12               MR. REED:  Your Honor, it's -- our position is

13     that this is relevant to show the financial motivation for

14     plaintiff defaming Mr. Halper.  And, in particular, for --

15     it's relevant on the personal jurisdiction question because

16     she's raising money off of bringing both of these lawsuits

17     in this forum.  And so that is purposeful availment, that is

18     minimum contacts.  And it goes to her both financial motive,

19     and as a witness, it goes to her financial bias.  So it

20     would be directly relevant to impeach.

21               MS. GORDON:  Every plaintiff has a financial

22     motive in every case.  We don't permit discovery as to how

23     they're funding their litigation.  This is irrelevant.

24               MR. REED:  Your Honor, she's raising money based

25     upon her defamation.  And, more importantly, she's raising
```

68

 1    money in order to promote her defamation lawsuits in this

 2    forum.

 3            MS. GORDON:  I hear his accusation, but no facts.

 4    I don't know what he's talking about.

 5            THE COURT:  But so what.  Why does that matter?

 6            MR. REED:  It's relevant to show her -- that she's

 7    profiting from her defamation of Halper.  It's relevant to

 8    show that she has a financial interest and bias in

 9    propagating defamation about Mr. Halper.  She has made it

10    her own little industry.  And that is directly relevant to

11    her credibility when she takes the stand and is asked

12    questions about Mr. Halper.  And that will happen if this

13    case goes to trial.

14            MS. GORDON:  I don't see how, in the rules of

15    evidence, that that would meet any kind of proper

16    impeachment.  I fail to see the connection.

17            MR. REED:  Your Honor, financial bias --

18            THE COURT:  We're not there yet.  I mean, we're

19    not at the rules of evidence yet.  I mean, rules of evidence

20    don't govern discovery.

21            MS. GORDON:  Well, that's his argument is he'll be

22    able to ask her those questions, that's why it's relevant,

23    that's why it's discoverable.  Because he wants to ask her

24    those questions on cross-examination, but I don't think he's

25    going to be able to ask her those questions on

                                                            69

```
 1    cross-examination.
 2              MR. REED:  Your Honor, you put your finger on the
 3    right question, which is, is this a question for discovery
 4    or trial.  I can represent that financial bias is, in my
 5    experience, heavily admitted at trials, and particularly in
 6    criminal trials.
 7              And -- so the issue here is, are we entitled to
 8    take the discovery to get the information to then present it
 9    at a trial.  And I think that's the general standard under
10    Rule 26.
11              THE COURT:  I understand.  I'm just trying to --
12    I'm just trying to, in my own mind, work through the
13    specific claims and counterclaims.  Right.  And the
14    association between who may or may not have financially
15    supported Ms. Lokhova and --
16              MR. REED:  Her lawsuits.
17              THE COURT:  Her lawsuits.  Yes, I'm sorry, her
18    lawsuits.
19              MR. REED:  This being one of them.
20              THE COURT:  This being one of them.  And how that
21    bears on -- I'll allow it.  I'll allow it.
22              "Identify each employer or entity for whom
23    Ms. Lokhova has worked since 2008 including the name,
24    address, telephone number of the employer or entity, the
25    name of her supervisor, the position she held, the rate of
```

70

```
 1    pay, dates of employment and reasons for leaving the
 2    employment."
 3           Mr. Reed, what do you think about that one?  Why
 4    is that necessary?
 5           MR. REED:  Well, there are two general areas that
 6    are going to be addressed.  One is, the plaintiff has
 7    asserted that she has been a Ph.D. student at Cambridge
 8    since 2004 and that this played an important -- this was an
 9    important fact in her account that, you know, she was
10    smeared because of her interaction with Mr. Flynn at a 2014
11    Cambridge dinner.
12           The facts that we believe, and as relayed to the
13    New York Times in an article, is that she was not a graduate
14    student at Cambridge.  And so her account of her being a
15    Ph.D. student and/or a graduate student for this entire time
16    is inaccurate, to put it politely.
17           Similarly, she has claimed that she has no
18    relationship to any Russian government entity, when, in
19    fact, starting, I believe it was 2008, she was employed by
20    Troika Dialog, which is a Russian -- at the time the largest
21    Russian private investment bank, which was acquired by the
22    largest Russian bank, which was owned by the Russian
23    government.  It was called Spur Bank.  And she then brought
24    a suit -- or a claim, I guess is more accurate, an
25    employment claim, against Spur Bank and received
```

```
 1    approximately, translating the pounds, $5 million in
 2    settlement of that.  And she has denied ever working for a
 3    Russian government entity.
 4           And so we would like to get her official position
 5    for purposes of, you know, challenging her account.  Not
 6    only of never working for the Russian government, but also
 7    for being falsely accused of having Russian ties.
 8           THE COURT:  But it's not Russian ties; it's being
 9    a Russian spy.  Right.  She was born in Russia.  There's
10    nothing wrong with having Russian ties or working for a
11    Russian company.  You know, this is where we have to sort of
12    draw some boundaries; don't we?  I mean, if --
13           MR. REED:  The boundaries are those created by the
14    plaintiff, Your Honor.  She's the one that says, in
15    paragraph 98, that the -- that the gravamen of her problems
16    is that Halper created a false impression or falsely
17    declared she had Russian ties.
18           THE COURT:  I think the understanding is that she
19    was -- that she was a Russian spy and that she was working
20    on behalf -- I mean, the way I read this, the allegation is
21    that she was working -- I mean, I'm not -- you know, these
22    are issues that need to be resolved by a trier of fact.
23           MR. REED:  Correct.
24           THE COURT:  The issue -- and we need to narrow it.
25    Right.  The claim is that Ms. Lokhova was a Russian spy.
```

```
 1   She was working on behalf of the Russian government.  She
 2   had a romantic relationship with General Flynn.  Right.
 3   That's what Ms. Lokhova is claiming Mr. Halper said and
 4   defamed her in that way; right?
 5            MR. REED:  Right.  And her position --
 6            THE COURT:  So she worked for a Russian bank.  So
 7   what?
 8            MR. REED:  Well, she's already testified that
 9   she -- she's already pled that she has not ever worked for a
10   Russian government entity, when, in fact, she has.  And
11   that's why we're asking about her to declare what her
12   employment is at this time, her employment history.  It's --
13   it shouldn't be that difficult.
14            THE COURT:  And why 2008?
15            MR. REED:  Well, because that's -- as far as we
16   understand, that's when she began working for Troika Dialog,
17   which was, again, acquired by Spur Bank.  And Troika Dialog
18   has a particular history to it.
19            THE COURT:  I mean, I think it's fair if you want
20   to go back.  2008 seems a little long to me, but I think
21   it's -- we'll go to 2008.
22            If you want to ask her employment history, if you
23   want to ask her education history, if you want to ask, you
24   know, was she a Ph.D., was she not a Ph.D., all of that I
25   think is proper for discovery purposes.
```

73

```
1            Do you have any other thoughts on that,

2   Ms. Gordon?

3            MS. GORDON:  The rates of pay, the reasons that

4   she --

5            THE COURT:  That's a little bit -- I don't know

6   that we necessarily need --

7            MS. GORDON:  The name of the supervisor.  I mean,

8   this is a background investigation basically.

9            THE COURT:  Yeah.  I think -- can we limit some of

10  that?  That seems a little -- I'm not sure I could have told

11  you my supervisor in 2008.

12           MR. REED:  Well, Your Honor, the rate of pay is, I

13  think, relevant, because she made an awful lot of money

14  working for the Russian banks.

15           The supervisors -- they're really only for

16  purposes of trying to figure out who to go to for

17  confirmation.  But I'll withdraw the supervisors in exchange

18  for the salary, if that makes any sense.

19           THE COURT:  All right.  I'll leave the

20  interrogatory intact, and plaintiff will just respond as --

21  to the extent that they have that information or can

22  reasonably acquire that information, they'll respond.  If

23  there's an issue with it, let me know.  But I think -- I

24  think it's appropriate as written.

25           With respect to 11:  "Identify any and all email
```

 1    accounts, whether personal or work-related, that you had in

 2    your name or on your behalf from January 1, 2008 to the

 3    present."

 4            2008, again, seems to me a rather long stretch.  I

 5    mean, I think you're entitled to email accounts, but why are

 6    we going back then?

 7            MR. REED:  The same reason, just to be -- just to

 8    be consistent with the commencement of her work with Troika

 9    bank.  That's the only reason.  Again, this would be in

10    London.

11            THE COURT:  I just don't know what -- I'm going

12    to -- I'm going to change the date to 2015.

13            MR. REED:  Okay.

14            THE COURT:  "Identify by URL or Web address any

15    and all accounts and/or Web pages with any social networking

16    websites, including but not limited to Twitter, Facebook,

17    MySpace, LinkedIn, or any other Web pages, websites or Web

18    blogs with which you have subscribed and/or have made

19    comments on such sites since on or about January 1, 2018,

20    and state whether you have searched these social media sites

21    for documents and information requested in defendant's first

22    set of document requests and interrogatories."

23            MS. GORDON:  And, Your Honor, I had objected to

24    this as being a 2008 one, and I just misread the date.  I

25    don't object to going back to 2018.

                                                              75

1            I am a little confused by the request.  So if I'm

2    understanding it to mean the request is to identify sort of

3    what her Twitter -- what her social media accounts are, if

4    that's what it's asking, then, okay, I understand that.  She

5    either has them or she doesn't, and going back to 2018 is, I

6    think, fine.

7            I wasn't sure if the request was trying to ask her

8    something else beyond, like, the identification of her

9    accounts.  That's why I'm saying it's vague.  I'm not

10   understanding it.

11           THE COURT:  How do you understand it, Mr. Reed?

12   You wrote it.

13           MR. REED:  Your Honor, this is simply asking for

14   the addresses of the sites; not the content.

15           THE COURT:  Right.

16           MS. GORDON:  Right.  No, I understand that.  But

17   for her accounts that she has, whatever her Twitter handle

18   is, whatever her MySpace is --

19           THE COURT:  That's --

20           MR. REED:  Yeah.

21           THE COURT:  Yeah.

22           MS. GORDON:  Yeah, okay.

23           THE COURT:  Okay.  That's easy.

24           "Identify all persons to whom you have

25   communicated your allegations about Stefan Halper as are set

                                                              76

```
 1    forth in the complaints in Lokhova I or Lokhova II."

 2              MS. GORDON:  So to the extent we're talking about

 3    the allegations in the amended complaint, I don't have an

 4    issue.  I do obviously with Lokhova I.

 5              THE COURT:  I understand your frustration, and

 6    this is -- look, this is a -- defamation cases in general

 7    are tricky.  Right.  Because, you know, as we said before,

 8    at the end of the day, you have to go in and unpack the

 9    underlying statements.  I understand that.  And to some

10    degree, I understand your frustration at the boundaries

11    we're putting up.  But I think this case can be tried

12    fair -- I think the case can proceed fairly and

13    appropriately by limiting this to the allegations in the

14    amended complaint.

15              "Identify all media companies to whom you have

16    communicated your allegations about Stefan Halper as set

17    forth in Lokhova I or Lokhova II.  And for each such

18    company, identify the persons with whom you have

19    communicated."

20              So this is one you've already sort of wrestled

21    with.  I think that -- do you have an argument again as to

22    why we should include Lokhova I?

23              MR. REED:  Nothing other than what I previously

24    argued, which is relevance, incorporation and personal

25    jurisdiction.  And those would be it.
```

77

1          And if I could, I would like to ask the Court for

2     a continuing objection so I don't have to repeat --

3          THE COURT:  Absolutely.  I think -- I think

4     you've -- I think you both have made your record very clear.

5          MR. REED:  Okay.

6          THE COURT:  And your objections are clearly

7     memorialized in your pleadings as well.

8          MR. REED:  Thank you.

9          THE COURT:  So ...

10         I think with respect to 14, I'll also limit it to

11    *Lokhova II* as -- in the amended complaint.

12         "Identify each representative, employee or agent

13    of the Russian government with whom you have communicated

14    since January 1, 2008."  And I think when looking at the

15    next several, they all seem to involve a Russian connection.

16         MR. REED:  Yes.

17         THE COURT:  Let me tell you how I would -- what I

18    would be inclined to do is to fold 15, 16, 17 and 18 into

19    one interrogatory.  I don't think 16 is appropriate as for

20    any -- identifying any Russian individual.  17 asks for

21    identifying any Russian intelligence member.  18 asks for

22    identifying any Russian intelligence member with whom you

23    have discussed the 2016 presidential election.  I'd be

24    inclined, for 2015, to approve an interrogatory that says

25    "identify each representative, employee or agent of the

                                                          78

```
 1    Russian government with whom you have communicated about
 2    Defendant Halper."  I think that covers most of it.  I think
 3    just asking for Russian citizens is too broad.  And I
 4    think -- for purposes, I think that gets you what you would
 5    need.
 6              MR. REED:  That's fine, Your Honor.
 7              MS. GORDON:  I'll note my objection.  I think all
 8    of those interrogatories are abusive.  It's just discovery
 9    abuse.  It's just designed to embarrass her by, again,
10    suggesting that she's a Russian spy.  That's the point of
11    that discovery, which isn't actually discovery.
12              THE COURT:  I understand.  I understand that's
13    your position.
14              MS. GORDON:  Your Honor, now that we've finished
15    the interrogatories and we've been going for two hours, can
16    we take a break?
17              THE COURT:  We certainly can.  Before we do that,
18    let me just ask you, has -- I'm sorry, I can't recall, is
19    there a protective order that's been entered?
20              MS. GORDON:  Protective order, no.  Mr. Reed --
21    we've been busy, as Your Honor knows.  So he sent me a draft
22    for one, and I have some edits.  I think we would be able to
23    get that done before we do any production certainly.
24              THE COURT:  Okay.  Okay.  Just see what you can
25    do.  I just want to make sure that there was some
```

```
 1   understanding about the proper use of discoverable materials

 2   between the parties.

 3              MS. GORDON:  We're working on it.

 4              THE COURT:  That's fine.  And before we -- has

 5   plaintiff propounded any discovery to defendant?

 6              MS. GORDON:  Not yet.

 7              THE COURT:  Okay.  Okay.  That's your call, but

 8   the clock is ticking, and --

 9              MS. GORDON:  I mean, the District Court extended

10   the discovery period for a month for me, and I don't view

11   that we -- tomorrow is September 1st.  I think I have plenty

12   of time.

13              THE COURT:  Okay.  All right.  How much time do

14   you all need?

15              MS. GORDON:  I just need a comfort break.  Five

16   minutes?

17              THE COURT:  Why don't we say 4:15.  Is that

18   enough?  Okay.  We'll take a brief recess.

19                   (A brief recess was taken.)

20              THE COURT:  Okay.  So let's move on to the request

21   for documents.

22              MR. REED:  If I could make a suggestion.

23              THE COURT:  Of course.

24              MR. REED:  I'm happy to run through them and note

25   where I think the prior rulings have --
```

80

```
 1              THE COURT:  That would be great.

 2              MR. REED:  -- affected them.

 3              THE COURT:  Whatever moves this along.

 4              MR. REED:  That's fine.  Okay.

 5              THE COURT:  All right.  Objection 1 --

 6              MS. GORDON:  One moment, Your Honor.

 7              THE COURT:  I just want to make sure that there's

 8  a -- you know, it takes a minute to read them in, but I just

 9  want to make sure that there's a record.

10              MR. REED:  I think the dispute with respect to one

11  is --

12              THE COURT:  I'm sorry.  Let me just read it in

13  just so the court reporter can capture it.

14              Number 1:  "All documents upon which plaintiff

15  relies to make the allegations in the original complaint in

16  Lokhova II, which is docketed as DE1."

17              MR. REED:  And, as I understand it, the objection

18  is that they don't want to respond with respect to the

19  original complaint.  We cited authority for the proposition

20  that it's still relevant for purposes of discovery.

21              THE COURT:  Uh-huh.  I think I'm going to grant it

22  just with respect to the amended complaint.

23              MR. REED:  Okay.

24              THE COURT:  Two -- I'm sorry.

25              MR. REED:  Yeah.  And, again, I would respectfully
```
                                                              81

```
 1    object as long as we're trying to make a record here.

 2               THE COURT:  I understand.  Whatever you think you

 3    need to do to --

 4               MR. REED:  Sure.

 5               THE COURT:  -- offer an order of proof or perfect

 6    the record for purposes, take your time and do.

 7               MR. REED:  Okay.  Let --

 8               THE COURT:  Let me just read it into the record

 9    for the court reporter.  "All documents upon which plaintiff

10    relies to make the allegations in the amended complaint in

11    Lokhova II, which is docketed as DE2."  I think that's

12    covered as well; right?  That's covered in the first one.

13               MS. GORDON:  Well, this is Lokhova II.  So this is

14    one of the ones -- if Your Honor looked at the chart that I

15    provided, there were -- one, two, three, four -- nine --

16               THE COURT:  Well, Number 1 was Lokhova II as well.

17               MR. REED:  Yes.  This is the complaint and the

18    amended complaint.

19               MS. GORDON:  Oh, right.  Yes.  So amended

20    complaint, right.  I don't have an objection to this except

21    my formal one about it being all documents.

22               So this is included in a group of nine of them

23    that I put in my chart that I'm making a formal objection to

24    the language, but I don't actually object to the substance

25    of it, and -- that I'm willing to produce for those.
```

```
 1              THE COURT:  I understand.  Why don't we do this,
 2   why don't you tell me which of those nine they are, that way
 3   when we get to them, we can skip over them.
 4              MS. GORDON:  Sure.  Those are 2, 6, 9, 25.
 5              THE COURT:  I'm sorry.
 6              MS. GORDON:  I'm sorry.  Am I going too fast?  2,
 7   6, 9.
 8              THE COURT:  Okay.  2, 6, 9, 25.
 9              MS. GORDON:  26, 28, 29, 34 and 50.
10              THE COURT:  Okay.
11              MR. REED:  And, Your Honor, just also for the
12   record, we've objected to their objection because they fail
13   to identify whether they're withholding any documents with
14   respect to any of these requests.  And under the rule of --
15   for them to say -- whether they're withholding something or
16   not, which would then justify us spending time to discuss --
17              THE COURT:  I'm assuming that there's something
18   responsive to all of this.  I mean, if we're arguing over
19   things in which the answer is there's nothing here, that
20   would be disappointing.
21              MS. GORDON:  Right.  I think there aren't any like
22   that.  In my general objections, I said I'm withholding on
23   everything subject to the Court's rulings except for these
24   nine, which I don't have any basis for withholding unless
25   maybe there's some privileged documents.
```

83

1          MR. REED:  Just so I understand, that means there

2    are responsive documents as to all of these that are being

3    withheld?

4          MS. GORDON:  Potentially, yes.  I can't say as I'm

5    sitting here there isn't one for which there are zero

6    documents, I suppose there could be, but I don't think there

7    is.

8          THE COURT:  I got you.  I understand.  Okay.

9          Three:  "All documents upon which plaintiff relied

10   to make the allegations in the original complaint in

11   *Lokhova I*, which is docketed as DE1."

12         MR. REED:  Your Honor, is two enforced?

13         THE COURT:  Two is enforced, yes.

14         MR. REED:  So three, I think, would be subject to

15   your earlier ruling.

16         THE COURT:  Right.

17         MR. REED:  So noted; is that right?

18         THE COURT:  Correct.

19         MS. GORDON:  And I have a group of those also,

20   Your Honor, that are -- where my objection is they're

21   *Lokhova I.*  I can give you the numbers.

22         THE COURT:  It might be easier if we just catch

23   those one at a time.

24         MS. GORDON:  Okay.  And I'll just keep track.  The

25   next one, three and four are in that group, the *Lokhova I*

                                                              84

```
 1   group.
 2            THE COURT:  Right.  So let me just make sure we're
 3   all clear.  Let's just back up.
 4            Number 1 I think we can deny, right, because
 5   Number 1 is really covered by Number 2; right?
 6            MR. REED:  That's true.
 7            MS. GORDON:  I'm sorry, I don't understand.  I
 8   thought we were limiting one because it relates back to the
 9   original complaint.
10            THE COURT:  Correct.  So all documents upon which
11   plaintiff relies to make the allegations in the original
12   complaint in Lokhova II, which is -- we're focusing on the
13   amended complaint.
14            MR. REED:  Correct.
15            THE COURT:  Right.  So Number 2 covers the amended
16   complaint.
17            MR. REED:  Correct.
18            THE COURT:  So we're good there?
19            MR. REED:  Correct.
20            THE COURT:  Three goes back to Lokhova I, so --
21   correct?
22            MS. GORDON:  Right.
23            MR. REED:  Correct, as does four.
24            THE COURT:  As does four.  So we're good with one
25   through four; right?  Okay.
```

                                                                 85

```
 1              Five:  "All documents upon which you relied to
 2    deny allegations in defendant's counterclaims."
 3              MS. GORDON:  Right.  And that's subject to my
 4    issue about the counterclaim.  That's the basis of my
 5    objection.
 6              THE COURT:  I got you.  We're going to -- that --
 7    and I understand that's a standing objection, but we're just
 8    not going to withhold discovery -- this discovery process.
 9    Again, if Judge Brinkema rules that the counterclaim is
10    defeated, then it becomes moot.
11              MS. GORDON:  Six is one of the ones where I'm
12    making a formal objection, but that's all.
13              THE COURT:  Okay.  I understand.  Six we'll --
14              MR. REED:  Enforce.
15              THE COURT:  Is fine.
16              Seven.
17              MR. REED:  I can represent I think seven -- I'm
18    sorry.
19              MS. GORDON:  Seven and eight, my objection is to
20    the fact that they're overly broad because of the
21    definitions we talked about, "you" and "media companies."
22    It just goes far beyond.  With respect to Simon & Schuster
23    and Post Hill Press, I have no problems.
24              MR. REED:  Also for the record, seven through nine
25    are related to the two publishers for the books, and they
```

86

```
1    expressly include requests regarding contractual documents.

2    I just want to make that clear because they had claimed that

3    we had not sought any contractual documents.

4              MS. GORDON:  With respect to Mr. Halper's

5    contracts; not Ms. Lokhova's.  Nine is one of the ones I

6    don't have a problem with.  I just have a formal objection

7    to the language.

8              THE COURT:  Okay.  So nine is good.  Let's go back

9    to seven.

10              MR. REED:  Seven is fine.

11              THE COURT:  Your objection to seven -- you have no

12    objection, as I understand it, to Simon & Schuster, you have

13    no objection to Post Hill Press?

14              MS. GORDON:  Correct.

15              THE COURT:  Your objection is based on the

16    definition of other media companies?

17              MS. GORDON:  Right.  Right.  Exactly.

18              THE COURT:  Okay.  I'll overrule that objection.

19              Did you also object to the issue of metadata?

20              MS. GORDON:  I did, yes, in my written objections.

21    That's beyond the scope of what most courts will permit

22    because it's so voluminous, unwieldy and yields almost

23    nothing in terms of --

24              THE COURT:  What's the need for metadata here?

25              MR. REED:  The reason for metadata is that
```

                                                            87

1   Ms. Lokhova has tweeted that her book was not published

2   because of requests -- concerns about the metadata by an

3   unidentified publisher.  So we want to find out what was --

4   if -- what the problem was with the -- with respect to the

5   metadata for her handiwork, her manuscript.

6           MS. GORDON:  If the request is for communications

7   about that, then I don't have an objection to that.

8           THE COURT:  Okay.

9           MS. GORDON:  As opposed to the metadata itself,

10  whatever it is.  Because technically it's not asking for

11  that, actually, if read the way he's just articulated.

12          MR. REED:  It says the publication of the book or

13  the related metadata.

14          THE COURT:  I read that as the metadata relative

15  to the communications.  Like the communications occurred,

16  you know --

17          MR. REED:  Yeah, that's my fault.

18          THE COURT:  I think the way you -- amended by your

19  explanation, I think that's reasonable and doesn't sound

20  like there's an objection from defense.

21          MS. GORDON:  Correct.

22          THE COURT:  So whether you restructure that or

23  whether you all just understand that that's what the request

24  is asking for is up to you.

25          MR. REED:  That's fine.

                                                          88

1             And then nine, I think --

2             THE COURT:  Nine, there was -- there was an

3    objection, but just on -- really in form, it was overruled.

4             Did we cover eight?  The same thing.  Seven and

5    eight are the -- there would be a similar ruling there.

6             MR. REED:  Yes.  Yeah.  They're just the different

7    names of the books.

8             THE COURT:  Right.  Ten:  "All documents

9    containing communications between publishers and plaintiff

10   regarding potential book relating to Mr. Halper."

11            MR. REED:  Yes.  And that's -- that goes to both

12   the defenses and to the counterclaims, because it's her

13   effort to market, so to speak, or to be -- to have

14   discussions regarding the book, its content and its

15   publication.

16            MS. GORDON:  I think my objection was -- to the

17   extent we're talking about the books that are the subject of

18   this litigation, I don't have an objection.  To the extent

19   we're talking about whether she was talking to other

20   people -- publishers about a different book that might

21   relate to him, then I think that's --

22            THE COURT:  It specifically refers to the book

23   relating to Mr. Halper.  So I assume that's the same book by

24   two different names.

25            MS. GORDON:  It says "a potential book relating."

                                                            89

1    I wasn't sure if that -- they mean a different book, another

2    book.

3              MR. REED:  No.  It was intended to be broad to

4    make sure that we didn't trip up on names of books.

5              THE COURT:  Yeah.  I think the intent is clear.  I

6    think it's if she was trying to market a book about

7    Mr. Halper and about this -- you know, this event or series

8    of events, I think it's covered by ten, and I think it's

9    proper.

10             "All documents containing or referring to diplomas

11   or degrees awarded to plaintiff by Cambridge University."

12             MR. REED:  That's simply to get to her prior

13   pleadings that say that she was a Ph.D. student when she

14   simultaneously denied being a graduate student.

15             THE COURT:  Right.

16             MS. GORDON:  So there's a series of these, Your

17   Honor.  It's 11 through 15.

18             THE COURT:  Right.  All documents may be -- I

19   understand where you're going, and I think you're entitled

20   to know what her -- but all documents may be a lot.  There

21   could be a lot of documents that deal with somebody's

22   matriculation through Cambridge.

23             I think -- I think it's sufficient to say any

24   record or -- you know -- you know what he needs, and he's

25   entitled to it; right?

                                                              90

1          MS. GORDON:  It's limited, I would agree, yes.

2          THE COURT:  Some records or documents about what

3    degree she got, she didn't get, and what her status was, and

4    I suppose currently is with respect to Cambridge.

5          MR. REED:  12 is for grades.  And it's not that we

6    want to grade her; it's that we just want to make sure that,

7    in fact, if she's never had a grade, she never took any

8    courses towards her Ph.D.  This would be reflected in the

9    fact that she has no grades.  But if she does ...

10          THE COURT:  I think we could structure it in a way

11    that just -- you know, you need to disclose records or

12    documents relating to her studies at Cambridge.

13          MS. GORDON:  To her degree, right.  I'm happy to

14    do that.

15          THE COURT:  And if plaintiff needs to be -- I'm

16    sorry.  Defense has a right to know.  Did she have a

17    master's?  Did she have a Ph.D.?  Was she two credits

18    towards a Ph.D.?  Did she write -- you know, all of those

19    are -- I think all of that is proper.

20          MS. GORDON:  For the record --

21          THE COURT:  I think we could just get there in a

22    little more of a --

23          MS. GORDON:  For the record, I'll say I think it's

24    all collateral and not discoverable.  But I understand what

25    the Court is saying.  I will be happy to produce documents

                                                        91

1    that show what her degree from Cambridge is.

2              MR. REED:  Okay.  And 14 and 15 are just

3    follow-ons to that, documents about her admission to the

4    Ph.D. program and documents about any dissertation she has.

5              MS. GORDON:  Thirteen we skipped over.  I think

6    it's communications between her and the University related

7    to becoming a Ph.D. doctoral student.  I think these are far

8    afield, Your Honor.

9              THE COURT:  Yeah.  I think you're entitled to

10   documents showing what did she graduate, what programs was

11   she in.  I don't necessarily think you need to go that far

12   and have communications between them about her studies.  If

13   the issue is, as far as you're concerned, she represented

14   herself as a person who had a Ph.D. from Cambridge and --

15             MR. REED:  Or was earning one.

16             THE COURT:  I'm sorry?

17             MR. REED:  Or was earning one.

18             THE COURT:  Or was earning one, I think you can

19   get there in a little bit more of a linear fashion.  But

20   that's fine.  I do think that's -- I think the subject is

21   appropriate.  I think we can limit the scope of the specific

22   request a little more.

23             Does that bring us to 16?

24             MR. REED:  It does.

25             THE COURT:  "All documents containing

                                                          92

1    communications between Ms. Lokhova and any media company

2    related to Mr. Halper."

3            MS. GORDON:  So literally read, Your Honor, this

4    would require me to produce documents for any communications

5    I might have had about Mr. Halper, including on my Twitter.

6    That's how broad, if you literally read the request, it

7    actually is.  I don't want to be -- to find myself in a

8    position later where Mr. Reed can say, well, you didn't

9    satisfy the full scope of these requests, which is why I

10   objected to -- vehemently to how broad they are.

11           MR. REED:  Your Honor, if she has a work product

12   issue, I have no problem dealing with that.  This is

13   intended to get communications between Ms. Lokhova and the

14   media companies about Mr. Halper.

15           MS. GORDON:  But it has to also be about the

16   subject of this lawsuit in order for it to be relevant.

17           MR. REED:  Mr. Halper has no dealings with

18   Ms. Lokhova.  She's stipulated she's never spoken to him in

19   her life.  The only reason why Ms. Lokhova is talking about

20   Mr. Halper is because of her contention that Halper is some

21   sort of spy that is using her inappropriately.

22           MS. GORDON:  But that's not what the plaintiff's

23   allegations are under the amended complaint.  So it's -- we

24   keep broadening it to beyond what I'm actually trying to

25   prove.  It wouldn't be objectionable if it said documents

                                                              93

1    containing communications between Ms. Lokhova and any media

2    company related to, let's say her allegations regarding

3    Mr. Halper.

4              THE COURT:  I think this is okay.  I think that --

5    I don't necessarily agree that it -- it would encompass

6    comments by counsel in your personal capacity or anything

7    along those lines.  I think that this is -- I think this is

8    properly tailored to communications between Ms. Lokhova and

9    media companies.  And I do agree with Mr. Reed.  I can't

10   imagine what those conversations would be that wouldn't be

11   relevant to either the claim or counterclaim.  I think

12   it's --

13             MS. GORDON:  Well, so, for instance, I've noticed

14   yesterday or the day before Ms. Lokhova, on her Twitter, was

15   discussing the Mar-a-Lago warrants and Mar-a-Lago and the

16   Crossfire Hurricane with respect to Carter Page, and

17   Mr. Halper sometimes comes up in those conversations, and

18   that really has nothing to do with this lawsuit.

19             If she's talking about kind of current events,

20   current things that are happening in the world that have to

21   do with current political issues or that kind of thing,

22   Mr. Halper --

23             THE COURT:  I understand.  And it's oftentimes

24   that, you know, discovery is going to be a little

25   overinclusive, and I get that.  But, you know, I do think

94

1    that -- you know, I'm not sure what statements that are made

2    today are going to be entirely relevant at a trial about

3    events that occurred several years ago or at least a few

4    years ago.  And this is limited to conversations between

5    Ms. Lokhova.

6              MS. GORDON:  I think they're also -- all the

7    proper ones are subsumed within 18.

8              THE COURT:  I'm sorry?

9              MS. GORDON:  I think all the proper things that

10   could be contained under 16 are actually subsumed under 18,

11   which is communications between Ms. Lokhova and media

12   companies about this case, and that would encompass the

13   amended complaint and counterclaims.  16 I think goes beyond

14   that.

15             THE COURT:  Well, I'll allow 16.

16             MR. REED:  I think 17 is essentially subject to

17   your prior rulings.

18             THE COURT:  Yes.  17 is out.

19             MR. REED:  And 18, I believe, is, as opposing

20   counsel suggests, probably a subset of --

21             THE COURT:  And, again, when we refer to

22   *Lokhova II*, I'm considering *Lokhova II* to be synonymous with

23   the amended complaint.

24             MR. REED:  Yes, Your Honor.

25             19, these are some of the specific communications

                                                            95

```
 1    that we are looking for.  The individuals are --

 2                THE COURT:  All right.  So -- I'm sorry.  I didn't

 3    mean to interrupt.

 4                MR. REED:  Sorry.  The individuals are people to

 5    whom she would have been communicating both her claims and

 6    her claims against Mr. Halper.

 7                MS. GORDON:  But it's literally -- the first one

 8    is her Twitter user.  So I guess this is every tweet she's

 9    ever tweeted about Mr. Halper?  I find it hard to believe

10    that that's relevant, but ...

11                MR. REED:  In some respects, we're captive to the

12    prolixity of Ms. Lokhova.  But she brought the suit.

13                MS. GORDON:  But not every one of her tweets, and

14    far from all of them, are going to be about the allegations

15    that we're down to.

16                THE COURT:  No, I understand.  I understand.  And

17    that's -- and I have to tell you, Ms. Gordon, that's a fair

18    point.  But I think for discovery purposes, I'll allow 19.

19                And -- I'm sorry.  20.

20                MR. REED:  Same thing.  It's a little more focused

21    on Mr. Flynn and his family.

22                MS. GORDON:  I don't see how it's not completely

23    overtaken by 19.

24                MR. REED:  Yeah.

25                THE COURT:  Well, 19 is --
```

1              MR. REED:  19's a little more focused on Halper.

2              MS. GORDON:  To the extent 20 is not about Halper,

3    then how is it relevant?

4              THE COURT:  It does seem that 20 -- it does seem

5    that 20 is subsumed within 19.

6              MR. REED:  I will withdraw 20 then.

7              THE COURT:  21.

8              MR. REED:  Yeah.  We've discussed this in a brief.

9    These are monies obtained from -- by plaintiff from

10   communications about Stef Halper.  The reason for this is

11   that while, in addition to the books, we don't know, but we

12   strongly suspect that she's raised money in a number of

13   other ways, including through her websites to -- based on

14   assertions regarding Mr. Halper, which we would probably

15   characterize as false assertions.

16             THE COURT:  But, again, connect the dots for me.

17   Right.  This isn't necessarily regarding damages; right?

18             MR. REED:  Well, it can certainly be regarding --

19   if she generated substantial sums from defaming Mr. Halper,

20   I think a jury is entitled to know that.  I would think that

21   would be admissible.  And the relevant point here is is it

22   discoverable?  And I think, because of that possible

23   pathway, it is.

24             MS. GORDON:  But it's not limited to anything

25   that's defamatory.  It's called for all communications,

                                                              97

```
 1    which could be any marketing she would do for her book,
 2    because everything is going to be "about," according to this
 3    request, Stefan Halper.  She wrote a book about him, that
 4    was the point.
 5              THE COURT:  No, I understand.  But I think
 6    these -- the question is, in a defamation suit, she wrote a
 7    book about Halper.  Any income related to that book seems to
 8    me fair game for discovery purposes.  I'm not -- again, we
 9    don't need to have a clear path at this stage for
10    admissibility, but I do think it's appropriate for discovery
11    purposes.
12              MS. GORDON:  I would agree.
13              THE COURT:  And I understand.  I'm doing my best
14    to limit --
15              MS. GORDON:  I know.  I know.
16              THE COURT:  -- the scope of discovery.
17              MS. GORDON:  I can see you are, Judge.  Yeah.
18              THE COURT:  You know, and I feel like we're -- you
19    know, we get there at times, and then we take another step
20    out.
21              MS. GORDON:  Well, I can't stand down on my
22    objection that his defamation suit is time-barred.  So there
23    should be no discovery on anything having to do with her
24    defaming him in her book because he didn't sue her for it
25    under the requisite time period.
```

```
 1              THE COURT:  If Judge Brinkema rules that the --
 2              MS. GORDON:  Then this one should be out, is what
 3   I think.
 4              THE COURT:  If Judge Brinkema rules that the
 5   defamation counterclaim is out, then I invite the parties to
 6   meet and confer and see how that changes these rulings, and
 7   to the extent that you can't agree, I'm happy to come back
 8   and -- on a Friday and work with you through it.  And I have
 9   to say, I -- well, that's ...
10              MR. REED:  22 it asks for edits of the coup book,
11   and 23 is simply the same for the spy book.  Spygate, sorry,
12   book.
13              MS. GORDON:  And here I objected on the grounds
14   that edits would be relevant post Mr. Reed's letters, but
15   not before.  Because any edits that she made to the book
16   before there was an issue of alleged defamation by him, I
17   can't see how that's relevant to anything.  It's not
18   relevant to his claim.
19              MR. REED:  Your Honor, edits at any time I think
20   are relevant.  And, more importantly, it would be I think
21   relevant -- potentially relevant to Judge Brinkema whether
22   there were any edits to the manuscript based on her ruling,
23   which was, you know, end of February.
24              So, you know --
25              THE COURT:  I think it's -- I think the answer is
```
                                                                  99

```
1    it all depends on the edits, and it all depends on the
2    reason for the edits --
3              MR. REED:  Right.
4              THE COURT:  -- which we don't know until the
5    information has been provided.  So I'll allow 22.
6              MS. GORDON:  To me, these 22 and 23 is the same,
7    basically, Your Honor.
8              MR. REED:  Yes.
9              MS. GORDON:  So, to me, these only relate to his
10   counterclaim.  I can't see what relevance they have to my
11   claims.
12             So, to me, these rise or fall on Judge Brinkema's
13   ruling on the book, because if there's no counterclaim for
14   defamation, the book -- the contents of the book are not
15   relevant.  It had not been published at the time that
16   Mr. Reed wrote the letters.  It wasn't out in the world yet,
17   which is one of the reasons it can't be the subject of
18   defamation.
19             MR. REED:  Your Honor, we respectfully disagree on
20   the timing issues.  We think that the standard law is that
21   counterclaims relate back to the commencement of the suit,
22   and so all of this is in a clearly timely period.
23             The allegations of defamation in the -- you know,
24   of the book are set forth.  And because it's 360 pages, not
25   in toto, and because I think it's fair to say that every
```

1    iteration of this manuscript, which supposedly didn't exist

2    until April, is relevant.  And, therefore, it's relevant

3    both to the -- what's in there, as opposed to what was taken

4    out.

5              THE COURT:  I think that's right.  You get to a

6    point where -- I think that's right.  And my sense is that

7    22 and 23 are relevant to both the claim and the

8    counterclaim.  If you'd like to revisit that issue if the

9    counterclaim is dismissed, I'm happy to hear it, but I'm not

10   going to condition the ruling on that now.

11             24:  "All documents containing any allegation that

12   plaintiff has defamed anyone."

13             MR. REED:  It's basically whether plaintiff has

14   been accused of defamation by anybody, and it's only if she

15   has a document reflecting that.

16             MS. GORDON:  I just fail to see the relevance,

17   Your Honor.

18             THE COURT:  Yeah.  It's -- I'll allow it, but it

19   would have to be a rather formalized claim.  Right.  It

20   should have to be either a civil cause of action or a demand

21   letter or something that was -- that was -- put plaintiff on

22   notice.

23             25:  "All documents containing communications

24   between Ms. Lokhova and any publisher or distributer."

25             MR. REED:  25 and 26 are two of my formals, but

                                                              101

```
 1    not --
 2              THE COURT:  Okay.  I understand.  Got you.
 3              So 27.
 4              MR. REED:  27 is language from the marketing
 5    material, quotes from it.  And so this asks for any
 6    documents relating to that, the specific allegations.
 7              MS. GORDON:  With it being in quotes, I thought he
 8    was quoting the complaint, and this is not in the complaint.
 9              MR. REED:  No, it's in the marketing material.
10              MS. GORDON:  In the marketing material.
11              MR. REED:  So that's where you'd find it.
12              MS. GORDON:  Let me read.
13              So we can put this into my category of I object
14    always to all documents, formulation.  But, otherwise, if
15    it's in the marketing materials, I think it is relevant.
16              THE COURT:  Okay.  I agree.
17              28.
18              MS. GORDON:  28 and 29 are, again, formal
19    objections.
20              THE COURT:  I've got you.  Okay.
21              30.
22              MR. REED:  It's duplicative otherwise.  It does
23    make reference to records and notes.
24              THE COURT:  I'm sorry, Mr. Reed, you said it's
25    duplicative of?
```

                                                              102

1          MR. REED:  It's duplicative of some earlier

2   requests, but it does make specific reference to notes or

3   records of communications, and theoretically that would be

4   subsumed in the prior as well.

5          THE COURT:  Right.  Okay.  So we'll withdraw 30 as

6   moot.

7          MR. REED:  Yeah.

8          THE COURT:  31.

9          MR. REED:  Same thing.  I think it's subsumed in

10  the communications.

11         THE COURT:  Okay.  So withdraw 31 as moot.

12         32:  "All documents relating to interviews you

13  gave to media companies."

14         MR. REED:  Same thing.

15         THE COURT:  Yep.

16         33.

17         MR. REED:  Yes.  This is a slightly different

18  kettle of fish.  These are communications by the plaintiff

19  with individuals at Cambridge that are featured in her book

20  with respect to allegations against Halper.

21         THE COURT:  As long as it's limited to Mr. Halper.

22         MR. REED:  Yes.

23         THE COURT:  These are other -- these are other

24  Cambridge employees?

25         MR. REED:  Yes.  Well, professors/employees.

103

```
 1                THE COURT:  I think we have to cabin it in to
 2       relating to Mr. Halper --
 3                MR. REED:  Yes.
 4                THE COURT:  -- regarding the issues.
 5                MS. GORDON:  I agree.  One of them is her mentor.
 6       I'm sure they were involved in a lot of campus things
 7       together with Mr. Halper included.  There's going to be a
 8       lot more here than just what relates --
 9                THE COURT:  I would allow that, but we have to --
10       we have to tie it to this case and these issues.
11                MR. REED:  Sure.  So relating to Halper regarding
12       Mr. Halper?  I mean ...
13                THE COURT:  Relating -- relating to Mr. Halper
14       with those individuals regarding -- we could say regarding
15       the --
16                MR. REED:  Regarding the allegations of the book?
17                THE COURT:  The allegations --
18                MR. REED:  In the books.
19                THE COURT:  -- in the books.  I was tempted to say
20       regarding the allegations of Lokhova I, but we're not going
21       there.
22                MR. REED:  34.
23                THE COURT:  "All documents relating to all
24       previously-planned or expected endorsement of the book for
25       prominent national figures as alleged" --
```

104

```
1              MS. GORDON:  Yeah.  This is one of my -- I object
2    to the formulation, but not on the ...
3              THE COURT:  Okay.  All -- 35:  "All documents
4    relating to your bankruptcy proceeding -- Ms. Lokhova's
5    bankruptcy proceeding in England, including financial
6    statements and asset inventories."
7              MR. REED:  I can tell you that this is --
8    Ms. Lokhova entered personal bankruptcy in London in 2018
9    after receiving a $5 million settlement with the Russian
10   bank.  And she emerged from bankruptcy in May of 2019, and
11   within a week of her discharge from bankruptcy, she filed
12   her $25 million lawsuit against Mr. Halper.  I suspect that
13   was not an asset that she identified in her bankruptcy.  And
14   so --
15             THE COURT:  I think that's going a little far.  If
16   you want to question her about that in the deposition,
17   perhaps, but I think -- as to a motive.  But I think getting
18   into a bankruptcy proceeding in all the documents that
19   normally are --
20             MR. REED:  Yeah.  And the only --
21             THE COURT:  And it's a foreign bankruptcy
22   proceeding.
23             MR. REED:  In many ways.
24             And the only reason for doing that is, it's hard
25   to ask questions without having at least the asset inventory
```

105

```
 1    to know whether she declared it.
 2              THE COURT:  I understand.  I'm not sure we're
 3    going to use it as a tool to sort of investigate some form
 4    of impeachment, other than perhaps, as I sort of see where
 5    you're going with this, did she initiate the lawsuit against
 6    Mr. --
 7              MR. REED:  Halper.
 8              THE COURT:  -- Halper as a result of --
 9              MR. REED:  Yes.  A 65-page complaint filed within
10    a week of emerging from bankruptcy in a foreign country.
11              THE COURT:  I think at this point it's a -- it
12    is -- at this point, I'm going to deny it.  I think it's
13    a -- I think it's outside the scope of where we need to be
14    discoverable.
15              MR. REED:  Do I get to inquire at the deposition?
16              THE COURT:  I think you can ask her about it, but
17    I'm not going to -- I think you can ask her about it.  I
18    think if there are concerns, you can object, and we'll
19    resolve -- you know, we'll resolve the objections.
20              MR. REED:  36 is -- asks for her passports --
21    copies of her passports.
22              She's declared in her amended complaint that she's
23    a citizen -- she has diversity citizenship.
24              THE COURT:  I didn't quite hear you.  She is ...
25              MR. REED:  In the amended complaint, as well as
```

106

1    the original, the basis for federal jurisdiction is

2    diversity based on her citizenship in a state.  I don't

3    think she is a resident of a state.  But she elsewhere

4    claims to be a resident/citizen of Britain and/or Russia.

5    We simply would like to get the passports to find out where,

6    in fact, she's basing her jurisdictional claims on.

7            MS. GORDON:  Your Honor, I think this is absurd.

8    So in the amended complaint, we say that subject matter

9    jurisdiction is based on the diversity statute, 28 USC 1332.

10   (a)(1) is for -- which I don't specify whether it's (a)(1)

11   or (a)(2), so this seems to be the basis of the problem.

12   (a)(1) is for citizens of different United States states;

13   (a)(2) is for cases between being a resident of a U.S. state

14   and a citizen of a foreign state.

15           And we say in -- a little further down that

16   Ms. Lokhova, in paragraph 14, she is a citizen of the UK and

17   has been since 2002.  There's just no issue here about

18   whether the diversity is proper.  This is, again, I think

19   more of the -- they want to do a background investigation on

20   her and force her to cough up, you know, personal

21   identifying documents for no good reason.

22           MR. REED:  Your Honor, we've agreed and

23   proposed -- well, we've proposed a confidentiality agreement

24   to the other side.  I don't think we're trying to do

25   anything here other than probe the accuracy of the

                                                          107

1  assertions.

2        She asserted in the amended complaint that she's a

3  citizen of a state.  More importantly, her toing and froing

4  in terms of the United States and Britain are relevant to

5  her personal jurisdiction objection where she says I'm a

6  residence of Britain, and therefore you cannot assert

7  personal jurisdiction over me based upon what I might say to

8  somebody else in England.

9        So I don't think this is far afield at all, and I

10  don't think it's burdensome either.

11        THE COURT:  It's -- I'm not moved on the diversity

12  issue, but what about the personal jurisdiction issue?

13        MS. GORDON:  Well, Your Honor, like I said, the

14  personal jurisdiction defense that I raised as a ground for

15  dismissing Mr. Halper's counterclaims only goes to one

16  paragraph, which is the conversations between Ms. Lokhova

17  and three or four people at Cambridge.  The issue there is

18  whether or not the Court can exercise jurisdiction over

19  defamation that occurred between foreign citizens in a

20  foreign country.

21        I'm not asserting that the Court doesn't have

22  personal jurisdiction over her for any other purpose, only

23  that one narrow issue of the counterclaim.  So there's no

24  question that the Court has personal jurisdiction over her

25  for his time-barred counterclaim about the book.  The only

108

```
 1   question is whether there's personal jurisdiction for the
 2   claim over communications that are exclusively between
 3   citizens of a foreign country taking place in a foreign
 4   country.  And I think that's a legitimate issue whether they
 5   can claim any kind of claim on those facts.
 6            But it's a very narrow issue tied to one paragraph
 7   of the counterclaim.  And we're blowing it all up into, as
 8   Mr. Reed wants to do with everything, you can see everything
 9   is related to everything, so it's all relevant, even though,
10   in actuality, the amount of discovery he's asking for on
11   what should be narrow claims is ridiculous.
12            THE COURT:  I'm not sure -- I don't think it would
13   be a huge ask, but I also just don't see any real tie.  I
14   don't think it really -- I don't think there's an issue
15   about true diversity here.  I'll deny the passport.
16            MR. REED:  Your Honor, can I have leave to inquire
17   about it at her deposition?
18            THE COURT:  Yes.  I think, you know, it's fair in
19   a deposition if you want to ask her, I suspect which is
20   really where you want to go, which is her travel history and
21   things of that nature.
22            MR. REED:  And that's a roadmap, literally.
23            THE COURT:  And I think you can ask about it.  I
24   just don't know that there's enough of a nexus right here,
25   right now to order her to turn over her passport, which, you
```

109

```
1    know, can have a lot of very private information entered
2    that's completely -- you know, travel.  It's completely
3    outside the scope of this cause of action.
4              So that brings us to 37.  "All documents
5    containing communications by Russians by or to" -- yeah,
6    that's --
7              MR. REED:  I think that's subject to your prior
8    Russian ruling.
9              THE COURT:  Right.
10             MR. REED:  And 18 [sic] is -- asks for
11   documents --
12             THE COURT:  I'm sorry, 38?
13             MR. REED:  I'm sorry, 38.
14             MS. GORDON:  I think this is subsumed under at
15   least one of the earlier ones already.
16             MR. REED:  It is, based on your prior description.
17             THE COURT:  Okay.
18             MR. REED:  So I withdraw it under the assumption
19   it's covered.
20             THE COURT:  And 39.
21             MR. REED:  I think that is, in substance, your
22   prior limitation on Russians to Russian government.
23             THE COURT:  40.
24             MS. GORDON:  Your Honor, I respect the Court's
25   ruling limiting it to representatives or agents of the
```

110

1    Government, but I think the subjects here, some of them are

2    off limits, too.  We've got *Lokhova I* here, the passport

3    issue we just discussed.

4              MR. REED:  I don't mind withdrawing the passport.

5    These are all otherwise things that are described in her

6    book about her relationship with Russia, except for D and E,

7    which we've already covered.

8              MS. GORDON:  But B is about *Lokhova I.*

9              MR. REED:  Yes.

10             MS. GORDON:  And so is C.

11             MR. REED:  But she's also -- it's her -- it's in

12   the book.  There's nothing in here that's not in the book

13   with respect to A -- I'm sorry, B or C.  That's, indeed --

14             THE COURT:  We're just going to put a period after

15   Russian government.

16             MR. REED:  Okay.

17             THE COURT:  And to the extent that there is a

18   dispute about whether or not there is a communication that

19   involves Ms. Lokhova and any member of the Russian

20   government, just frame it and try to resolve it.

21             MR. REED:  And --

22             MS. GORDON:  And, Your Honor, this may be --

23             MR. REED:  -- perhaps the best way to limit it is

24   if I'm permitted to inquire at a deposition.  If there's an

25   answer that is responsive, then, you know -- or refused, the

                                                           111

```
 1    Court can address it.
 2              THE COURT:  I think that's fair.
 3              MS. GORDON:  Your Honor, I was going to say, this
 4    may be one of, if there are some, where there are no
 5    documents that satisfy this request.
 6              This is part of this absurd assertion that somehow
 7    she's a Russian spy and is in communication with the Russian
 8    government about Mr. Halper and all these other things, and
 9    this is all nonsense.
10              THE COURT:  And if there are no documents, it
11    makes it easy.
12              MS. GORDON:  This is -- I object.  Maybe I'm not
13    being super clear on that.
14              These interrogatories and document requests of
15    this kind are, to me, the equivalent of when did you stop
16    beating your wife.  This is what this discovery is like.
17    When did you start being a Russian spy, when did you stop
18    being a Russian spy, how many times did you talk to the
19    Russian government about my client.  I think this is outside
20    the bounds of permissible discovery.
21              THE COURT:  I understand.  And the -- and we're
22    giving Mr. Reed a little bit of leeway here, you know.
23    Again, we're trying to draw that line in what seems to be
24    ever-moving sand.  But I think there's enough to process the
25    discovery, and then you can decide what motions, if any, you
```
                                                              112

1  want to file at that point, how much is relevant for trial

2  purposes, how it isn't.

3          This is one step in an ongoing step -- or an

4  ongoing process to make sure that if this case has to be

5  tried -- and, again, I still hold out some hope that, you

6  know, the parties can mediate or we can get there.  Maybe we

7  can, maybe we can't.  But if the case ultimately has to go

8  to trial in whatever form or fashion, whatever claims are

9  left, whatever counterclaims are left, that --

10          MS. GORDON:  I just want to make sure --

11          THE COURT:  -- the trial itself is clear.

12          MS. GORDON:  I understand.  And from a litigator's

13  perspective, I'm totally on board with what the Court is

14  saying.

15          But I would like to convey to the Court that

16  Ms. Lokhova is deeply offended, deeply offended by a large

17  number of the document requests and the last four or five or

18  six of those interrogatories.

19          Because this is the defendant that she's suing for

20  falsely calling her a Russian spy and a paramour of the

21  former director of the Defense Intelligence Agency.  Right.

22  And now, because he's killed her book deal, and she has the

23  temerity to sue him for that, now suddenly we're back to

24  prove that you're a Russian spy.  I want to convey to the

25  Court --

113

```
 1              THE COURT:  I understand, and Ms. Lokhova is --
 2    you know --
 3              MS. GORDON:  She's very upset.
 4              THE COURT:  This is why this case should settle,
 5    right, because everybody gets emotional, and everybody gets
 6    upset.  And the reality is that the more the parties can
 7    find terms on their own ground as opposed to having a judge
 8    or a jury resolve them, things are better.  But I understand
 9    that this is an emotional case, and a sad case and an
10    expensive case for all the parties.  I appreciate that.
11              And, you know -- but, again, we all come back to
12    the circular question of, in a defamation case, how many
13    layers of the onion do you peel back between what somebody
14    said to determine the truth or falsity of that fact, of that
15    statement that kind of carries through.  Which, at the end
16    of the day, makes it that much more important why the claims
17    and counterclaims have to be as specific as possible, as
18    narrowly tailored as possible.
19              So, you know, those are all the different factors
20    that have been thrown in to make this a challenging place
21    to -- or a challenging case to draw the lines.  Right.
22              So I understand Ms. Lokhova is very emotional
23    about this case, or very, very invested about this case.  I
24    understand that Mr. Halper is very invested about the case.
25    And, you know, we're trying to navigate everybody's
```

                                                              114

 1    interests as fairly as we can.

 2              All right.  So that brings us to 40.

 3              MR. REED:  Yes.  And for time sake, I will tell

 4    the Court I think that 40, 41, and 42 are duplicative,

 5    arguably, or become duplicative of 39 as modified by the

 6    Court.  And so I would withdraw those under the

 7    understanding that if there's responsive information, it

 8    will be produced in 39, and I will be able to --

 9              MS. GORDON:  I'm sorry.  Which numbers are we

10    talking about?  40, 41 and 42?

11              THE COURT:  Yes.

12              MR. REED:  Yes.  40, 41 and 42.

13              THE COURT:  All right.  So that brings us to 43.

14              MR. REED:  43.  In 43 --

15              THE COURT:  We're dealing with Ms. Lokhova's

16    father's shipping business.

17              MR. REED:  Yes.  And that's based on the fact that

18    the -- they've raised his -- the shipping business as an

19    issue with respect to a -- an FBI document which alleges

20    that -- which they contend says that Mr. Halper identified

21    her father as being a Russian shipping oligarch.  That's in

22    the amended complaint.  It's in I think even the "amended"

23    amended complaint.  And, therefore, we submit that that puts

24    at issue whether her father is, indeed, a shipping oligarch,

25    and that's why this --

                                                              115

```
1              THE COURT:  All documents relating to a shipping
2    business seems overbroad.  Even limited documents would be
3    in her possession about his shipping business.
4              MS. GORDON:  The other thing is we're not putting
5    it in issue, Your Honor.  Paragraph 50 is saying that
6    Mr. Halper made these allegations about Ms. Lokhova to the
7    Bureau, and then the -- one of the agents, Mr. Barnett, when
8    he was closing out the case, noted that they had
9    investigated Ms. Lokhova and had found no derogatory
10   information to substantiate the allegations that Mr. Halper
11   made about her.
12             And so the purpose of including this is to show
13   that -- it's showing the allegations that were made about
14   her that were deemed false by the FBI.  So we're not putting
15   her father's shipping business into issue.  The shipping --
16   father being a Russian oligarch is one of the false
17   allegations that Mr. Halper is making.
18             THE COURT:  Yeah.  If it's your position that
19   that's one of the false allegations that he was making -- is
20   it --
21             MS. GORDON:  But it's not one of the ones we're
22   suing on because it was covered by *Lokhova I.*
23             THE COURT:  That was my next question.
24             MS. GORDON:  Right.
25             THE COURT:  If it's not in the issue that they're
```

                                                              116

```
1    raising, then it's not going to be a factual issue when you
2    speak to the jury, and I don't think it's relevant.
3            But I make that ruling based on counsel's
4    representation that it's not something that is principally a
5    part of their theory, and I don't think it's a part of the
6    counterclaim.
7            MR. REED:  It's part of the claim.  It's on
8    paragraph 36 of the amended complaint.  It's an excerpt.
9            THE COURT:  I understand.  I remember reading it.
10           MR. REED:  Okay.
11           THE COURT:  I remember reading it.  I think --
12   again, I think that that's part of the broad swath that was
13   taken in the earlier paragraphs in the amended complaint,
14   but, you know, we are -- we're focusing on the issues that
15   the case is going to be tried on.  We're focused on the
16   issues as narrowed by Ms. Gordon.  We're focused on the
17   issues that are properly discoverable related to the claim
18   that's going to be tried.
19           MR. REED:  Right.  So is it --
20           THE COURT:  Put it this way:  I don't see the jury
21   ever seeing that -- that -- that communication.  All right.
22   It's just not going to be relevant to anything she's going
23   to present.  I don't think it's going to be relevant to
24   anything you're going to present.
25           I don't think her father's shipping business,
```

117

1    unless there's some other tie that I'm missing that's
2    connected to your counterclaim or plaintiff's claim, I'm
3    going to sustain that objection.
4            MR. REED:  Okay.  44 relates to her father loaning
5    money for her litigation.  There was a media report that her
6    father loaned her $2 million to prosecute her employment
7    discrimination case, and we'd like to find out if her father
8    subsidized either *Lokhova I* or *Lokhova II*.
9            MS. GORDON:  I, again, will say, how people
10   finance their litigation is irrelevant to the actual
11   litigation issues the jury has to decide.  This is
12   irrelevant.
13           THE COURT:  I think loaning money from a father to
14   a daughter about whether or not she prosecutes this case or
15   how she prosecutes this case, I'm just not sure that that's
16   something that is properly discoverable.  And I think I gave
17   you a little more latitude in terms of other funding
18   sources.  I can see that there's a path to a -- perhaps a
19   line of impeachment there, but I just don't see it from a
20   father to a daughter.
21           MR. REED:  Well --
22           THE COURT:  Similarly, I think 45 is overly broad.
23   If Ms. Lokhova is talking to her father about the pending
24   litigation, I'm -- it may not be privileged, but I can tell
25   you as a father of a daughter, it should be.  I think that's

                                                            118

1   a little -- I think -- I'm going to sustain the objection to

2   45 as well.

3           MR. REED:  46 I'll just withdraw for the time

4   being.

5           47, same thing.

6           MS. GORDON:  I'm sorry.  The same thing as in the

7   defendant is withdrawing it?

8           MR. REED:  Yeah, for the time being without

9   prejudice for renewal.

10          48, I think the Court's *Lokhova I* ruling applies

11  to half that.  But I also think that monies obtained from

12  fundraising for this litigation I think are also permitted.

13          MS. GORDON:  Again, I think it's irrelevant.  The

14  Court's earlier ruling had to do with fundraising based off

15  of talking about Mr. Halper.  So to the extent that he wants

16  to argue that, well, she's using my name to raise money and

17  that's really why she's writing the book, or that's really

18  why she's filing the lawsuit, okay.

19          But whether she's getting -- whether she's doing

20  fundraising of some other kind in order to pay for the costs

21  of this litigation, I just don't see how that's relevant to

22  the litigation.  Most plaintiffs are in the position

23  nowadays where they have to do some kind of fundraising to

24  pay for costs.

25          THE COURT:  How would this -- I assume that this

                                                            119

```
1     is for impeachment purposes; right?
2              MR. REED:  Yes.  Among others.  But, yes, that's
3     the most obvious to me.  She's making money off of bringing
4     lawsuits outside of the lawsuit itself.  And, you know, she
5     has --
6              MS. GORDON:  That's not what this asks for,
7     though.  It asks for questions obtained from fundraising for
8     the litigation.
9              MR. REED:  Right.  But I mean --
10             MS. GORDON:  Not that she's --
11             THE COURT:  If someone -- you know, take it
12    outside the -- maybe this is an imperfect analogy, but if
13    you take it outside the facts of this case, if somebody goes
14    out on the street and says -- you know, they start
15    collecting money because they want to -- you know, they want
16    to initiate a lawsuit against the State of Virginia to clean
17    up the Chesapeake Bay, right, and there's -- and there are
18    third parties funding that --
19             MS. GORDON:  They set up a GoFundMe.
20             THE COURT:  They set up a GoFundMe account, right.
21             MR. REED:  That's what happened here.
22             MS. GORDON:  So what --
23             THE COURT:  So why is that -- why would that lead
24    to a proper avenue of impeachment?  Is there --
25             MR. REED:  Because the person -- the person is
```

                                                                120

1    raising money using the lawsuit as a reason for raising the

2    money, and at least in the instance of *Lokhova I,* for

3    America's lawsuit.

4              THE COURT:  But she didn't know that when she

5    was -- I mean, you can't pin that.  I mean, that's why we

6    have a process.  Right.  She raised money, she initiated the

7    lawsuit, you know, the Court ruled against her.  I mean, you

8    never know what's going to happen until it happens.

9              MR. REED:  True.  But --

10             THE COURT:  I mean, you know, they claim that your

11   counterclaims are meritless.  Well, they're not meritless

12   until --

13             MS. GORDON:  Judge Brinkema says so.

14             THE COURT:  A judge says they are.  Right now,

15   they're alive.

16             MR. REED:  I don't have a GoFundMe site, Your

17   Honor.

18             MS. GORDON:  That's because he's a defense lawyer

19   at a firm, not a plaintiff's lawyer.

20             THE COURT:  All right.  So I'm having -- I'm

21   having a hard time making the connection.

22             If there is -- if there's an allegation that

23   the -- that there are third parties out there that are

24   funding this suit for some improper purpose or for some

25   other -- you know, then there has to be something more

                                                           121

```
 1    than -- you know, there has to be some factual predicate for
 2    that, right, other than just a --
 3              MR. REED:  How about simply allowing me to probe
 4    the issue with respect to developing additional facts at a
 5    deposition?
 6              THE COURT:  I'm not -- look, I mean, the -- what
 7    you ask in the deposition, it seems to me that the stripes
 8    are going to be a little wider there.  Right.  And, you
 9    know, if you want to ask a question in the deposition about
10    it, and you may object, you may not object.  If you do, I
11    don't see why there wouldn't be an answer and we'll resolve
12    the objections, you know, to the deposition in due course.
13              But, you know, part of this is, I am mindful about
14    the volume of discovery, too, that has to be provided.  And
15    I just want to make sure that we are -- we're keeping
16    that -- that issue in the forefront as well.
17              So I'm going to deny that.  But obviously it's
18    without prejudice.  If something comes up in the deposition,
19    if there's some reason to -- we have plenty of time.  As
20    Ms. Gordon says, there's a lot of time between now and
21    December 9th.
22              MS. GORDON:  That's what I think.
23              THE COURT:  We can revisit the issue.
24              I will tell you, Ms. Gordon, I spend a lot of my
25    days talking to lawyers who say, oh, my goodness, the final
```

122

1    pretrial is in two weeks, we need another month, and

2    unfortunately telling them no, so --

3              MS. GORDON:  I don't expect to ask.  I didn't ask

4    to begin with.  The Court sua sponte sent the schedule.  I

5    did not ask for it to be extended.  I only asked for

6    leave -- I only asked for these dates here to be extended.

7              THE COURT:  I understand.  I understand.

8              MR. REED:  So I think that carries us to the last

9    one.  46, 47, 49 fall under that same rubric, leaving only

10   50, which is mercifully the last one.

11             MS. GORDON:  The last one of the ones I have a

12   formal objection to only.

13             THE COURT:  So I think we've made our way through

14   it.

15             MS. GORDON:  49 is out, is that what happened?

16             MR. REED:  Yes.  It's subject to development.

17             THE COURT:  All right.

18             MS. GORDON:  I will say for the record that I

19   think it is irrelevant who funds the litigation, but if the

20   defendant is going to inquire in deposition, then I am also

21   going to ask his client in his deposition who is funding his

22   defense.  Because if we're going to go down this absurd

23   road, then I want answers to that question.

24             THE COURT:  What's good for the goose is good for

25   the gander, one famous philosopher said.

                                                              123

1            All right.  So I understand you all have -- the

2    deposition is currently scheduled for the 6th, subject to --

3    I understand you have -- Judge Brinkema is reviewing that.

4    Is that this Friday or -- I thought it was this Friday.

5            MS. GORDON:  It is set for this Friday.  And we

6    had a discussion before we sat down with Your Honor.  I was

7    always under the impression, and Your Honor has referred to

8    it a couple of times, that -- for discovery matters that

9    there's a one-week motion procedure here that if you file by

10   5:00 on Friday --

11           THE COURT:  It's the local rules.  It's in our

12   rules.

13           MS. GORDON:  -- we can be heard the following

14   Friday.

15           Now, I will say, Your Honor mentioned that last

16   time we were here, and I can't actually find that in the

17   local rules.

18           THE COURT:  I'll have my law clerk, who is the

19   smartest guy in this courtroom --

20           MS. GORDON:  I inquired from the clerk.  Because I

21   practice in Fairfax, too, and there clearly is a one-week

22   motion and a two-week motion there.  And I always thought

23   this court, for discovery matters and objections for

24   discovery, ruled it's a one-week motion procedure.

25   Technically I didn't find it in the rules, but I did find in

                                                           124

 1    the handbook that the Court has written for pro se litigants

 2    that there's a reference that says that if you file by 5:00

 3    on Friday, you can be heard, I think on a discovery matter,

 4    the following.

 5              THE COURT:  It's the practice here.  Henry, can

 6    you grab the local rules off my desk?

 7              THE LAW CLERK:  It's actually in the Rule 16

 8    order.

 9              THE COURT:  Oh.  It's in the Rule 16 order.

10    That's right.  It's in the scheduling order.  Not the

11    scheduling order, the discovery order, Rule 16.  I

12    apologize.  That's right.

13              MS. GORDON:  Okay.

14              THE COURT:  As I said, he's the smartest guy in

15    the courtroom.

16              MS. GORDON:  I should have called you.

17              THE COURT:  And the -- Rule 16, the practice is

18    Friday by 5:00 is -- the motion is filed.  The following

19    Wednesday by 5:00 the response is filed.  Any reply brief,

20    which is oftentimes not necessary or not needed, but a short

21    reply brief can come in midday Thursday, and then it's

22    docketed for Friday.

23              Now, obviously we ask the parties to meet and

24    confer beforehand.  We ask the parties to make sure that

25    everybody's available on Friday.  It would be very rare that

                                                              125

1    the Court's not available to sit on Friday.  If for some

2    reason I'm not and there is a -- and there's a sense of

3    urgency to the motion, we'll try to advance it, as we did

4    this, as opposed to keep the parties waiting.

5             MS. GORDON:  So in the interest of being fair to

6    the defendant, after we left here on Wednesday, I filed such

7    a motion, and it was noticed by me and then by the clerk for

8    two days from now, Friday.

9             I appealed Your Honor's rulings about the

10   deposition date and about the production, but not these

11   objections because we were pursuing those with this Court.

12            So I noticed that for this coming Friday on the

13   issue about the deposition, and the clerk set it for Friday.

14   That would have been pursuant to the schedule in the rule.

15   It would have meant that Mr. Halper would have needed to

16   have filed by 5 p.m. today, which, of course he didn't

17   because he's here with us.

18            So I would solicit the Court's assistance or

19   suggestion.  I don't want to give up the hearing date that I

20   have for Friday.

21            THE COURT:  That's really -- that's

22   Judge Brinkema's call.  I mean, once it's up -- if

23   Judge Brinkema is handling the motion, she's extraordinarily

24   accommodating, and she is very -- but I am not in a position

25   to make a scheduling issue.

                                                              126

1              MS. GORDON:  Right.  I wasn't asking for a ruling,

2    rather more of a suggestion perhaps.

3              Was the Court going to address the deposition date

4    or not?

5              THE COURT:  No.  I mean, look, my ruling was we're

6    going forward on the 6th, as we discussed last time.  Your

7    objection principally, as I recall, was that there was not a

8    true meet-and-confer and that the date was set.  But my --

9    but I also recall you representing that there was no reason

10   why your client couldn't be here, that you're in a position

11   to prepare your client, and that we were going to try to

12   expedite the discovery process or these discovery decisions

13   or discovery disputes so that counsel could be in a position

14   to review the discovery prior to the deposition.

15             MS. GORDON:  Right.

16             THE COURT:  I do think that -- and I was somewhat

17   moved by Mr. Reed's argument that, you know -- first of all,

18   an early deposition of the plaintiff, I think it's the

19   party -- or the parties need to decide themselves what's

20   best for their clients and what's best for their case.

21             The -- but I also -- given the fact that you do

22   have a dispositive motion pending before Judge Brinkema, it

23   does seem to me that Mr. Reed's argument that an early

24   deposition of your client in order to ram out the record for

25   that dispositive motion seems entirely appropriate.

1              In addition, you know, you had other scheduling

2    issues that made it difficult.  I mean, it wasn't a question

3    of putting it off a week or a short period of time.  Right.

4    You were unavailable for an extended period of time.  It

5    would have backed us up, as I recall, into maybe October.

6              MS. GORDON:  Late September/early October.

7              THE COURT:  Late September/early October.

8              MS. GORDON:  I don't find that at all

9    unreasonable.

10             THE COURT:  I understand.  Look, these are -- I

11   understand you don't.  And these are oftentimes issues over

12   which reasonable minds can differ.  But I think given those

13   facts, given those sets of circumstances, my feeling was it

14   was certainly appropriate and -- to move forward with

15   plaintiff's deposition now.

16             MS. GORDON:  So to answer your question then, it

17   is set for the 6th, and I have appealed that ruling to

18   Judge Brinkema and am set to be heard on that issue on

19   Friday morning, this Friday.

20             THE COURT:  Right.

21             MS. GORDON:  So with that being said, what would

22   the Court propose I do in terms of the other thing I

23   appealed to her, to the District Court, was the question of

24   when am I producing these documents now that the Court has

25   made rulings on the objections.

                                                           128

```
1              THE COURT:  Well, I'm going to -- I'm going to
2    resolve that issue now.  But like everything else, it is
3    reviewable by Judge Brinkema.
4              MR. REED:  Your Honor.
5              THE COURT:  I'm sorry, go ahead.
6              MR. REED:  Your Honor, I just want to clarify for
7    the record something.
8              After you ruled last Wednesday, opposing counsel
9    filed a stay and objection appeal, essentially, on Friday,
10   and -- without asking me about it and without asking me
11   about noticing it.  And she apparently noticed it for this
12   Friday.
13             I am under the impression that I -- under the
14   rules, I would have normally 14 days to respond, and the
15   noticing of the deposition sort of ex parte is curtailing my
16   time.
17             But I -- at no point was I ever under the
18   impression that I had to respond in three days to her motion
19   and -- by 5:00 today.  And there's -- there's nothing in the
20   rules that I have seen that gives a party a right to notice
21   a hearing to -- to eliminate the opportunity to respond.
22             THE COURT:  I hear you.  And the order deals --
23   and we have to stay faithful to the plain language of the
24   order.  It does not apply to the District Court; it applies
25   to magistrate judges, it does not apply to District Court
```

```
 1    judges.
 2              MR. REED:  That's my understanding.
 3              THE COURT:  So specifically, the order reads as
 4    follows -- and this is intended to resolve discovery
 5    disputes or jurisdictional disputes or things that the
 6    parties need answers to quickly that are not dispositive of
 7    the case.  Right.
 8              So the order specifically says:  "In order to
 9    provide for the prompt resolution of non-dispositive matters
10    to be heard by the assigned magistrate judge" -- so it deals
11    just with me -- "a non-dispositive motion may be filed no
12    later than 5 p.m. on a Friday and noticed for a hearing at
13    10 a.m. on the following Friday.
14              Under this expedited schedule, a response brief
15    must be filed no later than 5 p.m. on the following
16    Wednesday, and any reply briefs should be filed as early as
17    possible on Thursday to give the Court time to review all
18    pleadings before the hearing."
19              So, you know, this applies to us.
20              MS. GORDON:  I had understood the practice was
21    that it applied also to appeals from a magistrate's ruling
22    to the District Court.  I may be wrong about that, but
23    that's --
24              THE COURT:  For that, you would have to consult
25    the clerk's office or Judge Brinkema's chambers.
```

```
1              MS. GORDON:  Right.

2              THE COURT:  I do the best I can with our issues

3    down here.

4              MS. GORDON:  Right.

5              THE COURT:  If people want to appeal those issues

6    on a clear -- you know, it's clearly erroneous standard,

7    the -- that's -- you know, it doesn't bother me at all.

8    Right.  Everybody -- the job is to get it right.

9              MS. GORDON:  It's business, right.

10             THE COURT:  That's the nature of the -- what we

11   do.

12             MS. GORDON:  The clerk did set it after I noticed

13   it, and I --

14             THE COURT:  Well, I think oftentimes the clerks --

15   I think the clerks -- if you notice something, I don't think

16   it's the clerk's responsibility to --

17             MS. GORDON:  No, but they will call you if they

18   think it's not according to the rule.

19             THE COURT:  All I can tell you is this, there is a

20   sense of urgency to this.  We do have the -- if the relief

21   you're seeking from Judge Brinkema is a --

22             MS. GORDON:  In advance of Tuesday, exactly.

23             THE COURT:  -- postponement of a deposition next

24   Tuesday, you're going to have to -- you're just going to

25   have to take that up with Judge Brinkema.
```

```
 1              MS. GORDON:  I agree.

 2              THE COURT:  I can tell you, she is -- if you

 3    practice in this court, she is extremely accommodating.  She

 4    solves problems quickly, directly, efficiently.  So I'm sure

 5    she will be happy to tackle this.

 6              My suggestion would be to get something before

 7    Judge Brinkema with your respective positions as soon as

 8    possible.  I mean, if something is filed, she is aware of

 9    it, and she handles it quickly.  But I'm not in a position

10    where I can really impact how your appeal is.

11              MS. GORDON:  And we weren't asking you to do that.

12    I was struck by the fact that you had referenced twice now

13    it was in the rules, and since I couldn't find where it

14    was --

15              THE COURT:  I'm sorry.  It was my mistake.

16              MS. GORDON:  No, I'm --

17              THE COURT:  It's actually in the order.

18              MS. GORDON:  I'm happier you did because I was

19    struggling to find what your reference was to.

20              THE COURT:  The -- but now as to the -- and you

21    also have -- my understanding is Judge Brinkema has the --

22    has oral arguments scheduled for the motion to dismiss for

23    the following Friday.

24              MS. GORDON:  On the following Friday, yes.

25              THE COURT:  Right.
```
                                                              132

```
 1              MR. REED:  Right.  And we --

 2              THE COURT:  So let me ask you this -- I have to

 3    take just a quick break.  Let me ask -- let me see if we can

 4    take maybe a five-minute break.  Let me ask the parties to

 5    see if you can take those five minutes and -- because I

 6    assume your client is already scheduled to be here; correct?

 7              MS. GORDON:  I do not know the answer to that.

 8              THE COURT:  Okay.

 9              MS. GORDON:  I don't know.

10              THE COURT:  All right.  Let's do this, let's just

11    take a quick five-minute break.  I'm going to request that

12    during those five minutes, you all see if there's some

13    common ground you can come to in terms of scheduling.  And,

14    if not, I'm happy to make a decision and enter an order,

15    which you all are more than welcome to have Judge Brinkema

16    review or appeal, but we are on a short time frame.

17              MS. GORDON:  I think Your Honor already ruled on

18    this on Wednesday.

19              MR. REED:  Yes.

20              MS. GORDON:  I think we both understood that, and

21    that's what I had taken up.

22              THE COURT:  The question being when is the

23    discovery -- when do you have to turn over the discovery?

24              MS. GORDON:  We were waiting for your ruling on

25    that, that's true.
```

                                                                133

```
 1              THE COURT:  That seems to me to be the big issue

 2    now.

 3              MR. REED:  And the discovery technically is due

 4    today.

 5              THE COURT:  Right.

 6              MR. REED:  And I've not heard anything about an

 7    ETA.

 8              THE COURT:  I understand.  So why don't you all

 9    wrestle with that issue.  Give me five minutes or so, and

10    then we'll come back, and we will wrap this up.

11              MR. REED:  Thank you.

12              THE COURT:  Does that make sense?

13              MS. GORDON:  Very well.  Yes.

14              THE COURT:  All right.  Thanks.  We'll take a

15    brief recess.

16                   (A brief recess was taken.)

17              THE COURT:  Okay.  So as we sit here today, we

18    have made the rulings on the discovery disputes, the --

19    obviously defense counsel needs to review discovery prior to

20    the deposition.  I'm assuming counsel has been collecting

21    this information for some period of time?

22              MS. GORDON:  I've been trying to.

23              THE COURT:  I understand.  We all can just do the

24    best we can.

25              So were you able to come up with a schedule, an
```

134

```
 1    agreed-upon schedule?

 2             MS. GORDON:  No.

 3             MR. REED:  Not really.

 4             THE COURT:  All right.  So what I will order is,

 5    plaintiff must provide the discovery as ordered by the

 6    Court, as limited by the Court, by noon-time on Saturday.

 7             MR. REED:  Fine with the defendant.

 8             THE COURT:  I'm sorry?

 9             MR. REED:  Fine with the defendant, Your Honor.

10             THE COURT:  Okay.  Good.  And that gives you I

11    know not a tremendous amount of time, but it gives you a

12    couple of days to digest it and prepare --

13             MR. REED:  I appreciate it.

14             THE COURT:  -- for the deposition.

15             Obviously all of this is -- you know, we're kind

16    of running on dual tracks.  Right.

17             MS. GORDON:  Right.

18             THE COURT:  And if Judge Brinkema resets these

19    dates, if Judge Brinkema, you know, sees things differently,

20    then obviously that controls the parties' calendar.

21             MS. GORDON:  And also for the record I object to

22    this because I -- for the reasons I've already said.  And

23    one of the two things I did appeal to the District Court was

24    this provision of anticipating that Your Honor would have to

25    rule on this today, was the provision of documents in
```

                                                                135

```
 1    advance of what I think is an unduly early set deposition.
 2    So --
 3              THE COURT:  I understand.
 4              MS. GORDON:  I hear the Court's order, and I'll
 5    take it up with Judge Brinkema, and then we'll see what
 6    happens.
 7              THE COURT:  I think you've made a -- I think
 8    you've made a perfectly clean record for cabining it up.
 9              I would suggest that -- that to the extent that
10    you want to -- because we just -- time just dictates it.
11    Right.  But to the extent you can get something before
12    Judge Brinkema -- Judge Brinkema reads everything before she
13    takes the bench -- I would -- I would suggest you just try
14    to do it as soon as possible.  I don't need to hold you here
15    any longer.  I know you have things to do.  And I'll be
16    interested to see where things stand on Friday.  And, beyond
17    that, I suspect we will be seeing each other again at some
18    point in the near future.
19              Again, I appreciate the work that counsel is
20    doing.  I know that this -- I know that both of you have
21    clients to represent.  I think both of you are representing
22    your clients extraordinary well.  I know your clients feel
23    very passionately about this case, about the claims and the
24    counterclaims, and sometimes it's hard as lawyers to manage
25    those issues, but we will all get through this, and we'll
```

                                                              136

1    all plod through as best we can.  But I appreciate how

2    responsive and how professional everybody's been.  And,

3    again, we'll handle these issues as they come up.

4            With that, is there anything else that we need to

5    tackle today?

6            MS. GORDON:  Nothing from the plaintiff, Your

7    Honor.

8            MR. REED:  Nothing from the defense.

9            THE COURT:  Okay.  All right.  Thank you all very

10   much.  We're adjourned.  Have a nice night.

11           (Proceedings adjourned at 5:55 p.m.)

12           ----------------------------------

13   I certify that the foregoing is a true and accurate

14   transcription of my stenographic notes.

15                          *Stephanie Austin*
                            _____

16                          Stephanie M. Austin, RPR, CRR

17

18

19

20

21

22

23

24

25

                                                        137